# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| SWIFT AIR, LLC, | Case No.: 2:12-bk-14362-DPC |
| Reorganized Debtor. | Adversary No. 2:14-ap-00534-DPC |
| MorrisAnderson & Associates, Ltd., Litigation Trustee for the Reorganized Debtor, | **UNDER ADVISEMENT ORDER** |
| Plaintiff, | |
| v. | **[NOT FOR PUBLICATION]** |
| Redeye II, LLC, A Connecticut limited liability company; Briad Development West, LLC, a New Jersey limited liability company; Jerry Moyes and Vickie Moyes, husband and wife; Jerry and Vickie Moyes Family Trust; Swift Aircraft Management, LLC; Interstate Equipment Leasing, LLC, a Delaware liability company; SME Steel Contractors, Inc., a Utah corporation; Swift Aviation Group, Inc., an Arizona corporation; Swift Aviation Management, Inc., an Arizona corporation; Swift Aviation Sales, Inc., an Arizona corporation; Transjet, Inc., a North Carolina corporation; and J. Kevin Burdette, | |
| Defendants. | |

# Table of Contents

**INTRODUCTION** ......................................................................................................... 1

I.   **JURISDICTION** ............................................................................................... 3

II.  **BACKGROUND** ............................................................................................... 3

A.   Moyes' Business Interests ............................................................................ 3

B.   Moyes Enters the Air Transportation Business ........................................... 4

C.   The Business of Moyes' Affiliates and Amounts They Owed Swift at the Transaction
Date. .............................................................................................................. 5

   1.   Moyes Trust ........................................................................................... 5

   2.   Swift ...................................................................................................... 6

   3.   SAVM ................................................................................................... 6

   4.   SME ....................................................................................................... 7

   5.   Transjet and Transjet Subsidiaries ....................................................... 7

   6.   Services ................................................................................................. 8

   7.   Sales ...................................................................................................... 9

   8.   SAM ...................................................................................................... 9

   9.   SAG ....................................................................................................... 9

   10.  Transpay .............................................................................................. 10

   11.  Risk ..................................................................................................... 10

   12.  Redeye and Briad ............................................................................... 10

   13.  Legacy ................................................................................................. 12

D.   Summary of Debts Owed to Swift by It's Affiliates at the Transaction Date .................. 12

E.   Debts Owed by Swift to Affiliates at the Transaction Date ............................................. 12

1.    Moyes ........................................................................................ 13

2.    Services ................................................................................... 13

3.    Sales ....................................................................................... 13

4.    Transjet and Transjet Subsidiaries ........................................ 14

F.    Summary of Debts Owed by Swift to Its Affiliates at the Transaction Date ................... 15

III.  **THE TRANSACTION** ................................................................ 15

A.    Lead Up to the Transaction ........................................................ 15

B.    The LOI ................................................................................... 17

C.    Ehrlich's Role in the Transaction .............................................. 18

D.    Ehrlich's Red Flag Email ........................................................... 20

E.    Swift's Financial Statements Just Before the Transaction ................ 23

F.    Summary of the Transaction ....................................................... 24

G.    Transaction Documents ............................................................. 28

H.    The Legacy Transaction ............................................................. 33

IV.  **NEW SWIFT AFTER THE TRANSACTION BUT BEFORE THE BANKRUPTCY** 33

V.  **SWIFT'S BANKRUPTCY** ......................................................... 35

A.    Executory Contracts ................................................................. 36

B.    Post-Petition Financing ............................................................. 38

C.    Saipan Air ............................................................................... 40

D.    Bankruptcy Claims Filed by Moyes' Affiliates and Others ............. 41

E.    Motion Seeking Conversion to Chapter 7 .................................. 42

F.    Confirmation of Plan of Reorganization .................................... 43

VI.  **THE ADVERSARY PROCEEDING** ........................................... 44

A.  Procedural History ............................................................................................. 44

    1.  The Complaint and Dismissal of Causes of Action ....................................... 44

    2.  Denial of Motion for Leave to File Fourth Amended Complaint ................. 46

    3.  Discovery Disputes ........................................................................................ 46

    4.  Motions for Summary Judgment ................................................................... 48

    5.  Bankruptcy Court Jurisdiction and/or Authority .......................................... 50

    6.  Motions in Limine .......................................................................................... 51

B.  The Trial ............................................................................................................. 53

    1.  Plaintiff's Witnesses ...................................................................................... 53

        a.  Spindler ................................................................................................. 53

        b.  Moyes .................................................................................................... 53

        c.  Burdette ................................................................................................. 54

        d.  Huska .................................................................................................... 55

        e.  Forry ...................................................................................................... 58

        f.  Cahill ..................................................................................................... 59

    2.  Defendants' Witnesses .................................................................................... 59

        a.  Conry ..................................................................................................... 60

        b.  Huska .................................................................................................... 64

        c.  Penrod ................................................................................................... 66

        d.  Burdette ................................................................................................. 66

        e.  Moyes .................................................................................................... 70

        f.  Ehrlich ................................................................................................... 71

        g.  Lyon ...................................................................................................... 74

3.    Trial Exhibits ................................................................... 75

C.   Post-Trial ............................................................................ 75

VII. **ANALYSIS OF TRUSTEE'S CAUSES OF ACTION** ....................... 76

A.   Preferential Transfers ....................................................... 76

1.    Legal Analysis .............................................................. 76

2.    Interim MSJ Preference Order ................................... 79

3.    Insolvency .................................................................... 80

a.    Spindler Report. ................................................ 80

(i)    Value of Swift's 121 Certificate .................... 81

•   Income Approach ................................... 82

•   Cost Approach ........................................ 82

•   Market Approach ................................... 83

(ii)    Spindler's Accounts Receivable Adjustment .................... 84

(iii)    Spindler's Payable Adjustment ............... 85

(iv)    Spindler's Conclusions ............................ 86

b.   Lyon's Rebuttal Report ...................................... 87

c.   Spindler Testimony ............................................ 89

d.   Lyon's Report .................................................... 91

e.   Spindler's Rebuttal Report ................................ 93

f.   Lyon Testimony ................................................. 94

g.   Findings Regarding Insolvency ......................... 97

4.    Defenses ..................................................................... 105

a.    Contemporaneous New Value ......................... 105

b.    Subsequent New Value ........................................................................ 108

c.    Transjet Setoff or Recoupment .......................................................... 113

5.    Transferee Liability .................................................................................. 114

6.    Conclusions Regarding Preference Causes of Action ................................ 116

B.    Fraudulent Transfers ........................................................................................ 120

1.    Legal Analysis ......................................................................................... 120

a.    Intentional Fraudulent Transfers ...................................................... 123

b.    Constructive Fraudulent Transfers ................................................... 126

2.    Conclusions Regarding Fraudulent Transfer Causes of Action ................ 128

C.    Breach of Fiduciary Duty ................................................................................ 128

1.    Legal Analysis ......................................................................................... 128

2.    Moyes and Burdette Owed Common Law Fiduciary Duties To Swift ...................... 131

3.    The Swift Operating Agreement Did Not Eliminate Fiduciary Duties Owed to Swift By Moyes or Burdette .................................................................................. 131

4.    The Settlement and Release Agreement Did Not Release Moyes or Burdette From Their Breaches of Fiduciary Duties Owed to Swift ........................................... 133

5.    Moyes and Burdette Were Not "Officers" of Swift .................................... 134

6.    Even If Fiduciary Duties Owed By Moyes and Burdette Were Eliminated By ¶ 7.10 of the Operating Agreement, They Were Still Required to Act In Good Faith ..................... 135

7.    Moyes and Burdette Breached Their Common Law Fiduciary Duties to Swift ......... 137

a.    Moyes and Burdette Disregarded Prudent Advice of Counsel .............................. 140

b.    Moyes Captured the Value of the 135 Related Party Receivables ......................... 143

c.    SAM Retained the 135 Business ......................................................... 145

d.   Moyes Was Motivated to Have New Swift Pay the Debt He Guaranteed on the Transjet Planes ........................................................................ 146

e.   Moyes Benefited by New Swift Assuming $1.2 Million Payable to Transjet........ 146

f.   Moyes Was Motivated to Keep Business Flowing to Services and Transpay........ 146

g.   Moyes Benefited from the Legacy Transaction ....................................................... 147

h.   Moyes and Burdette Gained Indemnities From the Transaction ........................... 148

i.   Moyes and Burdette Sought to Reduce Their Exposure on the Transportation Taxes 150

j.   Moyes and Burdette Cut Swift's 121 Payables Creditors Adrift. .......................... 151

k.   Moyes Enjoyed Tax Benefits From the Transaction ............................................... 151

l.   SAVM's Cash Was Drained By Moyes................................................................... 152

m.   Moyes' Personal Interests Were Served by Ehrlich ............................................... 152

n.   The Existence of Badges of Fraud Further Support a Finding of Breach of Fiduciary Duty. .................................................................................................. 153

8.   The Court Rejects Moyes' and Burdette's Defenses of *In Pari Delicto* and Release ................................................................................................................ 153

9.   Conclusions Regarding Fiduciary Duty Causes of Action ........................................... 155

D.   Damages............................................................................................................................. 158

1.   Preference Damages...................................................................................................... 159

2.   Fraudulent Transfer Damages ...................................................................................... 160

3.   Breach of Fiduciary Duty Damages............................................................................. 160

4.   Interest on Damage Awards .......................................................................................... 161

a.   Interest on Preference Damages................................................................................ 161

b.   Interest on Breach of Fiduciary Duty Damages...................................................... 162

VIII.    **CONCLUSION** ......................................................................................................... 163

**INTRODUCTION**

This case involves a titanic battle between Plaintiff, MorrisAnderson & Associates, Ltd., litigation trustee for the Reorganized Debtor,[1] and Defendants Moyes, Burdette, Redeye, Transjet, Sales, SAVM, SAG, SME, SAM, Vickie Moyes, the Moyes Trust, and Briad. Plaintiff's Complaint in this Adversary Proceeding has been whittled down to six claims for relief. Those causes of action boil down to claims for breach of fiduciary duty and claims seeking to avoid preferential and fraudulent transfers. All these causes of action arise out of a complicated transaction[2] which occurred on December 21, 2011, about six months before Debtor filed its Chapter 11 Proceeding. According to the Plaintiff, Defendants allowed Swift's airline entity to be sold for $100 to Buyers and transferred valuable assets of Swift to the Defendants so Defendants could pay off millions of dollars of Swift's debts to its insiders.

This Adversary Proceeding was commenced on June 27, 2014. After four versions of the Complaint, seven motions for summary judgment, two *Daubert* motions, a stipulated dismissal of five of Plaintiff's causes of action, three discovery disputes, two motions in limine, two questions certified to the Arizona Supreme Court, seven days of trial in which 106 exhibits[3] totaling thousands of pages were admitted, six and one-half hours of closing arguments were heard, one Tentative Order was issued, additional briefing and arguments were supplied, this Court now issues its under advisement decision.[4] The Court entirely denies Plaintiff's fraudulent transfer claims and rules in

---

[1] Unless otherwise defined in this Order, defined terms are set forth in **Attachment 1** to this Order. To the extent this Order is inconsistent with prior orders in this Adversary Proceeding, this Order controls.

[2] Defined as the Transaction.

[3] **Attachment 2** is a list of the exhibits identified by the parties and those exhibits which were actually admitted into evidence at trial.

[4] This Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. To the extent this Court does not have the constitutional authority to enter final judgment on some of the causes of action in this Adversary Proceeding, this Order shall serve as this Court's report and recommendations to the District Court. See Bankruptcy Rule 8018.1.

1

favor of Plaintiff on portions of his causes of action for preferential transfer avoidance and breach of fiduciary duty.

On Plaintiff's preferential transfer avoidance claims, judgment is awarded in favor of Plaintiff and against the following Defendants in the following amounts:

Moyes Trust in the amount of $5,817,857,[5] plus interest;

Transjet in the amount of $1,802,668,[6] plus interest;

SAM in the amount of $5,817,857[7], plus interest;

Moyes in the amount of $9,744,381[8], plus interest; and

Redeye in the amount of $5,228,237[9], plus interest.

The amounts awarded against the Moyes Trust, SAM, Moyes and Redeye on account of the Redeye Receivable and Briad Receivable are each joint liabilities. The amount awarded against Moyes Trust on account of amounts attributable to the SME Receivable is also the joint liability of SAM.[10]

The Court also finds Moyes and Burdette breached their fiduciary duties to Swift. Moyes is liable for breach of fiduciary duty damages in the amount of $12,136,669, plus interest. Burdette is liable for breach of fiduciary duty damages in the amount of $12,136,669, plus interest.[11]

---

[5] This amount reflects the value of the SME Receivable plus the Redeye Receivable plus the Briad Receivable.
[6] This amount reflects the value of the Transjet Receivables transferred to Transjet.
[7] This amount is the § 550(a)(2) liability of SAM for the value of the SME Receivable plus the Redeye Receivable plus the Briad Receivable.
[8] This amount reflects the sum of the SAVM Receivable plus the Redeye Receivable plus the Briad Receivable.
[9] This amount reflects the value of the Briad Receivable plus the Redeye Receivable.
[10] Section 550(d) indicates that a "trustee is entitled to only a single satisfaction" of damages awarded on avoided transferees.
[11] The preference damages and breach of fiduciary duty damages are not cumulative but rather "alternative" damages (to use Defendants' terms in their 11-08-2019 Motion for Reconsideration at DE 543). See also § 550(d).

2

# I.    JURISDICTION

On March 15, 2019, the Court entered its order[12] holding that (1) it has the authority to enter final judgment on Plaintiff's preference claims under § 547,[13] (2) it may only issue a report and recommendations to the District Court on Plaintiff's breach of fiduciary duty claims, (3) as to the Trustee's fraudulent transfer claims against Transjet, the Transjet Subsidiaries, Transpay, SAG and SAM, the Court has authority to enter final judgment and (4) as to all other fraudulent transfer Defendants, this Court has the authority to only issue a report and recommendations to the District Court.

# II.    BACKGROUND

### A.    Moyes' Business Interests

In the 1960's, Moyes and his father Carl formed a trucking company. That company eventually became Swift Transportation. It eventually came to be publicly traded on the New York Stock Exchange as one of the largest trucking carriers in the United States.[14] By 2012, Swift Transportation's revenues exceeded $3 billion per year and it employed tens of thousands of truck drivers and others. At the time of the Transaction which is the subject of this Adversary Proceeding, Moyes was the president of Swift Transportation.

Beyond Swift Transportation, Moyes expanded his business interests over the years to include, among other things, a steel company, an NHL hockey franchise (Phoenix Coyotes),[15] partial ownership of an NBA franchise (Phoenix Suns), and an MLB franchise (Arizona Diamondbacks).

---

[12] See the Court's Order Regarding Authority to Enter Final Orders in this Adversary Proceeding, DE 512, which Order is incorporated herein by this reference. Unless otherwise indicated, "DE" shall refer to the docket entries in this Adversary Proceeding.

[13] Unless otherwise indicated, all section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[14] Swift Transportation is now a part of Knight-Swift Transportation Holdings, Inc. (NYSE:KNX) which heralds itself as "the largest full truckload carrier in North America." See investor.knight-swift.com.

[15] The Coyotes and its affiliates filed bankruptcy in this District on May 5, 2009, at case no. 09-bk-09488-RTB.

3

1      Prior to formation of the Debtor, several of Moyes' enterprises (e.g. SME, Redeye

2 and SAVM) owned airplanes. These planes were used for personal and executive travel.

3 Moyes was and is engaged in numerous other business, civic and philanthropic endeavors

4 but it is his family of air transportation businesses which are the focus of this Adversary

5 Proceeding.

6

7      B.    <u>Moyes Enters the Air Transportation Business</u>

8      In the early 2000's, Interstate was formed by Moyes to manage the corporate planes

9 controlled by Moyes. Interstate acquired a Part 135 Certificate issued by the FAA. This

10 135 Certificate can be operated with 10 or fewer employees. The 135 Certificate was

11 needed to fly the Moyes controlled corporate-type aircraft. Interstate's operations grew

12 to include air transportation for the Suns and Diamondbacks. Along the way, Interstate

13 acquired Sports Jet and obtained an FAA Part 125 Certificate which allowed it to fly larger

14 aircraft (20 + seats and weight over 6,000 lbs.)[16]

15      Hoping to expand further into the business of providing air transportation for sports

16 teams, in 2005 Interstate became Swift[17] and contracted with Pace to use its FAA 121

17 certificate. This 121 certificate enabled Swift to conduct airline operations. However,

18 Swift soon realized it was extremely expensive to tie its airline operations to Pace's 121

19 certificate so Swift applied to the FAA to obtain its own certificate. Swift was eventually

20 successful in obtaining a 121 Certificate at which time it terminated its arrangements with

21 Pace.

22      To operate under its own 121 Certificate, Swift needed at least 35 employees,

23 including what are known in the industry as "5 Wisemen." The 5 Wisemen were needed

24 to occupy the following full-time positions: Director of Safety, Director of Operations,

25

26 [16] See 14 Code of Federal Regulations § 125.1(a).
[17] Trial Ex 017 indicates Swift was formed as an Arizona limited liability company on March 16, 2005.

4

Chief Pilot, Director of Maintenance, and Chief Inspector.[18]  These positions are required of an airline by the FAA to "ensure the highest degree of safety in its operations."[19]  This is not surprising in that a 121 certificate holder is authorized to fly commercial passengers on pre-scheduled flights (as opposed to executive charter flights).  A 121 certificate holder is an airline.  By way of example, American Airlines, Delta Airlines, and Southwest Airlines are all 121 certificate holders.

When Moyes' business interests expanded into commercial air transport, through the efforts of his long-time associate Burdette, he built an infrastructure to support these operations.  **Attachment 3** is an Organizational Chart reflecting the Moyes' family of air transport businesses.  What follows is a brief description of Moyes' air transportation entities and the monies these entities owed Swift and Swift owed them as of December 21, 2011.[20]

C.  <u>The Business of Moyes' Affiliates and Amounts They Owed Swift at the Transaction Date.</u>

1.  <u>Moyes Trust</u>

At the top of the organizational chart for Moyes' air enterprises was the Moyes Trust.  Moyes was the sole trustee of the Moyes Trust.  He and his wife Vickie were co-beneficiaries of the Moyes Trust.[21]  The Moyes Trust owned SAG, SAM, Transjet, Transpay, Risk and SME.[22]  SAG, in turn, owned Swift, SAVM, Services and Sales.[23]  Transjet owned Transjet 1, Transjet 2, and Transjet 3.[24]

---

[18] See 14 Code of Federal Regulation § 119.65(a).
[19] *Id*.
[20] Defined as the Transaction Date.
[21] See the JTPS, DE 463, page 7, § III(1).
[22] See DE 463, page 7, § III(2).
[23] See DE 463, page 8, § III(3).
[24] See DE 463, page 8, § III(4).

5

Moyes loaned money to many of the Affiliates throughout the history of these entities. Cash, goods, customers and services flowed freely back and forth between the Affiliates.

### 2. Swift[25]

Moyes was Swift's president. Burdette was Swift's vice-president. Swift had no employees because it leased its workers from Transpay. Swift owned no planes but it derived its revenue from managing planes owned by other Moyes Affiliates via charter fees, sales commissions, and airplane management fees. To conduct its air transportation business Swift owned the 121 Certificate and the 135 Certificate.

### 3. SAVM

SAVM owned the SAVM Planes. Swift operated and chartered the SAVM Planes under its 135 Certificate and billed SAVM for its efforts. The SAVM Planes were sold in 2009 or 2010, each recognizing losses of over $3.5 million.[26] Moyes was the president of SAVM and Burdette was SAVM's vice-president. SAVM was wholly owned by SAG.

At the time of the Transaction, the balance owed to Swift by SAVM totaled $4,516,144.[27] The SAVM Receivable first appears on SAVM's books in its June 30, 2008 balance sheet and then steadily increased between 2008 through 2010 but then dropped about $84,000 between December 31, 2010 and the Transaction Date. SAVM had ceased

---

[25] The Swift limited liability entity remained intact throughout the course of the events described in this Order but the nature of its business and the ownership of its equity changed dramatically. Readers will note that "Swift" is defined as this entity through the Transaction Date, "New Swift" is this entity from the Transaction Date to the Petition Date, "Debtor" is this entity from the Petition Date to the Confirmation Date, and "Reorganized Debtor" is this entity after the Confirmation Date.

[26] Burdette testimony on February 14, 2019. DE 499.

[27] See DE 463, page 10, § III (34-36 & 38). See also Huska Declaration of October 16, 2018 at DE 381-1, ¶ 9. This amount is defined as the SAVM Receivable.

6

operations by the time of the Transaction Date.[28]  The SAVM Receivable was not guaranteed by Moyes.

SAVM also owed Moyes money at the time of the Transaction.[29] On the Transaction Date, the balance owed to Moyes by SAVM increased by $4,516,144, the exact amount of the SAVM Receivable transferred to Moyes.[30]

### 4.  SME

SME was owned by the Moyes Trust.  Presumably Moyes was its President but the Court assumes Burdette was not an officer of SME as it was a steel construction company, not an aviation enterprise.  SME owned an airplane[31] which was used by SME's executives.  Swift operated and chartered the SME Plane under Swift's 135 Certificate and billed SME for its efforts.

At the time of the Transaction, the balance owed to Swift by SME totaled $589,620.[32]  The SME Receivable was reflected on Swift's books as early as December 31, 2007.[33]  The SME Receivable owed to Swift was not guaranteed by Moyes.

### 5.  Transjet and Transjet Subsidiaries

Transjet was owned by the Moyes Trust.  Moyes was the president of Transjet[34] and Burdette was Transjet's vice-president.  Transjet, in turn, owned the Transjet Subsidiaries.  At various times, each of the three Transjet Subsidiaries owned a Boeing

---

[28] See DE 463, page 11, § III (39).
[29] Prior to the Transaction, pursuant to the SAVM Note, Moyes was owed $14,778,275 by SAVM. On the Transaction Date, Moyes received the SAVM Receivable and the amount Moyes was owed by SAVM on the SAVM Note increased to $19,294,419. *See* Trial Ex. 243. *See also* JPTS, at DE 463, page 11, ¶40.
[30] *Id.*
[31] Defined as the SME Plane.
[32] See DE 463, page 10, § III (32 & 33).  See also Huska's declaration of October 16, 2018 at DE 381-1.  This amount is defined as the SME Receivable.
[33] On December 31, 2007, the SME debt to Swift only totaled $6,063.  See Trial Ex. 022.  However, by December 31, 2008, SME owed Swift $2,937,834.  See Trial Ex. 023.
[34] DE 340-8, page 2 of 9.

737.[35]  Swift operated and chartered the Transjet Planes under its 121 Certificate.  In December 2007, Swift entered into the Transjet Agreements with each of the Transjet Subsidiaries.  The Transjet Agreements permitted Swift to charter or rent the Transjet Planes to third parties.  Swift did so primarily with professional sports teams.  Swift would enter into Charter Contracts with sports teams and collect payments from the teams for the benefit of the Transjet Subsidiaries.  Once a month, Swift was to remit these payments to Transjet Subsidiaries, net of certain taxes and the operational and administrative costs incurred by Swift which were attributable to the Charter Contracts.[36]  For its efforts on behalf of the Transjet Subsidiaries, Swift was to receive a management fee of $25,000 per month plus a commission of 5% of the gross revenue realized under the Charter Contracts.

At the time of the Transaction, the balance owed to Swift by the Transjet Subsidiaries was $1,802,668.[37]  The Transjet Receivables owed to Swift were not guaranteed by Moyes.

After the Transaction, the Transjet Receivables were transferred to Transjet and applied against the Transjet 135 Payable. The Transjet 135 Payable exceeded the Transjet Receivables by the amount of $103,125.[38] The Transjet Surplus was then applied to reduce the amount owed by Transjet to Moyes.[39]

### 6.   Services

Swift's operations were conducted at Phoenix Sky Harbor International Airport in a facility sub-leased from Services.[40]  Services was an FBO which provided fuel and

---

[35] These three Boeing 737's (the 801, 802 and 737DX) are defined as the Transjet Planes.  Transjet 3 eventually sold or gave back to its lender the Boeing 737 identified as 737DX.
[36] DE 340, Ex's 4, 5 and 6.
[37] DE 463, the JTPS at p. 16, ¶ 96.  See also Huska Declaration of October 16, 2018 at DE 381-1, ¶ 17.  This amount is defined as the Transjet Receivables.
[38] This is defined as the "Transjet Surplus."
[39] See Declaration of Forry attached as Exhibit C to DE 381.
[40] See DE 463, page 9, § III (17).

8

maintenance services to Swift, New Swift, the Debtor, the Reorganized Debtor and others. Services was wholly owned by SAG. Moyes was its president. Burdette was Services' vice-president. On the Transaction Date, Services was owed money by Swift on the Services Payable. At the Transaction Date, Services owed nothing to Swift.

### 7. Sales

Sales was engaged in the sales of Brazilian manufactured Embraer aircraft. Moyes was its president, Burdette its vice-president. Sales was wholly owned by SAG. On the Transaction Date, Sales was owed money by Swift on the Sales Payable. At the Transaction Date, Sales owed nothing to Swift.

### 8. SAM

SAM was created by Moyes and Burdette in December 2011 in anticipation of the Transaction. Specifically, SAM was to receive Swift's 135 Business as part of the Transaction and was to thereafter operate that 135 Business. It engaged in no business prior to the Transaction and owed nothing to Swift on the Transaction Date. SAM was wholly owned by the Moyes Trust. Moyes was its president, Burdette its vice-president.

### 9. SAG

SAG owned Swift, SAVM, Services and Sales but had no other assets or employees or business. It was simply a holding company, a "pass through" entity. SAG was wholly owned by the Moyes Trust. Any money or assets or transactions that came SAG's way were passed up to the Moyes Trust or down to SAG's wholly owned companies. At all relevant times, SAG acted as a mere conduit in the Transaction.[41] SAG's president was

---

[41] The Defendants have so stipulated. See DE 472, page 7, ¶ 14. See also, DE 439, Transcript of January 10, 2019 hearing, at page 133, lines 1 – 3. The treatise *Collier's on Bankruptcy* notes that "where a literal application of section 550(a) would permit the trustee to recover from a party who acted merely as a conduit, the bankruptcy court should

Moyes, Burdette its vice-president. At all relevant times, Swift was owed no money by SAG nor did Swift owe SAG any money.

### 10. Transpay

Transpay was a business which leased its employees to many of the Affiliates. For example, since Swift did not have employees, it leased pilots, co-pilots, flight crew, personnel and administrative staff from Transpay, an entity wholly owned by Moyes.[42] Presumably Moyes was Transpay's president and Burdette was Transpay's vice-president. Transpay owed nothing to Swift on the Transaction Date.

### 11. Risk

Risk was an insurance company which provided insurance coverage to Swift and then New Swift in relation to Debtor's 121 Business. Risk is referenced in the Settlement and Release Agreement[43] at Section 2. Risk owed nothing to Swift on the Transaction Date.

### 12. Redeye and Briad

Redeye was owned 50% by Moyes[44] and 50% by Briad. Honigfeld owned Briad. Redeye owned the Redeye Plane. Up to the date of the Transaction, Swift managed, operated and chartered the Redeye Plane under Swift's 135 Certificate.

---

use its equitable powers to prevent an inequitable result." 5 *Collier's* § 550.02[4][b] at 550-23 (16th Ed. 2019). The article, *Mere Conduit*, 93 Am.Bankr.L.J. 475 (2019), suggests that use of the phrase "mere conduit" is misleading, unnecessary and rendered obsolete with the Supreme Court's decision in *Merit Management Group v. FTI Consulting*, 138 S.Ct. 883 (2018). While that may be true, this Court will continue to use the term "mere conduit" because that was the language used by the Court in the Preference MSJ Interim Order and at the December 19, 2018 hearing.
[42] See DE 463, page 8, § III ¶¶ 14 & 15.
[43] Trial Ex. 003.
[44] DE 463, the JTPS at ¶ 18.

10

2 Swift's fees and costs incurred in operating the Redeye Plane were billed to Redeye. Those bills began accruing on June 1, 2007, as a receivable on Swift's books[45] and often went unpaid. These bills mounted up over time to the point that the unpaid invoices totaled $4,174,301[46] on the Transaction Date.[47] The Redeye Receivable owed to Swift was not guaranteed by Moyes.

The fixed expenses of Redeye were to be paid from the net revenue generated by its charter operations (excluding Moyes' and Honigfeld's usage) plus capital contributions to Redeye by Moyes and Honigfeld. Swift incurred variable fees and other costs due to Redeye Plane usage by Moyes and Honigfeld. Moyes and Honigfeld/Briad were each separately billed for their share of Redeye's variable expenses.

In June 2007, Briad began owing an obligation to Swift.[48] The Briad balance due to Swift totaled $1,053,936[49] shortly before the Transaction Date. The Briad Receivable owed to Swift was not guaranteed by Honigfeld. Although the Redeye Receivable and the Briad Receivable built up over a considerable period of time, Swift never threatened Moyes or Honigfeld or their entities to withhold services and air transport until payments were received from them.[50]

---

[45] Huska testimony at trial.
[46] This amount is defined as the Redeye Receivable. See the JTPS, pages 9 and 10, ¶ 26, DE 463. See also Huska Declaration of October 16, 2018. This number is slightly different than Swift's books, but the Court will adopt the amount referenced by Huska.
[47] See DE 463, the JTPS at pages 9-10, § III, ¶¶ 20-26.
[48] Huska testimony at trial.
[49] Defined as the Briad Receivable. See the JPTS, page 10, ¶ 30, DE 463. See also Huska Declaration of October 16, 2018. That declaration reflects a receivable which is $48,318 lower than the JPTS figure.
[50] See DE 463, page 10, § III, ¶¶ 27 & 31.

13.    Legacy

Legacy is another Moyes air transportation entity. It was owned by Moyes and his wife. It owed Swift $3,985,635 as of March 31, 2011,[51] but owed Swift $0 on the Transaction Date.[52]

D.    Summary of Debts Owed to Swift by It's Affiliates at the Transaction Date

At the heart of the Trustee's Complaint are the intercompany receivables[53] owed to Swift at the time of the Transaction and what became of those 135 Related Party Receivables in the Transaction and thereafter. Following is a list of the 135 Related Party Receivables owed to Swift just before the Transaction was consummated:

| Affiliate | Account Receivable Owed to Swift |
|---|---|
| SAVM | $4,516,144 |
| Redeye | $4,174,301 |
| Briad | $1,053,936 |
| SME | $589,620 |
| Transjet Subsidiaries | $1,802,668 |
| Legacy | $0 |
| **Total** | **$12,136,669[54]** |

E.    Debts Owed by Swift to Affiliates at the Transaction Date

The 135 Related Party Receivables owed to Swift just before the Transaction are only part of the story. An additional element in the Transaction was the money owed by Swift to its Affiliates[55] and how these 135 Related Party Payables were dealt with in connection with the Transaction. The 135 Related Party Payables are described below.

---

[51] Trial Ex. 026.
[52] The Legacy Receivable, the Legacy Transaction and the Legacy Claim are discussed more fully in §§ VI(A)(2) and VII(C)(7)(g), below.
[53] Defined as the 135 Related Party Receivables.
[54] This amount is the aggregate balance of the 135 Related Party Receivables plus the Transaction Date balance on the Legacy Receivable.
[55] Defined collectively as the 135 Related Party Payables.

12

### 1. Moyes

Moyes regularly supported Swift's business through loans to Swift. These loans were memorialized by a $15 million Revolving Credit Note dated October 19, 2005.[56] These loans began in October 2005 and continued through October 2007.[57] Swift occasionally made payments on the Moyes Note but, by the Transaction Date, Swift's books reflected that it owed $4,611,227 on the Moyes Note but Huska indicated the total was $4,762,360.[58]

### 2. Services

Through its FBO, Services provided fuel and services to Swift. However, Services did not always receive payments from Swift. The Services Payable built up over time, beginning no later than December 31, 2007.[59] By the Transaction Date, Swift owed Services the sum of $4,576,926.[60]

### 3. Sales

Sales was a remarketer of Brazilian manufactured Embraer aircraft. Sales was formed in the early 2000's. It did not own any aircraft. Sales provided cash transfers to Swift or paid certain obligations owed by Swift. Intercompany transfers by Sales to Swift began no later than December 31, 2007,[61] and built up over time but culminated in a balance owed by Swift to Sales on the Transaction Date in the amount of $502,313.[62]

---

[56] Trial Ex 018 defined as the Moyes Note.
[57] Trial Ex. 019.
[58] The Transaction Date balance on the Moyes Note is reflected in Trial Ex. 028 as "Notes Payable – Jerry Moyes." This differs from the balance described in Huska Declaration at DE 381-1, p. 19 of 40. The Court adopts the amount stated by Huska, namely $4,762,360.
[59] See Swift's December 31, 2007 balance sheet at Trial Ex. 022 which reflects Swift's debt to Services in the amount of $2,335,853.
[60] Defined as the Services Payable. See also Huska Declaration of October 16, 2018 at DE 381-1, p. 19 of 40, ¶ 30.
[61] See Swift's December 31, 2007 balance sheet at Trial Ex. 022 which reflects Swift's debt to Sales in the amount of $500,000.
[62] Defined as the Sales Payable. See Huska's declaration of October 16, 2018 at DE 381-1, page 19 of 40, ¶ 31.

4. <u>Transjet and Transjet Subsidiaries</u>

Through implementation of the Transjet Agreements, obligations were incurred to one another by and between Swift and Transjet and/or the Transjet Subsidiaries. By the Transaction Date, Transjet and/or the Transjet Subsidiaries were collectively owed $1,905,794[63] by Swift.

The Transjet Planes were financed when they were purchased by the various Transjet Subsidiaries. The 801 was financed with Comerica. The 802 was financed with Comerica. The 737DX was owned by Transjet 3[64] and later transferred to Yukon. Yukon then leased the 737DX to Swift.[65] Yukon leased the 737DX for $105,000 per month to Swift on December 14, 2011 in anticipation of Swift's Transaction with the Buyers. Swift posted a $210,000 security deposit. The 737DX leased "ended on or about May 31, 2012."[66] Under § 7.14 of the Purchase Agreement, the Seller was entitled to the security deposit once this six-month lease expired. The 801 Debt and the 802 Debt were guaranteed by Moyes. As of January 1, 2012, the monthly payments on the 801 Debt were $118,936 and the payments on the 802 Debt were $116,154 per month.[67]

---

[63] This amount is defined as the Transjet 135 Payable. See Trial Ex. 241 and Trial Ex. 028. See also Huska Declaration of October 16, 2018 at DE 381-1, page 19 of 40, ¶ 29. That declaration reflects a payable which is a few dollars higher.
[64] See DE 340, Ex. 6.
[65] Trial Ex. 008.
[66] See Conry Declaration, DE 119, page 8, ¶ 21. This is also Trial Ex. 209.
[67] See § III(G), below.

14

F.   Summary of Debts Owed by Swift to Its Affiliates at the Transaction Date

Immediately prior to consummation of the Transaction the following payables were owed by Swift to the Affiliates referenced below.

| Affiliate | Amount Owed By Swift |
|---|---|
| Moyes | $4,762,360 |
| Services | $4,576,926 |
| Sales | $502,313 |
| Transjet (and/or Transjet Subsidiaries) | $1,905,794 |
| **Total** | **$11,747,393**[68] |

## III.   THE TRANSACTION

A.   Lead Up to the Transaction

Swift had two distinctly different lines of business, the 135 Business and the 121 Business.  Its 135 Business was largely focused on flying corporate planes owned by SAVM, SME and Redeye.  When the global financial crisis hit in 2008, Swift's 135 Business took a beating.  Air travel customers dramatically reduced their travel in corporate jets.  Swift's 135 Business had not recovered from this harsh set back by the time of the Transaction.

Swift's 121 Business was much more complicated and required a much bigger infrastructure and financial commitment.  The Moyes Note grew in significant measure due to the need to financially support Swift's 121 Business.  Burdette recognized that Swift's 121 Business generated passenger traffic during the professional basketball and hockey seasons (October to May or June) but Swift's 121 Business expenses continued all twelve months of the year.  Swift's 121 Business losses piled up over the years, especially when Swift lost its contracts after the Arizona Diamondbacks,[69] the Utah Jazz[70]

---

[68] Defined as the 135 Related Party Payables.  See also Huska Declaration, DE 381-1, page 19 of 40, ¶ 32.
[69] The Diamondbacks moved its air travel business to AmericaWest Airlines, then a big team sponsor.  Burdette Testimony, February 14, 2019.  DE 499.
[70] The Jazz started to fly with a carrier that had ties to then NBA Commissioner David Stern.

Case 2:14-ap-00534-DPC    Doc 555    Filed 03/31/20    Entered 03/31/20 15:42:31    Desc
Main Document    Page 23 of 174

and the Phoenix Coyotes.[71]  Swift's losses needed to be covered with loans from Moyes

and some of the Affiliates.  Of course, the fact that millions of dollars were owed and not

getting paid by some of the Affiliates also caused hardship to Swift.  The 2011 six-month

NBA labor dispute was the crowning blow to Swift.[72]  Swift's revenues were greatly

diminished in the third and fourth quarters of 2011.

As of November 30, 2011, Swift's Balance Sheet reflected assets of $14,969,295

and liabilities of $18,229,263 for a net owner's equity of ($3,259,968.)[73]  In view of

Swift's eroding balance sheet and the significant losses Swift had been suffering since the

global financial crisis began in third quarter 2011, Burdette recommended to Moyes that

Swift either be sold or shut its doors.[74]  Although Moyes testified that he had the financial

strength to sustain continued Swift losses and possessed the will to press on, by August

2011, based on the counsel of his air transportation CEO Burdette, Moyes had decided to

sell Swift.  Absent a relatively near-term sale of Swift, Moyes then intended to shut down

Swift and some or all of the Affiliates air transportation entities.

In 3Q2011 or 4Q2011, Burdette met with two potential buyers.  "Shark Tooth

Man"[75] flew in from Hawaii expressing a desire to buy Swift.  He was not taken seriously

by Burdette.  Another potential buyer visited Swift from North Carolina to look at a

possible purchase of Swift.  However, Burdette determined that prospective buyer was

more interested in providing management services to Swift so it could be paid by Swift.

Fortuitous for Moyes, Burdette was contacted in October 2011 by Conry

concerning a possible sale to the Buyers.  Conry was working with Torbert and Stukes

---

[71] Moyes eventually lost his interests in the Coyotes when the Coyotes went through their own bankruptcy beginning in May 2009.  See *supra* FN 15.

[72] The NBA owners began a 161-day work stoppage on July 1, 2011, when its 2005 collective bargaining agreement expired.  The lock out ended December 8, 2011, just a few days before the Transaction Date.

[73] See Trial Ex. 027.  This Balance Sheet, of course, lists assets and liabilities at book value.  The Court fully appreciates this Balance Sheet did not reflect the fair market value of Swift at that time.  See the insolvency discussion in § VII(A)(3), below.

[74] See Burdette's Declaration at DE 258-3, page 5 of 21, ¶ 25.

[75] This fellow was remarkable to Burdette because of his bright orange shirt and shark teeth necklace.

who had very recently acquired Direct Air, the holder of an FAA Part 380 certificate.[76]
Buyers needed an FAA Part 121 Certificate to support Direct Air's commercial passenger
traffic. Burdette testified the Buyers had no interest in Swift's 135 Certificate but were
intrigued to learn that Swift's autumn to early summer sports business cycle dovetailed
nicely with Direct Air's business which principally generated summer travel ticket sales.
Conry and Stukes met with Burdette to discuss a possible purchase of Swift.

After meeting with Burdette, a November 1, 2011 draft letter of intent marked
"*FOR DISCUSSION PURPOSES ONLY*" was sent by Buyers to Burdette.[77] In essence,
this draft letter called for Buyers to acquire 95% of Swift in return for the Buyers'
agreement to pay Swift's trade payables and its unpaid long-term Transportation Taxes.
The Buyers indicated that Swift would retain its 121 Business but not its 135 Business.
Buyers would then merge Direct Air into Swift so it could operate both Swift and Direct
Air under Swift's 121 Certificate. Buyers expected Swift's trade accounts payable to total
$1.6 million and all its Transportation Taxes to total $2.6 million. Buyers also expected
to incur transaction costs of $500,000. Buyers projected the need to infuse $4.5 million
of working capital into Swift. Buyers were viewing their proposed purchase price as
totaling $4.2 million[78] followed by the need to inject an additional $5 million into New
Swift.[79] Like many letters of intent, this November 1, 2011 letter called for a due diligence
period followed by execution of a definitive written agreement.


B. The LOI

The November 1, 2011 draft letter of intent was followed by a letter signed on
November 4, 2011.[80] The LOI set forth the same basic terms as the November 1, 2011

---

[76] Burdette testified Direct Air's FAA Part 380 certificate was insufficient to effectuate Buyers' business plans.
[77] Trial Ex. 054. Burdette testified the handwriting on this Exhibit was Ehrlich's handwriting.
[78] Accounts payable of $1.6 million plus transportation taxes of $2.6 million.
[79] $500,000 of transaction expenses plus $4.5 million in working capital.
[80] Defined as the LOI. Trial Ex. 055.

17

letter except the Transportation Taxes were then identified as totaling $1.8 million. This brought the purchase price down $800,000 to $3.4 million. Buyers were also more specific about the accounts payable they were to pay, noting they would take on only payables due from Swift's 121 Business operations. In lieu of paying the Transportation Taxes on the barrelhead, Buyers proposed providing a personal guarantee to insure the payment of Swift's short and long-term Transportation Taxes. Buyers told Burdette they expected $5 million to be invested in Swift and that money was to come in the form of equity to be infused by Fowler through his entity Spiral.[81]

After learning of Buyers' intent to fold its Direct Air business into Swift's 121 Business and to have $5 million cash injected into Swift, Burdette felt comfortable with the Buyers' purchase proposal. Burdette knew Fowler to be a former NFL football player, part owner of the Minnesota Vikings and an owner of airplanes. Burdette checked up on Fowler a bit and felt he could write a check for his proposed $5 million contribution to New Swift. Burdette met with Fowler. Burdette also met with Conry and Stukes and came to understand Buyers were in a big hurry to purchase Swift so New Swift could begin operating both Direct Air and New Swift under Swift's 121 Certificate. Since Moyes and Burdette were otherwise prepared to shut Swift down, the prospect of a speedy sale of Swift to these Buyers was welcome relief to Moyes and Burdette.

C.   Ehrlich's Role in the Transaction

Upon receipt of the LOI, Swift's and Moyes' lawyer Ehrlich kicked into high gear. Ehrlich is a 40-year lawyer with vast experience in tax, estate planning, commercial transactions, corporate law and mergers and acquisitions. For many years he had represented Moyes and the Affiliates as their outside counsel. Ehrlich was the original

---

[81] Burdette video testimony.

statutory agent for Swift when it was formed in March 2005.[82]  Ehrlich formed many of the Affiliates, served as statutory agent for many of the Affiliates and handled many transactions for Moyes over many years.  Ehrlich was a natural to handle Swift's side of document drafting and communications with the Buyers' counsel, Holland & Knight, a large commercial law firm.

Holland & Knight began the initial drafting of the Transaction Documents but had many diligence requests of Ehrlich following Buyers' execution of the LOI.  Ehrlich immediately got to work for Swift but also for Moyes and all the Affiliates involved in this proposed sale.  Although Defendants' sought to characterize Ehrlich as solely representing SAG as seller in this deal,[83] the Court found that Ehrlich wore many hats in connection with the lead up to what became the Transaction.  Specifically, the Court held that Ehrlich jointly represented Swift and SAG in connection with the Transaction.  The Court ordered Ehrlich to turn over files related to his representation of Swift between January 1, 2008 and the Petition Date.[84]  Surprisingly, Ehrlich apparently also represented New Swift after the Transaction because his February and March 2012 billing statements form the basis of his firm's proof of claim filed on October 23, 2012, in Debtor's chapter 11.[85]

During the lead up to the ultimate execution of the Transaction Documents, Ehrlich's primary contacts at Swift were Burdette, Huska and Penrod.  On November 29, 2011, Ehrlich wrote a detailed email to Burdette itemizing his many concerns about the deal under discussion.[86]  At trial, many of Ehrlich's cautionary points were poo-pooed by

---

[82] Trial Ex. 065.

[83] DE 143 at pages 20 – 27.

[84] DE 182 at page 3, ¶ 3.

[85] The post-Petition Date claim #44-1 filed on the Claims Register by or for Ehrlich totaled $6,072.76 which is the aggregate of a January 10, 2012 bill to SAG for $2,260.56 and bills to New Swift on February 6, 2012 and March 6, 2012 in the amount of $3,812.20.

[86] Trial Ex. 066.  This email is defined as the Red Flag Email.

Burdette.  He testified that Ehrlich customarily acted as if the sky was falling.[87]  Burdette

took the Ehrlich Red Flag Email warnings with a grain of salt.

As Buyers learned more about Swift, its 121 Business, its assets and its operations,

the deal terms began to morph.  This, of course, is not particularly unusual in any

transaction.  However, at trial the Trustee highlighted several bright warning signals.

Specifically, the Trustee painstakingly compared Ehrlich's Red Flag Email[88] with the

actual terms finally memorialized in the Transaction Documents.  The Trustee contends

that Moyes and Burdette ignored Ehrlich's cautionary advice and that their cavalier

indifference supports the Trustee's breach of fiduciary duty claims against them.

### D.    Ehrlich's Red Flag Email[89]

Ehrlich's Red Flag Email runs ten pages and "60" paragraphs long.[90]  A number of

the more interesting cautionary paragraphs are highlighted below together with an

indication of how Burdette and Moyes disregarded many of these warnings in the final

Transaction Documents.

- Ehrlich wanted the Transportation Taxes paid in full at closing.  He was
  concerned Burdette and Huska, as individuals in control of Swift's checkbook,
  could have personal liability for the Transportation Taxes.[91]  Buyers did not pay
  the Transportation Taxes at closing.[92]

- Ehrlich wanted the Swift membership interests transferred from SAG to the
  Buyers only after all payables assumed by the Buyers were satisfied.[93]  In the

---

[87] Burdette Video Testimony.
[88] Trial Ex. 066.
[89] *Id*.
[90] Note this Red Flag Email has 60 numbered paragraphs but none of these paragraphs are numbered 35-43.
[91] Trial Ex. 066, ¶¶ 54 and 57.
[92] As it turns out, New Swift never fully paid the Transportation Taxes but after the Transaction Date it apparently paid approximately six monthly installments of $62,000 as required by the Purchase Agreement.
[93] Trial Ex. 066, ¶ 2.

20

final Transaction, the Buyers accepted the burdens of certain payables but unconditionally received all Swift's membership interests at closing. The Buyers said they wanted this chance to gain discounts from these Swift account payables.

- Ehrlich wanted Buyers to assume responsibility for unpaid personal property taxes but noted Swift only paid those taxes "when caught."[94] While the final language of ¶ 3.14(a) of the Purchase Agreement[95] appears to be drafted according to Ehrlich's wishes, the Trustee highlights that Moyes' and Burdette's "pay when caught" approach to personal property taxes was a shoddy business practice.

- Ehrlich noted that "of course, Swift Air has always had losses."[96] Swift's financial statements bear witness to this observation. This is suggested by the Trustee as a prime motivation for Moyes to unload Swift.

- Ehrlich was concerned about Swift making representations to the effect that it was in good stead with its customers and suppliers "especially given the problems which Swift Air has had in the past."[97] The Trustee suggests this highlights Swift's pre-Transaction financial difficulties.

- Ehrlich questioned why Direct Air's merger into Swift was not a requirement of Buyers' purchase of Swift.[98] Since Burdette testified that combining Direct Air with Swift was an integral component of Buyers' business plan and to the future success of Swift, the Trustee (and the Court) finds it is troubling that the Purchase Agreement did not require this consolidation.[99]

---

[94] *Id.*, ¶ 18.
[95] Trial Ex. 001.
[96] Trial Ex. 066, ¶20.
[97] *Id.*, ¶ 26.
[98] *Id.*, ¶ 36.
[99] See Trial Ex. 001, ¶ 6.8 of the Purchase Agreement at p. 34 where it indicates that AAII "may want to, but shall not be required to, contribute the equity in or assets of [Direct Air] to or merger Direct Air into [New Swift]."

21

- Ehrlich noted the large impact Swift was feeling from the 2011 NBA lockout. In his words "[c]learly the NBA strike is a material adverse change . . ." with respect to Swift's business. No such representation appears in the Purchase Agreement.[100] More important, for the purposes of this Adversary Proceeding, the Trustee suggests Ehrlich's comments highlight how harmful the NBA strike had been to Swift and why a prompt sale of Swift was so important to Moyes and Burdette.

- Most significantly, Ehrlich wanted Swift to gain representations from Buyers "to ensure that the purchaser is adequately capitalized."[101] Not only did the Buyers never make such written representations in the Purchase Agreement, just before closing, the $5 million <u>equity</u> injection (which was to be contributed by Fowler/Spiral before closing) then suddenly became a pre-closing <u>loan</u> of $5 million. Burdette testified that it did not matter whether money was brought into New Swift as equity or as debt. Ehrlich was insistent that the distinction was important and that the desperately needed new money arrive as equity.[102] As it turns out, neither the equity contribution nor the loan were ever made before closing or at any time after closing. The Trustee suggests this was the death knell for New Swift. The Trustee further suggests that Moyes and Burdette were desperate to off-load Swift's 121 Business under any terms, even knowing the Buyers were not contractually bound to gain crucial financing to support New Swift's post-Transaction operations.

- Erhlich's Red Flag Email matter-of-factly acknowledges that SAG was insolvent even before the Transaction.[103] This, of course, is one of the primary

---

[100] See ¶ 3.24 of the Purchase Agreement.
[101] Trial Ex. 066, ¶ 33 referencing ¶ 3.24 of the Purchase Agreement.
[102] Trial Ex. 066, ¶ 57.
[103] Trial Ex. 066, ¶ 53 "… however, I will not comment on any pending litigation which a potential judgment creditor may claim that there was no such authority (given the insolvency of [SAG])".

22

questions the Court needs to answer:  Was Swift insolvent on the Transaction Date or was it rendered insolvent by the Transaction?[104]


E.     Swift's Financial Statements Just Before the Transaction

Ehrlich's Red Flag Email to Burdette was largely accurate when he noted that "[o]f course, Swift Air always had losses."[105]  The following is a summary of Swift's year-end income statements from December 31, 2007 through December 31, 2010 plus its income statements for September 30, 2011, and December 21, 2011.  Also referenced is New Swift's December 31, 2011 income statement:

| Date | Gross Revenue | Gross Profit | Net Income from Operations | Net Income |
|---|---|---|---|---|
| 12/31/2007[106] | 7,969,086 | 2,852,096 | 451,568 | (968,915) |
| 12/31/2008[107] | 13,605,641 | 6,117,734 | 1,690,354 | 585,267 |
| 12/31/2009[108] | 11,749,180 | 6,037,034 | 2,633,312 | 2,150,350 |
| 12/31/2010[109] | 11,786,692 | 5,424,846 | 978,904 | 213,996 |
| 9/30/2011[110] | 9,480,068 | 3,674,747 | (30,438) | (826,990) |
| 12/31/2011 | 12,743,712 | 3,459,675 | (714,992) | (4,122,727) |

Swift had a long history of intercompany transactions with its Affiliates.  Its balance sheets from 2007 forward all reflect significant intercompany receivables owed to Swift and large debts owed by Swift to certain of its Affiliates, especially to Moyes.  For years before the Transaction, Swift's balance sheets reflected a negative equity position.  The following is a summary of Swift's member's[111] equity accounts from 2007 to the Transaction Date:

---

[104] This matter is discussed in greater detail below at § VII(A)(3).
[105] Trial Ex. 066, ¶20.
[106] Trial Ex. 022.
[107] Trial Ex. 023.
[108] Trial Ex. 024.
[109] Trial Ex. 025.
[110] Trial Ex. 026.
[111] Recall SAG was Swift's sole member until the Transaction Date.

23

| Date | Retained Earnings | Retained Earnings Current Year | Total Membership Equity |
|---|---|---|---|
| 12/31/2007[112] | (2,179,980) | (966,915) | (3,204,185) |
| 12/31/2008[113] | (3,146,895) | 585,266 | (2,618,919) |
| 12/31/2009[114] | (2,561,629) | 2,150,351 | (468,568) |
| 12/31/2010[115] | (411,277) | 213,990 | (254,578) |
| 11/30/2011[116] | (197,287) | (3,005,390) | (3,259,968) |
| 12/21/2011[117] | (197,287) | (1,466,325) | (1,720,903) |
| 12/22/2011[118] | (197,287) | (745,665) | (1,000,243) |
| 12/31/2011[119] | (197,287) | (4,122,728) | (4,753,020) |

F.    Summary of the Transaction

**Attachment 4** is a schematic describing the flow of membership interests, assets and liabilities in connection with the Transaction. Although some of the Transaction Documents refer to certain events occurring before another, for all practical purposes, there was only one transaction which was orchestrated in stages, all of which occurred on the Transaction Date.

The Court will first provide an overview of the Transaction and then highlight, document by document, what the parties to the Transaction caused to occur through each of these Transaction Documents.

Moyes and Burdette wanted to get out of the 121 Business as Swift was sustaining huge losses in 2011. The Buyers wanted an ongoing 121 certificated operation to combine with its recently acquired Direct Air business. Buyers did not need or want Swift's 135 Business. However, Moyes needed to continue the 135 Business to service and manage the corporate aircraft he and Honigfeld still used. Importantly, Transjet 1 and Transjet 2

---

[112] Trial Ex. 022, p. 2.
[113] Trial Ex. 023, p. 2.
[114] Trial Ex. 024.
[115] Trial Ex. 025.
[116] Trial Ex. 026, p. 4 and Tr. Ex. 030.
[117] Trial Ex. 028.
[118] Trial Ex. 028.
[119] New Swift's post Transaction balance sheet. This balance sheet no longer reflected the Affiliates' intercompany receivables and payables or its 135 Business.

each owned Boeing 737's which had large monthly bank payments[120] guaranteed by Moyes and required significant ongoing maintenance expenditures.[121] If Moyes could just get rid of Swift's 121 Business and have someone else pay for the Transjet Planes he could solve two important problems in one fell swoop. The Transaction solved these problems and more. Moyes and his companies were able to recover $11,747,393 in debts owed to him and his companies while largely paying off debts certain Moyes Affiliates owed to Swift.

Here is how it happened:

- SAG, 100% owner of Swift, transferred all its membership interests in Swift to the Buyers in return for $100.

- Swift retained its 121 Business, 121 Payables and 121 Receivables but Swift unloaded to SAM its 135 Business and transferred to SAG its 135 Receivables and 135 Payables.[122] The 135 Business continued to be controlled by Moyes.

- Swift transferred to SAG the 135 Related Party Receivables totaling $12,136,669 in return for SAG's and SAM's agreement to handle (1) the 135 Related Party Payables, totaling $11,747,393,[123] (2) the 135 Non-Related Party Payables totaling $1,419,060,[124]and (3) the Tax Note.[125]

- SAG owed nothing, had no employees and had no business of its own. Rather, it was a holding company that owned Swift, SAVM (then defunct),

---

[120] In January 2012, Transjet 1's 801 debt service was $118,936 per month. Transjet 2's 802 debt service was $116,154 per month.
[121] See the discussion of Huska's trial testimony in § VI(B)(1)(d), below.
[122] See DE 463, page 11, § III, ¶ 48.
[123] SAG had no money to pay these debts and no business with which it could gain funding to pay these payables.
[124] See DE 428, Trustee's transaction flow chart, p. 9 of 11. Trustee's assertion includes $360,755 from the Balkans Claim. Defendants contend $2,780,000 is the number. See DE 381, Defendants' Statement of Facts. Defendants' contention includes $700,000 for the Balkans Legal Settlement.
[125] The Tax Note was in the amount of $400,000. It was signed by SAG, SAM, SAVM and Transjet. It was not guaranteed by Moyes. The Tax Note is found at Trial Ex. 002. New Swift was never paid any amounts on the Tax Note. See Huska Testimony discussed in § VI(B)(1)(d), below.

25

Sales (then defunct), and Services. SAG, in turn, was 100% owned by the Moyes Trust. As it pertains to the Transaction, SAG was a mere conduit of value that flowed (a) to and from Swift and (b) to and from Moyes, Transjet and the Moyes Trust. Since SAG was a mere conduit, this Court found (and the parties all agreed) SAG was not the initial transferee of the 135 Related Party Receivables.[126] This is important for purposes of § 550 of the Bankruptcy Code, as discussed more fully below.[127]

- SAG transferred the SAVM Receivable to Moyes.[128]
- When Moyes received the SAVM Receivable from Swift (via SAG), he added this amount to a note balance already owed to him by SAVM.[129]
- SAG transferred to the Moyes Trust (a) the Redeye Receivable, (b) the Briad Receivable, and (c) the SME Receivable.[130]
- The Moyes Trust (100% owner of Transjet) transferred the Transjet Receivables to Transjet which, in turn, applied the Transjet Receivables to the Transjet 135 Payable in the collective amount of $1,905,794.
- Swift transferred to SAG the Redeye Receivable, the Briad Receivable and the SME Receivable which, in turn, transferred them to the Moyes Trust which promptly transferred the Redeye Receivable, the Briad Receivable and the SME Receivable to SAM, an entity created just days earlier to receive these receivables and Swift's 135 Business.
- SAM retained and collected the SME Receivable but transferred the Redeye Receivable and Briad Receivable on August 31, 2012 to Moyes who, in turn,

---

[126] See this Court's Order dated February 13, 2019, ¶ 14 (DE 472). See also *supra* FN 41.
[127] See § VII(A), below.
[128] See *supra* FN 29 and *infra* FN 528.
[129] The Court understands that Moyes wrote off this SAVM debt as an uncollectible bad debt and personally obtained corresponding tax benefits in doing so. See DE 381, Exhibit C.
[130] Defendants' counsel conceded this course of transfers at oral argument on January 10, 2019. See Transcript of Hearing, DE 439 at page 81, lines 20 – 24.

transferred these receivables to Redeye for the purposes of increasing his Redeye capital account.[131]

- Swift split its business in two. New Swift retained the 121 Business but transferred its 135 Business to the newly formed SAM. Since FAA rules prevented Swift from actually transferring its 135 Certificate (or for that matter its 121 Certificate), Swift and SAM entered into agreements whereby New Swift would service SAM's 135 Business until SAM could apply to the FAA and obtain its own Part 135 certificate. SAM, in turn, signed the Tax Note in favor of New Swift and agreed to handle the 135 Payables. SAM never made payments on the Tax Note[132] but did pay $350,000 towards the Balkans Claim. Balkans filed a proof of claim in Debtor's chapter 11 in the amount of $360,755.16.[133]

- SAG's 2011 tax return claimed a $4,510,000 loss related to an aircraft purchase deposit it lost as of December 21, 2011.[134]

- New Swift signed aircraft leases which obligated it to pay for the 737's owned by Transjet 1 and Transjet 2. The New Swift lease payments were in the exact amount of the monthly payments owed on loans secured by these planes, which loans were guaranteed by Moyes.

---

[131] The JPTS confirms the transfer of the Briad Receivable and Redeye Receivable from SAM to Moyes to Moyes' capital account in Redeye. See DE 463, page 11, ¶ 47. Recall that Redeye built up its large obligation to Swift because, in part, Moyes was not contributing equity capital or making loans to Redeye so Redeye could pay its bills to Swift, all while Moyes regularly used the Redeye Plane.

[132] See Huska testimony, February 12, 2019 Trial Transcript. DE 491.

[133] See Debtor's claim registry #64-1. This claim was filed on November 2, 2012, and is supported by an attached Judgment by Confession dated April 12, 2012, signed by Judge Norman Goodman of the Supreme Court of the State of New York, County of New York. That Judgment, in turn, is supported by an affidavit from Burdette signed January 24, 2012, in which Burdette identifies himself as "the vice-president of Swift Air, LLC" and in which he confesses judgment for $700,000 against New Swift and in favor of Balkans. This is quite curious as Burdette had earlier resigned as an officer of Swift on December 21, 2011. See Trial Ex. 012.

[134] See Form 4797 attached to SAG's 2011 tax return as a part of Trial Ex. 031. This inured to Moyes' benefit as SAG's losses passed through to him as reflected by the K-1 also included in Trial Ex. 031.

- New Swift was obligated to pay the Transjet 121 Payable[135] to Transjet and/or the Transjet Subsidiaries.[136]

- New Swift signed an agreement with Transpay to lease employees and signed an agreement with Services to sub-lease a portion of its FBO.

- Direct Air was not required to (and did not) merge with New Swift, even though Burdette thought this was one of the key transactional components which could enable New Swift to succeed where Swift was failing.

- Buyers were not required to inject new equity or obtain new financing even though Buyers and Burdette both recognized New Swift would need $5 million in order to support its post-Transaction business operations.

## G. Transaction Documents

The Transaction was structured to take place in two phases, but in reality, it was one unified whole. In the first step Buyers acquired 100% of the membership interests of SAG. In step two, New Swift entered into a series of new obligations.

Following is a summary of the pertinent Transaction Documents.

Purchase Agreement.[137] This document calls for the transfer of 100% of the membership interests of Swift from SAG to Buyers. 90% of the membership interests went to AAII and 10% to JGH. The cost to the Buyers was $100. New Swift retained the 121 Business including associated assets. New Swift also took on certain 121 Payables plus the Transportation Taxes and certain amounts that had never before been booked by Swift but which, post-Transaction, became owing to Transjet and/or the Transjet

---

[135] For a further discussion of this newly booked payable, see the discussion of the Spindler Report in § VII(A)(2)(a), below.

[136] These new obligations to Transjet totaled $1.2 million but pre-Transaction were not booked as Swift obligations. This obligation absorbed by New Swift is not to be confused with the $1,905,794 owed by Swift to Transjet on the Transaction Date, which amount was handled by SAG and SAM. See § II(E), above.

[137] Trial Ex. 001.

28

Subsidiaries. Swift's 135 Business was transferred to SAM but the 135 Related Party Receivables were transferred to SAG who then transferred these receivables on to the Moyes Trust, Transjet and Moyes. SAM and SAG agreed to handle the 135 Payables and to execute the Tax Note. The Purchase Agreement is 47 pages long and contains many warranties, representations and schedules which, in painstaking detail, flesh out the terms of the Transaction.

Tax Note.[138] The Tax Note was created pursuant to § 2.5 of the Purchase Agreement and required New Swift to pay off the delinquent Transportation Taxes and accompanying interest and penalties through December 11, 2013.[139] This document calls for payment by SAG and SAM of up to $400,000 to New Swift. The first installment of $62,000 plus interest was due on January 8, 2014. The Tax Note is tied to an installment agreement between Swift and the IRS and relates to the Transportation Taxes. Keep in mind SAG was simply a holding company with no business of its own and that SAM was a newly created entity with no demonstrated capitalization. With these two obligations, the Tax Note was of dubious value. Moreover, payments were never made on the Tax Note.[140] The Tax Note provided New Swift no value.

Settlement and Release Agreement.[141] This seven-page agreement was a pre-condition to closing the Purchase Agreement. In essence, it called for New Swift to release Moyes and the Affiliates of amounts they owed to Swift (the 135 Related Party Receivables) and the Affiliates agreed to release claims they had against Swift (the 135 Related Party Payables). Excepted from these mutual releases were obligations New Swift would owe post-Transaction Date to Transpay, Risk, and Transjet.

---

[138] Trial Ex. 002.
[139] Trial Ex. 001 at page 12, § 2.5.
[140] See the summary of Huska's testimony in § VI(B)(1)(d), below. See also February 12, 2019 Trial Transcript at page 27, lines 7 – 15. DE 491.
[141] Trial Ex. 003.

Employee Leasing Agreement.[142]  Here, New Swift agrees with Transpay to lease from Transpay the people it needed to operate New Swift's 121 Business.  Transpay, in turn, was to handle human resource matters concerning these employees.  New Swift was to pay Transpay for the salaries and benefits that these people were to be paid by Transpay.

Part 135 Transaction Services Agreement.[143]  In this agreement, SAG, SAM and New Swift agree that SAM would operate the 135 Business on New Swift's 135 Certificate until SAM could obtain its own 135 certificate.  This part of the Transaction was meant to be "fiscally neutral" to New Swift.  This agreement acknowledges that both SAM and New Swift would lease their portion of the FBO from Services.

Part 135 Assignment and Assumption Agreement and Guarantee.[144]  This agreement calls for New Swift to assign to SAM its 135 Business assets but, because 135 certificates cannot be transferred, New Swift was to remain the 135 Certificate holder and SAM could operate the 135 Business on New Swift's 135 Certificate until SAM could obtain its own 135 certificate.  When that happened, New Swift was to transfer to SAM the name "Swift Air" and the domain name "flyswiftair."[145]  SAM acknowledged it was to be responsible for the 135 Business liabilities and SAG agreed to guarantee losses over $200,000.[146]

Sublease.[147]  In this agreement, New Swift agreed to sublease from Services 6,000 square feet of the FBO property located at 2710 E. Old Tower Road at Sky Harbor International Airport.  SAM apparently was to sublease the balance of the FBO property for use in its 135 Business.  Services has a ground lease with the City of Phoenix and that was where the FBO was located.

---

[142] Trial Ex. 004.
[143] Trial Ex. 005.
[144] Trial Ex. 006.
[145] *Id* at page 2, paragraph 3.  See also Trial Ex. 001, § 2.3(b).
[146] Again, a guarantee by SAG was worth little as it was simply a holding company with no business operations or cash, or bank accounts of its own.
[147] Trial Ex. 007.

Aircraft Lease Agreement – 737DX.[148]  As of December 14, 2011, Yukon leased

2 to Swift the 737DX.  This six-month lease called for delivery of the 737DX on or about

3 December 15, 2011.  Monthly lease payments totaled $105,000 per month.  Swift posted

4 a $210,000 security deposit with this lease.  Under § 7.14 of the Purchase Agreement, the

5 security deposit was to be given to Swift at the end of that lease.

6 Aircraft Lease Agreement – 801.[149]  As of the Transaction Date, Transjet 1 leased

7 to New Swift the 801.  This lease is virtually identical to the Aircraft Lease Agreement-

8 737DX and the Aircraft Lease Agreement-802.  This one and one-half year lease called

9 for monthly payments to Transjet 1 by New Swift in the amount of $118,936 per month.[150]

10 The deal terms described in Schedule "A" of each lease is where most differences may be

11 found in these three airplane leases.

12 Aircraft Lease Agreement – 802.[151]  As of the Transaction Date, Transjet 2 leased

13 to New Swift the 802.  This one and one-half year lease called for monthly payments of

14 $116,154.[152]

15 Ehrlich Opinion Letter.[153]  As counsel for Swift and SAG, Ehrlich penned his

16 firm's Transaction Date opinion letter in support of the Transaction, as required by ¶ 7.11

17 of the Purchase Agreement.  This opinion letter confirms that Swift and SAG are valid

18 entities and have the power and authority to execute the Purchase Agreement.  Ehrlich is

19 careful to note on page five of this letter that his opinions are subject to the effects of

20 bankruptcy insolvency and fraudulent transfer laws which effect the rights of creditors.[154]

---

[148] Trial Ex. 008.
[149] Trial Ex. 009.
[150] Transjet 1 owed $118,936 per month to Comerica Bank on its purchase money loan to acquire the 801.  Moyes guaranteed that loan.  Transjet 1's lease with New Swift was essentially a pass-through lease designed to keep current the Transjet 1 obligation to Comerica Bank, thereby protecting Moyes on his guarantee of that debt.
[151] Trial Ex. 010
[152] Like Aircraft Lease Agreement-801, this lease was designed to protect Moyes on his guarantee of Transjet 2's purchase money loan with Comerica Bank which loan called for monthly payments of $116,154.
[153] Trial Ex. 011.
[154] See also ¶ 3.2 of the Purchase Agreement which permits Ehrlich's opinion letter to exclude matters which may effect the Transaction's enforceability under bankruptcy, insolvency and fraudulent transfer laws.

He does <u>not</u> opine as to the solvency of Swift or SAG nor was a solvency opinion sought or obtained from anyone else as a requirement to Buyers' closing the Transaction.

<u>Resignation Letter</u>.[155]  This Transaction Date document reflects that Swift's sole manager (SAVM) and its sole officers Moyes (President) and Burdette (Vice-President) not only resigned from their roles with Swift but also release and discharge Swift from any claims they may have against Swift prior to the Transaction Date.[156]

<u>Transfer of LLC Interests</u>.[157]  In this document SAG transfers to AAII, JGH and Spiral 100% of its membership interests in Swift.  This transfer acknowledges that these interests are transferred 90% to AAII and 10% to JGH.  Spiral is identified as one of the three "Purchasers," presumably a drafting error in the final Transaction Documents since Spiral was never a signatory to any of the Transaction Documents.[158]

<u>LLC Membership Interests Power</u>.[159]  In this document SAG transfers its limited liability company membership interests in Swift to AAII (90%) and JGH (10%).

<u>Consent of the Sole Manager as Sole Member of Swift, L.L.C.</u>[160]  This document is a resolution of Swift in which its sole member (SAG) and sole manager (SAVM) resolve that (1) Swift agrees to the terms of the Purchase Agreement and (2) Moyes (as Swift's president) or Burdette (as Swift's vice-president) are authorized to execute the Purchase Agreement for Swift and to take all other actions necessary to complete the Transaction.[161]

<u>Unanimous Consent of Sole Director of SAG</u>.[162]  This document provides SAG's resolution that SAG approves the Transaction and that SAG's officers (Moyes as

---

[155] Trial Ex. 012.
[156] As noted *supra* FN 133, this resignation did not stop Burdette from confessing judgment against New Swift a month later.
[157] Trial Ex. 013.
[158] See also the signature blocks on the Purchase Agreement which lists Spiral as a signatory at page 48.
[159] Trial Ex. 014.
[160] Trial Ex. 015.
[161] SAVM's participation in this and other Transaction Documents is interesting because SAVM was essentially defunct and hopelessly insolvent on the Transaction Date.
[162] Trial Ex. 016.

32

president) and Burdette (as vice-president) are authorized to execute the Purchase Agreement for SAG and to take all other actions necessary to complete the Transaction.

### H. The Legacy Transaction

Legacy was yet another Moyes owned air transportation company. Swift's March 31 and June 30, 2011 financial statements indicate Legacy owed Swift $3,985,635.[163] The Legacy Receivable was transferred by Swift to Moyes on September 24, 2011, in return for reducing the balance owed by Swift to Moyes on the Moyes Note.

## IV. NEW SWIFT AFTER THE TRANSACTION BUT BEFORE THE BANKRUPTCY

An important component to Defendants' defenses is the suggestion that New Swift failed because, post-Transaction, it made business choices which spelled its doom. In this Section, the Court itemizes a number of important events that occurred after the Transaction Date.

First and foremost, New Swift was almost immediately confronted with serious cash flow shortages. At the time the Transaction closed, Buyers and Seller expected Spiral/Fowler to loan $5 million to New Swift. The Buyers knew that New Swift desperately needed this money and so did Moyes and Burdette. That cash injection was not required as a condition to closing the Transaction nor did those funds ever come to New Swift, whether in the form of a loan or equity. As it turned out, Fowler and Spiral had been sued by its bank on December 6, 2011.[164] They were in no position to invest or loan $5 million to New Swift.

---

[163] Defined as the Legacy Receivable. Trial Ex. 026.
[164] DE 258, Cali's Declaration at pages 292-319.

33

Absent the crucial Fowler/Spiral money, Torbert scrambled to find operating cash for New Swift. He obtained $1 million from his contact Vogelstein[165] but even this amount was insufficient to keep New Swift afloat.[166] The Buyers used American Express cards to buy goods and services.[167] They even used the credit cards of New Swift's COO, Van Lier. It appears New Swift may have also managed some of its cash shortage crisis by not paying its federal taxes[168] or all its state taxes.[169]

New Swift's plight was not aided by the heavy burden of its Transjet 801 and 802 lease obligations which totaled in excess of $234,000 per month, amounts which may have been in excess of the market prices to lease such planes.[170] New Swift also had significant expenses associated with its lease obligation to Transpay (employee leasing), Services (FBO sublease) and its lease obligation to Yukon on the 737DX.[171] New Swift could not stay apace with these obligations as evidenced by the claims they filed in Debtor's bankruptcy.[172] It does, however, appear that SAM's use of New Swift's 135

---

[165] Vogelstein's loan is discussed more fully below in § VI(B)(2)(9).

[166] February 13, 2019 Trial Transcript at pages 159 – 160. DE 495.

[167] See the American Express Claim #19-1 in the amount of $135,510.

[168] See the IRS Claim #4-1 filed in the amount of $1,525,774. It is not clear whether all or a portion of this claim is the same as the Transportation Taxes.

[169] See Arizona Department of Transportation Claim #86-1 in the amount of $29,640.

[170] February 13, 2019 Trial Transcript of Mr. Conry. DE 495. Conry testified that, after the Petition Date, one of these leases was reduced to about $40,000 per month. See also Trial Ex. 080 which is Administrative DE 575, this Court's order approving Debtor's motion (Administrative DE 570) pertaining to Debtor's airplane leases. The term sheet (Exhibit B) to that motion states:

    1. KMW Leasing will waive and release Debtor from all amounts related to leasing of aircraft N250MY post-Bankruptcy filing date of June 27, 2012. Furthermore, KMW Leasing will waive and release the Debtor's estate and the Reorganized Swift from and all claims arising under or related to its lease with Debtor with regard to the Debtor's use of the aircraft identified as N250MY.

    2. Burdett, Transjet 1, Transjet 2 and any other related company will waive and release Debtor from all amounts related to leasing of aircraft N801 and N802 post-Bankruptcy filing date of June 27, 2012.

    3. Transjet 1 (N801TJ) shall agree upon the terms of a new lease for the aircraft to be leased to Swift for the following terms; a. Term – Next Due C Check (estimated to be July/August 2015) b. Rent -- $40,000 per month.

Notwithstanding the foregoing, the Court is *not* finding that the post-transaction lease rates on the Transjet 801 and 802 charged to New Swift were or were not above existing market rates.

[171] This plane lease called for payments of $105,000 per month

[172] See Claims #69-1 (Transpay, $37,540) and 71-1 (Services, $368,154).

34

Certificate (via the Part 135 Transition Services Agreement[173]) did not further cripple New Swift as this was to be a "fiscally neutral" arrangement between the parties.

While one of the cornerstones for New Swift's business plan was to merge New Swift with Direct Air, that merger (or any other form of consolidation) did not occur, nor did Moyes or Burdette require the Buyers to effectuate this significant move.[174]

What the Buyers did do was enter into an aircraft charter agreement with Saipan Air and into an aircraft lease with KMW Leasing.[175] Both the Saipan Air deal and the KMW lease factored large in Debtor's subsequent bankruptcy.[176] After the transaction closed, New Swift's management also took out cash distributions.[177] Ultimately, New Swift had insufficient cash flow to pay for its leased planes, its leased FBO, its leased employees and the debt it took on as part of the Transaction. New Swift needed but never received from Spiral or Fowler the $5 million all knew was required for New Swift's survival.

## V. SWIFT'S BANKRUPTCY

On June 27, 2012,[178] Debtor commenced its Chapter 11 Proceeding with this Court.[179] On October 10, 2013,[180] this Court confirmed Debtor's plan of reorganization which approved the appointment of Plaintiff as litigation trustee to perform the duties and responsibilities as are set forth in the plan and creditor trust agreement.[181] Between the Petition Date and Confirmation Date, Debtor and various creditors engaged in a myriad of

---

[173] Trial Ex. 005.

[174] It is not clear to the Court whether this was ultimately good or bad for New Swift. Direct Air filed bankruptcy on March 29, 2012 in the United States Bankruptcy Court for the District of Massachusetts, Case No. 12-40944. See Lyon Report, page10, FN 22.

[175] The Debtor sought Court approval to enter into lease agreements for additional airplanes at DE 580 and an Amended Motion was filed at DE 590; the Court granted the Amended Motion at DE 25.

[176] See §§ V(B) and (C), below, for further discussion of KMW and Saipan Air.

[177] Within one month of the Transaction Date, Avondale Ventures, LLC (noted as "Owner and Board Member") received $92,000 from New Swift while ASI (noted as "Owned 100% by Don Stukes") received $1,688. See Statement of Financial Affairs, Exhibit 3C, Administrative DE 44, page 24 of 36.

[178] Defined as the Petition Date.

[179] Administrative DE 1.

[180] Defined as Confirmation Date.

[181] Administrative DE 662.

35

contested matters involving the assumption or rejection of executory contracts, post-petition financing, conversion to chapter 7 and confirming a plan of reorganization. A number of the bankruptcy related events pertain to this Adversary Proceeding.

### A.   Executory Contracts

Within 22 days of the Petition Date, the Chicago Blackhawks filed an Emergency Motion for Order Compelling Debtor to Assume or Reject Charter Contract and Other Related Relief.[182]  Just a day later, the Nashville Predators filed an Emergency Motion to Compel Assumption or Rejection of Executory Contract.[183]  A third similar emergency motion was filed by the Milwaukee Bucks and Boston Celtics.[184]  The Court issued an Order Re: Motions to Compel Debtor to Assume or Reject Certain Executory Contracts which ordered Debtor to file a motion to assume the executory contracts by August 7, 2012, noting that failure to do so would result in the subject executory contracts being deemed rejected.[185]  On August 2, 2012, the Colorado Avalanche and Denver Nuggets filed an Emergency Motion to Include Additional Teams in Debtor's Required Motion to Assume Executory Contracts.[186]  On August 6, 2012, a similar motion was filed by the St. Louis Blues and Boston Bruins.[187]  Ultimately, Debtor timely complied with the August 2, 2012 Order and filed Debtor's Emergency Motion for Order Authorizing Assumption of Executory Contracts with Certain Designated Sports Franchises.[188]  On August 28, 2012, the Court issued an Order Granting Debtor' Emergency Motion for Order Authorizing Assumption of Executory Contracts with Certain Designated Sports Franchises.[189]  The

---

[182] Administrative DE 52.
[183] Administrative DE 62.
[184] Administrative DE 73.
[185] Administrative DE 94.
[186] Administrative DE 96.
[187] Administrative DE 109.
[188] Administrative DE 118.  See also Trial Ex. 208.
[189] Administrative DE 170.

36

Executory Contracts Order authorized the Debtor to assume the executory contracts with the Chicago Blackhawks, Milwaukee Bucks, Boston Celtics, St. Louis Blues and Boston Bruins.[190] The Executory Contracts Order also deemed Debtor's executory air charter agreements with the Colorado Avalanche, Denver Nuggets, Nashville Predators and Phoenix Suns rejected as of August 7, 2012.[191]

In addition to the charter contracts with professional sports teams, Debtor listed in its bankruptcy schedule G an executory contract with Transjet 2 for two aircraft leases dated December 21, 2012.[192] As is discussed in further detail below, Transjet 2 also filed a proof of claim in Debtor's bankruptcy. Transjet 1 and 2 filed a Joinder in Debtor's Emergency Motion for Order Authorizing Assumption of Executory Contracts with Certain Designated Sports Franchises.[193] Transjet 2, alone, filed an Objection to Debtor's Third Amended Plan of Reorganization asserting that Transjet 2 never agreed to waive its right to an administrative claim under the terms proposed in Debtor's Third Amended Plan of Reorganization.[194] Debtor filed an Objection to Administrative Expense Claim Asserted by Transjet 2, LLC and "strenuously" objected to the validity of an administrative expense claim held by Transjet 2.[195]

Debtor's Third Amended Plan required Transjet 1 and Transjet 2 to waive and release any and all claims arising under or related to its lease with Debtor for the pertinent aircraft and to allow for amounts owed under the lease to be offset against damages incurred by Debtor as a result of Transjet 1 or 2's failure to make agreed upon payments to Stambaugh Aviation, Inc.[196] Further, that plan required Transjet 1 and 2 to waive any

---

[190] *Id.* at page 3 and Ex. A.
[191] *Id.* at page 4.
[192] Administrative DE 45 at Schedule G page 64.
[193] Administrative DE 141.
[194] Administrative DE 645.
[195] Administrative DE 656 (Debtor asserted its right to offset amounts due and owing from Transjet 2 to the Debtor against the amount, if any, due and owing from the Debtor to Transjet 2. This offset was asserted because Debtor claimed Transjet 2 failed to perform its obligations under as assumed agreement with Stambaugh Aviation, Inc.).
[196] Administrative DE 662 at Ex. 1 pages 41 – 42.

37

additional amounts owed by Debtor and to release the Debtor's Estate and the Reorganized Debtor from all liability for such amounts.[197] Ultimately, the order confirming Debtor's plan ordered that Transjet 2 and Comerica Leasing Corporation reserved any and all respective rights with regard to the administrative claim referred to in Transjet 2's Objection to Debtor's plan.[198] No further litigation concerning the administrative expense sought by Transjet 2 appears in this Court's administrative docket.

### B.  Post-Petition Financing

Shortly after Debtor filed its chapter 11 petition, Debtor filed a motion to approve financing with and a sale to Spiral.  Stukes declaration supported the Spiral deal.[199]  This proposed deal never came to fruition.  Debtor then filed an Emergency Motion for Order (i) Authorizing Postpetition Financing, (ii) Granting Liens and Providing Superpriority Administrative Expense Claims, (iii) Approving Loan Documents Relating to the Foregoing, (iv) Scheduling a Final Hearing, and (v) Granting Other Related Relief.[200] Debtor sought authority to enter into a loan agreement in which Debtor would obtain post-petition financing from Nimbos in the principal amount not to exceed $2,000,000.[201]  On August 22, 2012, the Court entered an Order (1) Authorizing Debtor-In-Possession to Obtain Interim Financing, Grant Security Interest and Accord Priority Status Pursuant to 11 U.S.C. §§ 364(c) and 503(b); (2) Giving Notice of Final Hearing Pursuant to Bankruptcy Rule 4001(c)(2); and (3) Modifying Automatic Stay.[202] This same order approved a loan agreement entered into by Nimbos and Debtor that provided for a change

---

[197] *Id.*
[198] Administrative DE 662 at 22.
[199] See Administrative DE 100.
[200] Administrative DE 120.
[201] *Id.* at page 2.
[202] Administrative DE 154.

in ownership agreement between AAII and Nimbos.[203]  The Court entered a Final Order related to the post-petition financing on September 12, 2012.[204]

Beginning in February 2013, Debtor made six subsequent motions to amend its loan agreement with Nimbos resulting in Debtor incurring a $6,343,000 obligation to Nimbos.  First, on February 27, 2013, Debtor filed an Emergency Motion for Order (i) Authorizing and Approving Amendment to Debtor in Possession Loan Agreement, Including Increase of Loan Ceiling, and (ii) Granting Other Related Relief, seeking, amongst other things, an increase of $400,000 in the loan ceiling[205] and the Court issued an Order Granting Debtor's Motion on March 7, 2013.[206] Debtor then filed an Emergency Motion for Order (i) Authorizing and Approving Second Amendment to Debtor in Possession Loan Agreement, Including Increase of Loan Ceiling, and (ii) Granting Other Related Relief, seeking another increase of $450,000 in the loan ceiling[207] and the Court issued an Order Granting Debtor's Motion on April 23, 2013.[208]  At a May 22, 2013 hearing, Debtor made an oral motion to amend the loan agreement to increase the loan ceiling by $50,000 which the Court approved on May 29, 2013.[209]  At a hearing on June 5, 2013, Debtor made another oral motion to amend the loan agreement to increase its borrowings by $110,000 which the Court then approved on June 6, 2013.[210]  On July 29, 2013, Debtor filed a motion seeking another increase of $1,409,000 in the loan ceiling.[211] The Court granted that request on July 31, 2013.[212]  Finally, on the same date that Debtor filed its Third Amended Chapter 11 Plan of Reorganization, Debtor filed another motion,

---

[203] *Id.* at Ex. 1, § 6.13.
[204] Administrative DE 196.
[205] Administrative DE 400.
[206] Administrative DE 419.
[207] Administrative DE 458.
[208] Administrative DE 476.
[209] Administrative DE 521.
[210] Administrative DE 528.
[211] Administrative DE 570.
[212] Administrative DE 575.

this time seeking a loan increase of $4,419,000.[213]  The Court entered its order approving that request on August 29, 2013.[214]

### C.  Saipan Air

Almost three months before the Petition Date, New Swift and Saipan Air entered into an aircraft charter agreement that required New Swift to provide Saipan Air with aircraft, crew, maintenance, and insurance.[215] On July 11, 2012, Debtor filed its schedules and statements and listed on Schedule F an unsecured claim to Saipan Air for $1,800,000.[216] On October 12, 2012, Saipan Air filed a proof of claim in Debtor's bankruptcy asserting a $1,800,000 unsecured claim for "services contracted and not delivered."[217] Saipan Air's proof of claim was supported by a declaration of Adam Ferguson, Saipan Air's chief operating officer.[218] Adam Ferguson's declaration states that he met and spoke with Conry, Burdette and Van Lier on March 21, 2012 about adding Saipan Air to New Swift's operations.[219]

Saipan Air was actively involved in Debtor's bankruptcy.  It was represented by counsel from Polsinelli Shughart, P.C.[220] Saipan Air was treated as a Class 4 general unsecured creditor in the Debtor's Confirmed Plan.  Saipan Air voted to accept that plan.[221]

---

[213] Administrative DE 617.
[214] Administrative DE 630.
[215] Administrative Claims Register Claim No. 30-1, at 12.
[216] Administrative DE 45, at 51.
[217] Administrative Claims Register Claim No. 30-1, at 1.
[218] *Id.* at 4 – 8.
[219] *Id.* at 3. While this Court makes no finding as to the veracity of any of the allegations set forth in this declaration, the Court does wonder why Burdette would be involved in New Swift post-Transaction.  This wonder is magnified by the fact that, after the Transaction, Burdette signed a confession of judgment against New Swift.  See FN 133 describing Burdette's confession of judgment against New Swift a month after he resigned from Swift.
[220] Administrative DE 87 (Notice of Appearance by John J. Herbert of Polsinelli Shughart, P.C. on behalf of Saipan Air). See also Administrative DEs 181, 250, 358 as they relate to FRBP 2004 Examinations.
[221] Administrative DE 654.

Following entry of the Court's order on Debtor's Confirmed Plan, the Reorganized Debtor filed an Emergency Motion to Enforce Confirmation Order and Plan Injunctions, asserting that Saipan Air filed a complaint in the District Court for the Northern Mariana Islands that violated the terms of the Confirmed Plan.[222] After Saipan Air filed a Response and Objection to Emergency Motion to Enforce Confirmation Order and Plan Injunctions[223] and a Supplemental Response and Objection to Emergency Motion to Enforce Confirmation Order and Plan Injunctions,[224] the Court heard oral argument on the matter and issued an Order Denying Emergency Motion to Enforce Confirmation Order and Plan Injunction, Without Prejudice because the relevant causes of action were dismissed from Saipan Air's complaint.[225]

### D. Bankruptcy Claims Filed by Moyes' Affiliates and Others

Various claims were filed against Debtor by certain Affiliates. Transpay filed claim #69-1 in the amount of $37,540 along with its letter terminating Debtor's employee leasing agreement with Transpay. It appears this was a claim allowed against the Debtor's bankruptcy estate. Claim #70-1 was filed by SAM in an unknown amount on October 30, 2012. The Debtor objected to that claim[226] and that objection was sustained, resulting in a complete denial of claim #70-1.[227] SAG filed a similar claim in an unknown amount (claim #72-1) to which Debtor objected.[228] This claim was disallowed entirely.[229] Services filed its November 5, 2012 claim #71-1 in the amount of $368,154 in connection with rent allegedly not paid by Debtor on the FBO property sublease. That claim appears to have

---

[222] Administrative DE 880.
[223] Administrative DE 894.
[224] Administrative DE 896.
[225] Administrative DE 911.
[226] Administrative DE 694, dated October 15, 2013.
[227] Administrative DE 777, dated December 2, 2013.
[228] Administrative DE 694.
[229] Administrative DE 777.

been allowed in the full amount because Debtor's Confirmed Plan stated "[Services] and the Reorganized Debtor shall execute and deliver a new lease for the Reorganized Debtor's use and occupancy of its existing business premises at the fixed rate of $9,000 per month for a term of 6 months commencing on the Effective Date…"[230] Finally, the Transjet Subsidiaries filed claims #73-1 ($832,550), 74-1 ($50,000), and 75-1 ($240,000). The Reorganized Debtor objected[231] to claim #73-1 and this Court entered its order of December 2, 2013[232] sustaining this objection and disallowing claim #73-1 in its entirety. The Reorganized Debtor objected[233] to claim #74-1 and this Court entered its order of December 2, 2013[234] disallowing claim #74-1 in its entirety. Claim #75-1 appears to have been allowed in full.

In addition to the Affiliates' claims, Balkans filed claim #64-1 in the amount of $360,755.16. The Arizona Department of Transportation filed a claim for $29,640 (Claim #86-1). The U.S. Department of Transportation filed a claim for $81,247, Claim #97-1. The IRS filed a secured claim (Claim #4) in the amount of $1,541,431 and was to be paid under the Confirmed Plan over 48 months.[235] Burdette was also to pay a portion of this claim pursuant to his agreement with the IRS.[236] American Express filed Claim #19-1 in the amount of $135,510.


E.     Motion Seeking Conversion to Chapter 7

On November 19, 2012, the Committee filed a Motion to Convert Chapter 11 Case to Chapter 7.[237] The evidentiary hearing on the Motion to Convert started on January 22,

---

[230] Administrative DE 662 at Ex. 1 page 24.
[231] Administrative DE 696.
[232] Administrative DE 780.
[233] Administrative DE 697.
[234] Administrative DE 781.
[235] DE 662-1, ¶¶ 1.1.49 and 4.1.2.
[236] DE 662-1, ¶ 1.1.48.
[237] Administrative DE 284.

42

2013.[238]   After one-half day of testimony, the trial was continued to January 29, 2013, when the Debtor and Committee reached a settlement.   The Motion to Convert was withdrawn on January 29, 2013.[239]   The Committee renewed their Motion to Convert on February 15, 2013.[240]   On March 22, 2013, the Court issued an Under Advisement Decision Denying Motion to Convert.[241]

In its Under Advisement Decision Denying Motion to Convert, the Court found that Debtor had shown a reasonable likelihood of rehabilitation.[242]   The Court further found that the Committee failed to show post-petition gross mismanagement by the Debtor.[243]   Finally, although the Committee did show a substantial and continuing loss to the estate, the Court found that alone was insufficient to justify granting the Motion to Convert.[244]   The Court denied the Motion to Convert without prejudice and advised the parties that "… the Court will keep close tabs on the Debtor's progress towards confirmation."[245]

F.   Confirmation of Plan of Reorganization

On October 25, 2012, Debtor filed its first Chapter 11 Plan of Reorganization[246] and Disclosure Statement.[247]   After a series of objections and hearings, Debtor filed a First Amended Chapter 11 Plan of Reorganization[248] and First Amended Disclosure Statement.[249]   A Second Amended Chapter 11 Plan of Reorganization[250] and Second

---

[238] This was undersigned's first day on the bench.
[239] Administrative DE 365.
[240] Administrative DE 379.
[241] Administrative DE 429.
[242] *Id.* at page 1.
[243] *Id.* at page 7.
[244] *Id.*
[245] *Id.*
[246] Administrative DE 246.
[247] Administrative DE 247.
[248] Administrative DE 577.
[249] Administrative DE 579.
[250] Administrative DE 609.

43

Amended Disclosure Statement[251] quickly followed.  Less than a week later, Debtor filed a Third Amended Chapter 11 Plan of Reorganization[252] and Third Amended Disclosure Statement.[253]  The Court issued its Confirmation Order on October 1, 2013.[254]

The Confirmed Plan required the Reorganized Debtor to issue 100% of the newly issued equity interests of the Reorganized Debtor to Nimbos.[255]  A $600,000 pool was created from money advanced to the Debtor by Nimbos.  The Confirmed Plan also established a creditor trust that included retained causes of action for the Trustee to pursue.[256]  Unsecured creditors were to receive distributions from the pool and any net recoveries achieved by the creditor trust.  The Trustee was further given the exclusive right to sue on, settle, or compromise any and all creditor trust assets, including retained causes of action.[257]  Finally, the Confirmed Plan provided for this Court to retain jurisdiction to hear and decide the retained causes of action of the Trustee.[258]

On November 7, 2015, the Court issued an Order Granting Motion for Final Decree.[259]

## VI. THE ADVERSARY PROCEEDING

### A. Procedural History

#### 1. The Complaint and Dismissal of Causes of Action

On June 27, 2014, Plaintiff initiated this Adversary Proceeding.[260]  Plaintiff's initial complaint was amended on January 15, 2015 and again on June 5, 2015.  The Complaint

---

[251] Administrative DE 611.
[252] Administrative DE 620.
[253] Administrative DE 621.
[254] Administrative DE 662.
[255] *Id.* at Ex. 1, page 21.
[256] *Id.* at Ex. 1, page 22.
[257] *Id.* at Ex. 1, page 27.
[258] *Id.* at Ex. 1, page 30.
[259] Administrative DE 944.
[260] DE 1.

44

is Plaintiff's third amended complaint.[261]  On November 25, 2015, Defendants filed their Answer.[262]

On April 2, 2018, the Court issued an Order Approving Stipulation to Dismiss Counts 7 – 11.[263]  Among the causes of action dismissed were Counts Ten and Eleven which essentially sought the Court's orders declaring that the Affiliates were one and the same as Moyes and Burdette and that the corporate veils of these entities should be pierced, that they should be recognized as the alter egos of their owners.  These causes of action had been added to the Trustee's claims in the Complaint following oral argument on Trustee's October 1, 2015 motion for leave to file a third amended complaint[264] where this Court ordered[265] that alter ego and piercing claims were not just remedies but must be pled as causes of action.  The April 2, 2018 order also dismissed the following defendants from the Complaint:  Risk, Transpay, the Transjet Subsidiaries, Opulent Air, LLC, Teamjet, LLC, Transjet Holdings, LLC, Teamjet Enterprises, Inc., Sports Jet, Luxury Air, LLC, Luxury Enterprises, Inc., Jane Doe Burdette and Jane Does 1-10.  Although Briad was not dismissed from the Complaint, the Complaint now seeks no relief against Briad.

On July 20, 2018, the Court issued an Order Denying Plaintiff's Motion for Leave to File Fourth Amended Complaint.[266]  Plaintiff, therefore, proceeded with six claims for relief, two alleging fraudulent transfers (Counts One and Two), three alleging preferential transfers (Counts Three, Four and Five), and one alleging breach of fiduciary duties (Count Six).  As noted in § VII(B)(1)(b) below, Plaintiff never dismissed his constructive fraudulent transfer claims but the JTPS does not address those claims nor did the evidence at trial support such claims.

---

[261] DE 94.
[262] DE 95.
[263] DE 266.
[264] Filed at DE 85.
[265] DE 93.
[266] DE 311.  See § VI(A)(2), below.

45

## 2. Denial of Motion for Leave to File Fourth Amended Complaint

The Legacy Receivable was transferred to Moyes by Swift on September 24, 2011. The Trustee claims to have first learned in December 2017, that the Legacy Receivable was transferred to Moyes. The Trustee learned of this transfer when he requested from Defendants the 1Q2011 and 2Q2011 Swift balance sheets. After receiving those balance sheets and realizing the Legacy Receivable was not transferred to Moyes until September 2011, the Trustee filed his motion[267] seeking leave to file his fourth amended complaint to add the Legacy Claim. After briefing and oral argument, this Court denied the Trustee's motion for leave to amend because (1) it was filed nearly two and one-half years after the November 3, 2015 Complaint and almost four years after the filing of the Trustee's initial complaint on June 27, 2014; (2) the Trustee should have requested Defendants' production of the 1Q2011 and 2Q2011 Swift financial statements long before December 2017; (3) the Legacy Receivable transfer to Moyes by Swift involved an entity not named in the Complaint and arose out of a transaction which the Court found was three months prior to the Transaction Date and not connected with the Transaction which is at the subject of the Complaint; (4) the Trustee's Legacy Claim would not relate back to the date of Trustee's initial complaint and, therefore, was barred by the statute of limitations; and (5) that to allow the Trustee to amend his Complaint to include a claim to avoid Swift's transfer of the Legacy Receivable to Moyes would occasion substantial prejudice to Defendants.[268]

## 3. Discovery Disputes

On September 14, 2016,[269] the Court held a telephonic hearing regarding a discovery dispute between the parties. This dispute arose from the number of non-uniform

---

[267] DE 297 filed on May 31, 2018.
[268] DE 311 dated July 20, 2018 is this Court's order denying Trustee's motion to add the Legacy Claim to his Complaint.
[269] DE 129.

46

interrogatories propounded upon Defendants by Plaintiff based upon Plaintiff's belief that the parties had an understanding that Plaintiff was merely looking for the flow of proceeds from the Transaction and that they should not count against the 25 interrogatories allowed under Fed. R. Civ. P. 33. Defendants disputed that such an understanding ever existed and requested that the Plaintiff provide Defendants with any documents or communications that they allege support the Plaintiff's argument that Defendants somehow limited their rights to object to superfluous interrogatories under Fed. R. Civ. P. 33. Plaintiff did not produce anything in response but continued to press its position that it was entitled to the additional interrogatories.

On October 19, 2016,[270] the Court held an order to show cause hearing why Ehrlich should not be held in contempt for his refusal to turn over Debtor's legal file to the Trustee in order for the Trustee to use the information to further prosecute its claims against various insiders of the Debtor.

At the request of Plaintiff, the Court set a telephonic hearing on September 28, 2017,[271] concerning a discovery dispute. Plaintiff subsequently requested that the hearing be vacated.

On May 9, 2018,[272] the Court held a telephonic hearing regarding a discovery dispute. As a result of the motion to amend complaint, Defendants wished to postpone the expert depositions and filing of expert reports. However, Plaintiff wanted to go forward with the scheduled deposition of Lyon. Plaintiff indicated the motion to amend complaint would not be filed until May 31 and Defendants objected to the deposition of Lyon being taken before the motion was filed.

On August 10, 2018, Defendants filed a Notice of Filing Demonstrative Chart to Assist the Court in Assessing the Disputes Between the Defendants' Statement of Facts

---

[270] DE 134.
[271] DE 216.
[272] DE 295.

and the Trustee's Statement of Facts regarding the Motion for Report and Recommendation for Partial Summary Judgment (Intent; Punitive Damages).[273]  The Court did not set a hearing on this filing.  However, at the August 13, 2018 status hearing,[274] the Court referred counsel to Local Bankruptcy Rule 9013-1 concerning motion practice as it relates to discovery disputes.  The Court reminded counsel that, should a discovery dispute arise, counsel are not to file a motion to compel or a motion for a protective order but should engage in a meaningful effort to resolve the dispute.  Failing that, counsel should contact the courtroom deputy to schedule a telephonic conference with the Court.

### 4. Motions for Summary Judgment

The parties collectively filed seven dispositive motions plus two *Daubert* motions seeking to exclude allegedly unreliable expert opinions.  From September 2018 through January 2019, the Court heard oral arguments on all seven dispositive motions and the *Daubert* motions.  The following is an abbreviated recap of these motions.

Punitive Damages and Intentional Fraudulent Transfers Motion.  On October 18, 2018, the Court heard oral arguments on Defendants' Motion for Report and Recommendation for Partial Summary Judgment and Request for Judicial Notice on the Intentional Claims and Issue of Punitive Damages[275] and Plaintiff's Response.[276]  The Court issued an Order Granting in Part, and Denying in Part, Defendants' Motion for Summary Judgment.[277]  The Court denied Defendants' request for summary judgment on Trustee's claim for fraudulent transfer made with the actual intent to hinder, delay or defraud creditors under § 548(a)(1)(A) and granted Defendants' request for summary

---

[273] DE 319.
[274] DE 325.
[275] DE 257.
[276] DE 277.
[277] DE 401.

48

judgment on the Trustee's claim for punitive damages.[278]

Breach of Fiduciary Duty Motion.  Also, on October 18, 2018, the Court heard oral arguments on Defendants' Motion for Partial Summary Judgment on Count VI and Request for Judicial Notice on Breach of Fiduciary Duty[279] and Plaintiff's Response.[280] The Court took the matter under advisement.  On January 10, 2019, the Court issued an Amended Under Advisement Order on Motion for Summary Judgment on Count VI.  That Order denied Defendants' motion.[281]

*Daubert* Motions and Insolvency Motions.  On December 19, 2018, the Court heard oral arguments on both parties' *Daubert* motions,[282] Plaintiff's Motion for Summary Judgment Re: Insolvency[283] and Defendants' Cross-Motion for Report and Recommendation for Summary Judgment Regarding Insolvency.[284]  The Court denied both Plaintiff's and Defendants' *Daubert* motions.  Plaintiff's Motion for Summary Judgment Re: Insolvency and Defendants' Cross-Motion for Report and Recommendation for Summary Judgment Regarding Insolvency were both denied.[285]

The SAVM, Redeye and Transjet Motions.  On January 10, 2019, the Court heard oral arguments on Plaintiff's three motions for summary judgment related to the accounts receivable owed to Swift by SAVM,[286] Redeye,[287] and Transjet,[288] and Defendants' Responses.[289]  The Court ruled from the bench on all three motions for summary judgment, but then, on February 13, 2019, the Court issued an Order Granting in Part and

---

[278] *Id.*  In § VII(D), below, the Court further discusses the dismissal of Trustee's demand for punitive damages.
[279] DE 270.
[280] DE 320.
[281] DE 429.
[282] DE 355 and DE 370.
[283] DE 353.
[284] DE 375.
[285] DE 425.
[286] DE 328.
[287] DE 330.
[288] DE 339
[289] DE 380.

49

Denying in Part Motions for Summary Judgment Re: Preference Claims Asserted by Trustee.[290]

Even if this Court's partial summary judgments were improvidently granted, the record of evidence admitted at trial supports this Court's rulings.

Fiduciary Duty Motion and the Arizona Supreme Court.  On January 23, 2019, the Court heard oral arguments on Plaintiff's Motion for Summary Judgment Re: Breach of Fiduciary Duty[291] and Defendants' Response.[292]  The Court denied Plaintiff's motion and issued a Minute Entry Order.[293]  As a result of supplemental authority and arguments presented at oral argument, on January 29, 2019, the Court issued an Order Certifying Questions to Arizona Supreme Court on the issues of whether managers and/or members of an Arizona LLC owe fiduciary duties to the LLC and whether the terms of an Arizona LLC's operating agreement may lawfully limit or eliminate those fiduciary duties.[294]  This matter is discussed more fully below in §§ VI(C) and VII(C), below.

5.  Bankruptcy Court Jurisdiction and/or Authority[295]

On February 15, 2016, Defendants filed a Notice Regarding Bankruptcy Court's Jurisdiction to Enter Final Judgment[296] and on February 24, 2016, Defendants filed a Reservation of Rights Regarding Constitutional Authority and Jurisdiction of the Bankruptcy Court to Enter a Final Order.[297]  On January 16, 2019, the parties further briefed the issue of the Court's authority to enter final judgments and Defendants filed a Brief Regarding Bankruptcy Court's Jurisdiction to Enter Final Judgment[298] and Plaintiff

---

[290] DE 472.
[291] DE 332.
[292] DE 378.
[293] DE 444.
[294] DE 449.
[295] This topic is also discussed in § I, above.
[296] DE 106.
[297] DE 107.
[298] DE 434

50

filed a Position Statement Re: The Bankruptcy Court's Jurisdiction to Enter a Final Order in this Case.[299]  On March 15, 2019, the Court issued an Order Regarding Authority to Enter Final Orders in this Adversary Proceeding and determined that (1) as to Plaintiff's breach of fiduciary duty claims, this Court lacks the authority to enter final orders; (2) as to Plaintiff's preference claims under 11 U.S.C. § 547, this Court has the authority to enter final orders as to all Defendants; and (3) as to the fraudulent transfer claims brought under §§ 544 and 548, this Court has the authority to enter final orders as to defendants who filed a proof of claim or asserted a setoff defense.[300]

### 6.  Motions in Limine

On January 29, 2019, Defendants filed Motion in Limine No. 1: Motion to Exclude Evidence Concerning the Legacy Receivable Transaction.[301]  The next day, Defendants filed Motion in Limine No. 2: Motion to Exclude Evidence Concerning Alter Ego, Piercing the Corporate Veil and to Enforce the Law of the Case.[302]  Plaintiffs filed their Response to Motion in Limine No. 1[303] and their Response to Motion in Limine No. 2.[304] Defendants filed their Reply in Support of Motion in Limine No. 1[305] and their Reply in Support of Motion in Limine No. 2.[306]

On February 7, 2019, the Court issued an Under Advisement Order Re Motion in Limine No. 1 (Legacy Receivable[307]).  This order noted that, while the Trustee's Legacy Claim was barred, at trial the Trustee would be able to admit certain evidence showing the

---

[299] DE 435.
[300] DE 512.
[301] DE 447.
[302] DE 451.
[303] DE 454.
[304] DE 455.
[305] DE 456.
[306] DE 457.
[307] DE 461.

basis for the existence of the Legacy Receivable and the satisfaction of that Legacy Receivable as it related to Trustee's breach of fiduciary duty claims.[308]

On February 11, 2019, the Court issued an Under Advisement Order Re Motion in Limine No. 2 (Alter Ego/Piercing the Veil)[309] in which the Court held that Trustee was precluded from seeking any relief based on theories of alter ego or piercing of the corporate veil.[310] The Court noted that evidence related to Trustee's dismissed alter ego and piercing of the corporate veil claims could be presented at trial, but only as it relates to Trustee's remaining claims.[311] Specifically, the Court noted the possibility of such evidence successfully establishing a breach of fiduciary duty by one or more Defendants.[312]

Following trial, on February 25, 2019, Trustee filed a Motion for Clarification of Under Advisement Order Re: Motion in Limine No. 2 (Alter Ego/Piercing the Corporate Veil) and sought clarification as to whether Trustee was permitted to hold third parties liable under an alter ego or piercing of the corporate veil theory.[313] Defendants filed an Objection.[314] Trustee filed a Reply[315] and the Court heard oral argument on April 17, 2019. The Court issued its Order and reiterated that the 2019 trial did not include claims for alter ego or piercing of the corporate veil.[316] The Court did note that should Trustee prevail on any of its claims in this Adversary Proceeding, there remained a possibility that Trustee could learn in post-judgment discovery about post-Petition Date events or transactions that warrant pursuit of such claims.[317]

---

[308] The Legacy Claim is discussed more fully above in §§ II(C)(13) and VI(A)(2).
[309] DE 466.
[310] *Id.* at 1.
[311] *Id.* at 2.
[312] *Id.*
[313] DE 492.
[314] DE 505.
[315] DE 516.
[316] DE 530.
[317] *Id.* at 2.

Case 2:14-ap-00534-DPC    Doc 555    Filed 03/31/20    Entered 03/31/20 15:42:31    Desc
Main Document    Page 60 of 174

B.     The Trial

Beginning on February 11, 2019, and concluding on February 20, 2019, the Court conducted a trial on all unresolved issues.   After extensive opening statements by the parties, witness testimony commenced.   What follows is intended by the Court to be a high level (not granular) recap of the testimony of witnesses called in the following order:

1.     Plaintiff's Witnesses

a.     Spindler

Since Spindler's testimony focused on the question of Swift's Transaction Date insolvency, it is recounted in § VII(A)(3)(c), below.[318]

b.     Moyes

Plaintiff introduced Moyes' direct testimony by playing his video-taped deposition of January 16, 2018.[319]   In that deposition, Moyes noted that he delegated to Burdette and Penrod the authority to run Swift.   He relied upon Burdette to run Swift because Moyes was giving 110% of his efforts into running Swift Transportation.   Moyes would annually look at Swift's financial statements but not delve into the details.   When cash was needed for Swift, Penrod would work up charts indicating these needs.

Moyes testified it took about five years and $5 million worth of cash and time to obtain Swift's 121 Certificate but he did not remember why he felt that was the amount invested.   He suggested that number may have come to him from Burdette.

As to the Legacy Receivable and SAVM Receivable, Moyes had no recollection as to how those debts to Swift came to be or whether they were collected.   He did note that it was more important to collect receivables owed by non-Moyes Affiliates than to press

---

[318] February 11, 2019 Trial Transcript, page 41. DE 493.
[319] February 11, 2019 Trial Transcript, page 124.  DE 493.  See also Trial Ex. 137.

his Affiliates for payment. However, he stated that "I paid my bills." He did not indicate whether he considered the Affiliates' obligations to Swift to be his bills or whether he was just referring to bills for which he had personal liability, e.g., Affiliates' debts guaranteed by Moyes.

When it came to the Transaction, Moyes said Burdette told him he should sell Swift, so he did.[320] He did not remember why Burdette recommended the sale. Moyes did not negotiate the Transaction or even know the Transaction details since he was not involved in the Transaction.

The Court found Moyes' testimony credible but not particularly revealing because he knew little about Swift's financial affairs and almost nothing involving the Transaction. He trusted Burdette. Burdette called the shots on Moyes' air transportation businesses. As to Moyes' comment that he paid his bills, the Court finds that to be a bit of hyperbole if he meant that his Affiliates paid their creditors. Many of the Affiliates owed money to Swift for a very long time. While it is true Moyes loaned money to Swift, he did not lend it enough to timely pay all its bills to Affiliates or outside vendors. The Affiliates often did <u>not</u> pay their bills.


c.    <u>Burdette</u>

Plaintiff introduced Burdette's direct testimony by playing his videotaped deposition of September 29, 2017.[321] In his deposition, Burdette testified that, with respect to Swift's business affairs, Moyes was as informed as he wanted to be. Since Moyes was not detail focused, Burdette informed Moyes of only very high-level Swift matters. Burdette never spoke to Moyes about Swift's accounts receivable aging reports but Moyes would be given Swift's financial statements every quarter or so. However,

---

[320] Specifically, Moyes testified that "I sold them on Kevin's recommendation to get out of it." See February 11, 2019 Trial Transcript, page 151, line 15. DE 493.
[321] February 11, 2019 Trial Transcript, page 160. DE 493. See also Trial Ex. 136.

54

these financial statements were broad brush statements that did not reveal the names or amounts of Swift's account receivable obligors.

Burdette discussed what he described as the financial "apocalypse" that began in 2007. It was a time when people stopped flying with Swift on the corporate charter side of its business. He acknowledged that in the time just before the Transaction, Swift was unable to pay Services.[322] When asked about Swift's receivables owed by SAVM, Briad and Redeye, his testimony was not very illuminating. When discussing the Transaction, Burdette claimed to feel a lot more comfort about the Buyers once he was told Spiral/Fowler would put $5 million into New Swift. He knew of Fowler as a person who owned a few planes at Phoenix Sky Harbor Airport. During his video testimony, Burdette was hostile, impatient and disdainful.[323]

### d.  Huska

(a) Direct Examination.[324] Day two of the trial began with Huska's testimony. He was Swift's director of accounting and finance but then worked for New Swift as its CFO. He stayed in that capacity through Debtor's bankruptcy and remained with the Reorganized Debtor after the Confirmation Date.

Huska confirmed that Swift was hit very hard by the economic meltdown which began in 2007. He confirmed Swift suffered dramatic losses in the first 11 months of 2011. He indicated Swift was profitable in only one year, 2008. Huska testified that at all times, Swift's principal assets were the accounts receivable owed to it. A good deal of his testimony focused on Swift's receivables. As to the receivables retained post-Transaction Date by New Swift,[325] Huska walked through the collectability of those 121

---

[322] Recall that Services provided fuel, maintenance and other FBO goods and services.
[323] This is not particularly surprising given that Plaintiff was suing him for millions of dollars.
[324] February 12, 2019 Trial Transcript, page 19. DE 491.
[325] Those retained receivables are defined as the 121 Receivables.

Receivables, referencing Schedule 3.23(j) to the Purchase Agreement.[326]  Huska testified he was not concerned about collectability of the Briad Receivable or Redeye Receivable because Moyes and Honigfeld were behind those obligations.  During his testimony, Huska referred back to his October 16, 2018 declaration.[327]

When questioned about the Tax Note[328] which was executed in connection with the Transaction (an obligation in favor of New Swift signed by SAVM, SAG, SAM and Transjet), Huska confirmed no payments were ever received on that Tax Note.

In reviewing Trial Ex. 028, Huska confirmed that the cash held by Swift as customer deposits was not readily available for use in Swift's operations.  That cash was essentially held in trust until it was earned by Swift.  The usable cash in Swift's till at the time the Transaction closed was about $32,000.  Huska confirmed that amount was inadequate to run an airline like Swift.  He also confirmed that the collectable receivables retained by New Swift after the Transaction's closing were under $500,000.  Despite this cash shortage, New Swift paid Torbert $4,500 on January 2, 2012 and paid Stukes $500 on the same date.[329]

Huska confirmed that Swift's losses were not all prior to the Transaction Date.  In the Debtor's first monthly operating report filed post-bankruptcy, the Debtor's income statement reflected a year to date accrual basis loss (1-1-2012 to 7-31-2012) of $2,298,564.[330]  By October 18, 2013, Debtor had incurred post-Petition Date losses before reorganization expenses in the amount of $7,639,434.[331]  These staggering losses occurred

---

[326] Trial Ex. 001.
[327] DE 381-1.
[328] Trial Ex. 002.
[329] These payments are reflected in Debtor's Statement of Affairs filed on July 11, 2012 at Administrative DE 44, Ex. 23.  Not a bad return on their nominal $100 investment two weeks earlier.  But see even larger transfers to the Buyers after January 2, 2012 identified *supra* FN 177.
[330] Trial Ex. 038, Administrative DE 171, p. 5 of 17.
[331] Trial Ex. 046, Administrative DE 742, p. 4 of 15.

56

even though, during the course of the bankruptcy, Debtor rejected a number of its unprofitable contracts.[332]

Huska's testimony turned to Debtor's initial bankruptcy filings. Huska provided the data needed for Debtor's counsel to prepare the bankruptcy Schedules and Statements of Affairs. Debtor's schedules of assets and liabilities reflected at Schedule B23 that Debtor's 121 Certificate had a value of $0 on the Petition Date.[333]

Huska was asked to identify Debtor's proposed post-bankruptcy sale to Spiral for $1.1 million, a proposal where Spiral was also to loan $600,000 to Debtor.[334] Trustee's counsel suggested this "loan to own" proposal reflects not only Debtor's desperate need for cash but also its willingness to sell the Debtor's 121 Business for less than the debts then owed to Debtor's creditors.

Huska testified concerning the annual "C-Check" maintenance required by the FAA of airplanes flown under 121 certificates. He noted a C-Check on a Boeing 737 cost in the neighborhood of $500,000 (labor) plus any parts expenditures. Under New Swift's leases with Transjet 1[335] and Transjet 2,[336] New Swift was to bear the cost of these C-Checks.[337]

(b) Cross Examination.[338] Huska's brief cross examination emphasized that Trial Ex. 027 was a Swift financial statement stated at book value, not fair market value. Swift's December 31, 2008 balance reflected federal transportation taxes due in the amount of $1,045,048[339] at a time when Swift's cash balance was $3,687,012. Finally, Huska

---

[332] The contracts acquired by New Swift in the Transaction are referenced in the Purchase Agreement, § 3.12 and itemized in Schedule 3.12. See Trial Ex. 001.

[333] Trial Ex. 036, Administrative DE 45, pp. 5 and 6 of 66 filed July 11, 2012. It is interesting to note that the Debtor's filings (and Huska) attributed no value to the Debtor's 121 Certificate. This is discussed more fully below in connection with the reports and testimony of the parties' solvency experts. See § VII(A)(2).

[334] Trial Ex. 100, Administrative DE 66 filed with the Court on July 29, 2012.

[335] Trial Ex. 009.

[336] Trial Ex. 010.

[337] ¶ 8 of both Trial Ex. 009 and Trial Ex. 010.

[338] February 12, 2019 Trial Transcript, page 65. DE 491.

[339] Trial Ex. 023.

confirmed that the proposed post-bankruptcy sale to Spiral/Fowler by the Debtor was not consummated.[340]

### e. Forry

Forry's direct examination was introduced via designations from transcripts of a Rule 30(b)(6) deposition dated August 17, 2017.[341] At the time of her deposition, Forry was a representative of SAG. Forry generally discussed the relationships between SAG, the Moyes Trust, Swift, Services, SAVM, and Sales. Forry testified that SAG was a holding group which owned all the equity or membership interests in Swift, Services, SAVM, and Sales before the Transaction Date. Forry also testified that the Moyes Trust owned SAG.

Forry further testified that SAG did not own any assets and, except for the equity or membership interests in Swift, Services, SAVM, and Sales, SAG, did not hold interest in any other entity. Forry stated that the corporate officers for SAG were Moyes, Vickie Moyes and Burdette.

Forry's testimony also included a discussion of the SAVM Receivable and SAVM's ability to satisfy that obligation. Forry testified that, from SAG's perspective, SAVM did not have the ability to pay Swift and that, as of the Transaction Date, SAVM could have repaid to Swift "[v]ery minimal, if anything" of the SAVM Receivable. Forry went on to testify, however, that the SAVM Receivable was a "collectible asset" because of the relationship between SAG, SAVM and the Moyes Trust and that ultimately the Moyes Trust "bears the burden of all the liabilities and the assets for the companies that are underneath them."

---

[340] Huska later testified in Defendants' case in chief.
[341] Trial Ex. 067, at Ex. 3, pages 114 – 139.

58

Finally, Forry testified that, as of November 30, 2011, Swift had negative equity in the amount of $3,259,968 and that from SAG's perspective Swift's liabilities exceeded its assets by over three million dollars at fair value.[342]

### f. Cahill

Cahill's direct examination was introduced via designation from transcripts of his deposition dated November 30, 2017.[343] Cahill was a representative of Briad. Cahill testified about Briad, the Briad Receivable and Redeye.

Cahill testified that Moyes became a member of Redeye in 2007 and that Moyes and Honigfeld would each be 50% responsible for funding Redeye, except that each would be responsible for the individual costs associated with their individual flights incurred through Redeye. Cahill further testified that Swift operated the Redeye Plane for Redeye and that Redeye accrued an account payable owed to Swift. Cahill explained that Redeye did not have any means to satisfy its obligations to Swift aside from capital contributions from Redeye's two members, Moyes and Honigfeld. Cahill testified that ultimately, Moyes obligation to Redeye was reconciled with Redeye's account payable owed to Swift and Briad's account payable owed to Swift.

Plaintiff closed his case at the beginning of the third day of trial.

### 2. Defendants' Witnesses

Defendants began their case in chief on day three of the trial. They called the following witnesses in the order in which they are listed below:

---

[342] Although Forry testified that Swift's "debts exceeded the assets by $3.2 million" at "fair value[,]" the Court does not give this testimony any weight with respect to this Court's determination of Swift's solvency as of the Transaction Date. Forry appeared to the Court to not fully appreciate the import of the solvency questions or even her answer to those questions.
[343] Trial Ex. 67, at Ex. 4 pages, 142 – 194.

59

### a. Conry

- Direct Examination by Defendants.[344] Conry began his work as New Swift's CEO in March 2012. Conry has spent the bulk of his career in the aviation business, particularly with companies holding 121 certificates. Conry had knowledge of the Arrow and Sky King airline bankruptcies and the fact that their bankruptcy transactions concerned holders of 121 certificates where their airline operations had earlier terminated. He identified the FAA requirement that a 121 certificate holder have on staff 5 Wisemen to serve certain mandated roles.

Conry described how he came to be involved with Stukes (AAII) and Torbert (JGH) and their acquisition of Direct Air. He described Direct Air's need to acquire a 121 certificate and hence the Buyers' desire to acquire Swift and the 121 Certificate held by Swift. Direct Air's customer base generally needed air transportation from May through early September. This dovetailed nicely with Swift's primary business of transporting sports teams from September through early June. Direct Air was acquired by Torbert and Stukes (or their entities) in October 2011.

On behalf of Stukes and Torbert, Conry approached Swift about acquiring its 121 Business. Conry did not previously know Moyes or Burdette. The fact that Swift was a going concern was useful because a non-operating 121 certificate acquisition would take time and money to jump start. Conry did not know whether the Buyers or Burdette proposed the structure of the Transaction which was ultimately agreed upon because Stukes and Torbert negotiated the deal, not Conry. Swift's 121 Business had value to the Buyers not just because of its 121 Certificate but because it was operating, had revenue, and had contracts in place. The Buyers were never interested in acquiring Swift's 135 Business. Conry agreed that the Buyers were at arm's length from Swift and were under no compulsion to buy the 121 Business.

---

[344] February 13, 2019 Trial Transcript, page 18. DE 495.

Conry aided the Buyers in their due diligence for the Transaction. It was essential that the Buyers view Swift's business as two separate components – the 121 Business and the 135 Business.

Torbert and Stukes introduced Fowler to Swift as a person who would be infusing cash into the New Swift entity. Spiral's financials were shown to Swift and Buyers' business plan was explained to Burdette. Burdette did not question Buyers' ability to effectuate their plan. Conry was not aware that Fowler's bank, U.S. Bank, sued him on December 15, 2011.[345] Conry knew the Fowler/Spiral money was required for Buyers' plan to work.

From the Transaction Date until March 2012, Conry was New Swift's *de facto* CEO, serving as a consultant. In March, Conry became the president and CEO of New Swift.

Post-closing the Buyers continued to talk with Fowler. Conry even signed a declaration[346] describing the terms of a proposed sale of the business to Spiral. Neither Fowler nor Spiral ever came through with loan financing, an equity contribution or a purchase.

After the Transaction Date, Conry contacted Saipan Air and entered into a contract for New Swift to provide that cargo air carrier with passenger travel service. To aid that new business, New Swift entered into two leases with International Lease Finance Corporation for two Boeing 757's. New Swift made some lease deposits but never took delivery of the 757's.

Conry discussed $1.0 to $1.5 million of new credit obtained by New Swift from Vogelstein after the Transaction Date. The Vogelstein financing, however, was

---

[345] In the category of "Phoenix is still a small town," the U.S. Bank attorneys that sued Fowler and others were the same attorneys that represent the Defendants. See Trial Ex. 024.

[346] Administrative DE 119, Trial Ex. 209, Conry Declaration at pages 2 and 3.

61

insufficient to sustain New Swift's operations so it filed its Chapter 11 Proceeding on the Petition Date.[347]

Buyers were driving the push for a December 2011 close date to the Transaction. By the Summer of 2012, New Swift was expecting to need six to seven aircraft. Conry testified that the Debtor's 121 Certificate had market value even though, on the Petition Date, it had no book value. Conry continued to run Debtor's 121 Certificate operations post-bankruptcy.

Conry testified that Wooley was Nimbos' principal and that was who negotiated with Conry for Debtor's DIP financing and the ultimate "loan to own."

- Cross Examination.[348] On cross, Conry confirmed that the 135 Certificate remained with New Swift, then the Debtor and then the Reorganized Debtor. After the Confirmation Date, SAM obtained its own 135 certificate so it no longer needed to be tied to the 135 Certificate originally obtained by Swift.

Conry testified that, after the Transaction Date, New Swift was very short of funds. Beginning in February 2012, New Swift used an American Express credit card to pay for goods and services. Over $800,000 was charged on this account.[349] This credit card was owned by Van Lier, COO of New Swift. New Swift also borrowed from Vogelstein[350] the sum of about $1 million. Vogelstein was located by Torbert. The amount Vogelstein loaned New Swift was inadequate to fund New Swift's operations.

Conry testified as to the December 31, 2011 New Swift financial statement which reflected negative equity of over $4.7 million (book value) and available cash of $145,609, an amount admittedly insufficient to fund New Swift's operations. Conry also discussed post-Petition Date funding to the Debtor by Nimbos. He noted that, after the Confirmation

---

[347] June 27, 2012.
[348] February 13, 2019 Trial Transcript, page 135. DE 495.
[349] See Administrative DE 66-4.
[350] Vogelstein is not listed as a creditor in Debtor's schedules (Administrative DE 45) nor did he file a proof of claim. He was presumably repaid prior to the Petition Date. If so, his $1 million loan provided only very temporary relief.

Date, the Moyes group came back into some form of ownership of the Reorganized Debtor.

Conry discussed his August 7, 2011 declaration[351] filed in support of Debtor's assumption of certain contracts with sport teams, a possible sale to Spiral, and a possible sale to Nimbos. Although the post-Petition Date effort to sell Debtor's assets to Spiral never came to pass, the Trustee's cross-examination questions suggested that eight months after the Transaction Date, Debtor's assets were believed by Debtor to be worth not over $1.1 million (against millions of debt outstanding) and that Debtor was insolvent.

Conry testified that Debtor needed a Boeing 767 leased from KMW Leasing (owned by Wooley) but was unable to pay for that plane lease or to support its continued operations in the early days of its Chapter 11 Proceeding. For this reason, the Debtor sought financing from Nimbos, an entity controlled by Wooley. In fact, Debtor sought numerous rounds of post-bankruptcy financing via the Nimbos DIP Financing.[352]

Conry testified that among the obligations that needed to be serviced post-bankruptcy were Debtor's airplane lease obligations to Transjet, which leases called for monthly payments collectively exceeding $234,000. These payments aided Moyes because he was a guarantor of Transjet's bank loans owed on these two planes. Eventually, those plane lease obligations of Debtor were reduced to about $40,000 per month.

The Trustee's questioning of Conry suggested that, until those plane leases were reduced, the Debtor was required to pay amounts far in excess of the market for such plane leases.

---

[351] Trial Ex. 209, Administrative DE 119.
[352] See *supra* Part V(B).

Conry acknowledged that because the Spiral/Fowler investment or loan was never received by New Swift, it could not meet its post-Transaction Date obligations and needed to file bankruptcy.

- Re-Direct.[353] Conry agreed that Buyers wanted the Transjet Planes. Buyers also asked to take on the FBO lease with Services and payroll obligations with Transpay. On re-direct, Conry acknowledged that the New Swift December 31, 2011 balance sheet reflected its 121 Certificate at a book value of $0 because it had been fully depreciated and that New Swift cash was $148,000, up from the Transaction Date amount of $39,000.

Conry acknowledged that the proposal to sell Debtor's assets to Spiral for $1.1 million was only a starting point and that the Debtor proposed to accept higher offers for those assets. In any event, that sale never happened. Eventually, KMW Leasing took its plane back.

As to Nimbos, Conry testified Wooley/Nimbos/KMW Leasing were unrelated to Debtor and Debtor's negotiations with Wooley were in good faith and at arm's length. Conry concluded his testimony by addressing the Court as follows:

> If I may, Your Honor, just a real quick note. In October '13 when Swift exited bankruptcy and went forward, with your support it's a real success story what this company turned into and I just wanted to say thank you for believing and seeing the law that Swift could survive. It's a company that employs 500 employees, 30 aircraft and we appreciate -- we appreciate your decision.

### b. Huska

- Direct by Defendants.[354] Huska testified about Swift's relationship with SAVM and how the SAVM Payable built up over time to the point where the SAVM

---

[353] February 13, 2019 Trial Transcript, page 187. DE 495.
[354] February 13, 2019 Trial Transcript, page 195. DE 495.

Payable became uncollectible once the SAVM planes were sold off.[355]  He also testified as to SAVM's obligation to Moyes which built up to over $19 million.[356]

Huska testified about Swift's transactions with Transjet, Briad, Redeye, Services and SME.  There was no doubt in Huska's mind that the Briad, Redeye and SME receivables were collectible.

Huska confirmed that he prepared the schedules which were attached to the Purchase Agreement.  Swift's 135 Business and 121 Business were never separated until he prepared separate schedules in the run up to the Transaction.  In the Transaction, Huska's points of contact were Ehrlich and Burdette.  On the Buyer's side he worked with Stukes and Conry and came to believe they knew the aviation business and had a good plan for New Swift once the Transaction was to close.  The Buyers were provided all the information they sought.  Buyers were well informed about Swift's assets and operations. When the Transaction closed, Huska went to work with New Swift believing it was a good opportunity for him.[357]

- Cross-examination.[358]   On cross-examination, Huska acknowledged that Swift did not regularly make efforts to collect receivables owed to Swift by Affiliates but sometimes did account sweeps for accounting purposes.

- Re-direct.  On re-direct, Huska acknowledged that Swift Affiliates were not aggressive in collecting amounts owed to them by Swift.

---

[355] See Trial Ex. 020.  Note these financial statements refer to Swift Aviation Management, Inc. as "SAM."  In this Order that entity is defined as "SAVM."

[356] See Trial Ex. 243

[357] Of course, if Moyes would otherwise shut down Swift, the opportunity with New Swift was likely the only real prospect available to Huska within the Swift aviation group.

[358] February 13, 2019 Trial Transcript, page 247. DE 495.  Trial Transcript, February 14, 2019, page 5 DE 499.

c.     <u>Penrod</u>[359]

Defendants next called Penrod to testify. She has worked for Moyes for many years managing Transpay, managing documents, and handling finance and accounting issues for Moyes' companies. She testified about the history of the SAVM Receivable[360] and balances on the Moyes Note.[361] She helped Huska and Burdette with the accounting side of the Transaction including helping Huska split Swift's 135 Business from its 121 Business.[362] She discussed her work on SAM's accounting of the 135 Related and unrelated Payables moved from Swift to SAM at the time of the Transaction.[363] Of those payables, she identified $486,987 as having been paid by SAM after the Transaction Date. She also testified that wires of $300,000 and $50,000 were sent to Balkans to pay down the balance of $700,000 that SAG and SAM agreed under the Purchase Agreement were to be their responsibility.[364]

d.     <u>Burdette</u>[365]

•     Direct Examination by Defendants. Burdette testified that he was Swift's vice president and was designated by Swift's president, Moyes, to run Swift. He owned no equity interest in Swift nor any of its Affiliates, nor did he receive any director compensation or salary from Swift. Since Swift's personnel were all leased from Transpay, it paid Burdette's salary. Burdette received no compensation from the Transaction.

Burdette verified that in 2011, Moyes was extremely busy running Swift Transportation, a company then with about 30,000 employees and annual revenues over

---

[359] Penrod's testimony begins at page 21 of the February 14, 2019 Trial Transcript. DE 499.
[360] Trial Ex. 243.
[361] See the Swift balance sheet, Trial Ex. 027.
[362] Trial Ex. 019.
[363] Trial Ex. 238. This exhibit was admitted but the Court ignored columns J and K from lines 3 to 17. See February 14, 2019 Trial Transcript, page 73, lines 1 – 6. DE 499.
[364] Penrod testimony beginning at page 74, Trial Transcript of February 14, 2019. DE 499. See also Trial Ex. 047, page 4.
[365] Burdette's testimony begins at page 87, Trial Transcript of February 14, 2019. DE 499.

$3 billion.  Although Burdette reported to Moyes, he did so at random intervals.  In the meantime, he had full authority to hire, fire, obtain financing, sue, enter into contracts and do whatever else he felt was best.

Burdette testified at length about the genesis of Moyes' air transportation businesses and how it came to have a 121 Business and a 135 Business and what each business line entailed.  He described how Moyes supported Swift's development and how he believes it took about $6 to $7 million to get its 121 Certificate up and running.  Since Swift only capitalized about $1.4 million of these start up expenses, he indicated the other $5 million + were expensed in the years they were incurred.  This testimony was not at all specific nor was it credibly backed by documentation.

Burdette described how the 2008 financial crisis crippled Swift's 135 Business and how Swift lost its contracts with the Suns, Jazz and Coyotes and how the NBA labor strike in 2011 severely harmed Swift's 121 Business.

Burdette testified that, in 2011, Swift was not listed for sale but he was approached by Conry in October 2011 indicating his principals, Torbert and Stukes, were interested in a quick purchase.  Neither Burdette nor Moyes previously knew any of the people associated with the Buyers.  The Buyers wanted only Swift's 121 Business, not its 135 Business.

After a non-disclosure agreement was signed, Swift opened its books to Buyers.  After the LOI was signed, the parties rapidly moved towards closing on the Purchase Agreement since Buyers were in a big hurry.  Burdette thought Buyers' business model made sense and that, after meeting and lightly checking out Fowler, it appeared to Burdette that Fowler could write a check for the $5 million Buyers projected it needed.  Burdette noted that Spiral putting money into New Swift was absolutely important to Swift.  Burdette said the Buyers did not need Fowler's money to close the Transaction but would need it to expand.  Burdette's testimony also emphasized that the Buyers were completely

at arm's length. The Court agrees this was true. Burdette also testified that the Transaction made sense for the Buyers. The Court also finds this was true but only because Buyers were able to acquire Swift's ongoing 121 Business and its 121 Certificate at essentially no cost or financial risk.

Burdette saw Buyers' intended to bring on Van Lier, a knowledgeable aviation operator, the type of person Swift lacked.[366] This combined with Direct Air's summertime business reflected a business plan that could succeed where Swift was failing. Burdette testified that he felt the sale to Buyers was in Swift's best interest. By "Swift" this Court took Burdette to mean the Swift family of companies (Transpay, Transjet, Services, Swift, etc.).

Burdette testified that the Transaction Date value of Swift's 121 Certificate was $5 to $10 million.[367]

Burdette testified that Moyes did not request that the Transaction be structured in any particular way, nor did he require certain receivables or payables be transferred to his companies. Burdette confirmed that neither he nor Moyes had any side deals with the Buyers and that is there were no deals separate and apart from the deal set forth in the Transaction Documents.

Burdette testified that, after the Confirmation Date, and before January 1, 2014, Wooley, the 100% owner of Reorganized Swift, contacted him about Moyes coming back into the business. Moyes agreed to acquire 50% of the Reorganized Debtor from Wooley and, as a part of that deal, the Tax Note was torn up and the Reorganized Debtor continued to pay the IRS $62,000 per month on the Transportation Taxes. He also testified that the debts owed on Transjet 1's 801 and Transjet 2's 802 were paid off by Moyes (a guarantor of those debts) and then the Debtor's leases on those planes were reduced to $40,000 per

---

[366] Page 206, DE 499.
[367] Page 202, DE 499.

68

month per plane, down from over $235,000 per month for these two planes. The Reorganized Debtor was to be responsible for payment of the C-Checks on the 801 and 802.[368]

- Cross Examination.[369] On cross examination, Burdette acknowledged that, before the Transaction, he did no due diligence on Direct Air, the company which Buyers had only recently acquired and which was to provide needed synergy with Swift's 121 Business.[370] Burdette acknowledged it was his responsibility to make sure Fowler's $5 million came into New Swift. Burdette acknowledged that, while Swift was operating at the time of the Transaction, he did not know whether all its unrelated vendors were being paid timely or fully.

Burdette testified that the 801 and 801 leases totaling $235,000 per month between New Swift and Transjet 1 and Transjet 2 reflected the amounts owed monthly on the debt service on those planes.[371] These amounts did not necessarily reflect market value for these planes. By comparison he noted that, during the Chapter 11, Debtor had $80,000 per month on a Boeing 767 lease. On the other hand, he indicated that the $40,000 per month re-negotiated lease payments on the 801 and 802 leases were under market.[372] He also pointed out that, in any event, these new plane leases were nearly two years after the Transaction Date.

- Re-Direct. On re-direct, Burdette noted a 121 certificate is greatly enhanced when the holder is an operating company. He also testified that New Swift retained $4.35 million of 121 Business related debt, namely $1.8 million[373] of Transportation Taxes, $1.2

---

[368] Trial Ex. 118, which was also filed at Administrative DE 570. See also Administrative DE 575 approving that motion which became Trial Ex. 080.
[369] Trial Transcript February 15, 2019, beginning at page 10. DE 494.
[370] *Id.* at page 48.
[371] Prior to the Transaction, Swift had no contractual liability for debt service on or leases of either the 801 or the 802.
[372] February 15, 2019 Trial Transcript at page 172. DE 494.
[373] *Id.*

69

million[374] to Transjet and approximately $1.4 million[375] of accounts payable. New Swift also took customer deposits and corresponding liability plus payroll and accrued vacation liability.[376] He also testified that the Buyers never complained that Moyes and Burdette did not live up to their side of the Transaction. As to the cost of the 801 and 802 leases ($235,000 per month), Burdette noted the Buyers needed these planes[377] and were willing to overpay for the privilege of using them.

### e. Moyes[378]

- Moyes Direct Examination by Defendants. Moyes testified that he is 75 years old, married to Vickie Moyes, and has ten children. In 2011, he was Swift Transportation's CEO, perhaps then the largest truckload carrier in the world, with revenues then totaling about $3.3 billion per year. In 2011, he was working for the trucking company 50 to 60 hours per week and that the company had about 20,000 employees. In 1966, that company had one truck. In addition to his job and family responsibilities, Moyes was active in the West Valley Crisis Center, Operation Smiles and a Plain City, Utah scholarship fund.

Moyes described SME Steel, a company formed in 1985 which employs 400 to 500 people and that he serves on its board. He also discussed the roles Penrod and Burdette served for him and his Affiliates. When Moyes started transporting sports teams, Burdette recommended Moyes obtain a 121 certificate so he loaned Swift the money to do so. He said it took about $5 million to obtain the 121 Certificate and to establish the structure to get it operational.

---

[374] Trial Ex. 001, Schedule 1.1.3, Bates page 0205.
[375] Trial Ex. 001, Schedule 2.4(b), Bates page 0220.
[376] Trial Ex. 048, Ex. 2.
[377] February 15, 2019 Trial Transcript, p. 176. DE 494.
[378] February 19, 2019 Trial Transcript, page 58. DE 500.

Moyes testified he did not tell Burdette to sell Swift.  Rather, the Buyers approached Burdette to purchase Swift.  Burdette and Erhlich handled the Transaction.  Moyes did not negotiate the deal or specify the terms of the deal.

Moyes wanted New Swift to succeed because it carried the Swift name and many of Swift's employees went to work for New Swift.  He had no involvement with New Swift until it filed bankruptcy about six months after the Transaction.  He was shocked when it did file bankruptcy.  Because he guaranteed the debts on the 801 and 802 planes, and because Debtor was not timely paying the debt, he eventually stepped in to pay off those debts.

- Cross-Examination.  Moyes re-confirmed that the 121 Certificate acquisition and start up cost around $5 million but could not identify what his loan proceeds to Swift were used for.  He re-confirmed that, while he approved the Transaction, he did not know the particulars of this deal.  He acknowledged 2011 was a rough year for Swift but said he was committed to it and knew it would take millions of dollars to keep it going.  As to capitalizing versus expensing Swift's 121 Certificate acquisition costs, he acknowledged he would prefer to expense such costs.

- Re-Direct.  Moyes acknowledged that Burdette and Ehrlich negotiated and helped document the Transaction and that Burdette recommended to Moyes that he go forward with the Transaction.  Moyes trusted Burdette.


   f.   Ehrlich[379]

- Direct Examination.  Ehrlich testified that he is an attorney with 40 years of practice whose work involves transactional law, estate planning, real estate and tax.  He has handled 200 – 300 transactions over the course of his career, 30 - 50 of which he

---

[379] February 19, 2019 Trial Transcript, beginning at page 115.  DE 500.

handled for Moyes. He served as outside counsel for Moyes in connection with the Transaction. He primarily worked with Burdette and Huska on this deal.

Ehrlich noted that since Swift could not transfer its 121 Certificate, the entity itself needed to be transferred to Buyers via an equity sale by SAG. As a part of the Transaction he represented SAG and issued his firm's opinion letter to counsel for Swift.[380]

Ehrlich testified the Buyers initially suggested the Transaction structure of splitting Swift's 121 Business assets and liabilities away from the 135 Business assets and liabilities. Buyers were not interested in the 135 Business of Swift. Buyers' counsel, Holland and Hart, prepared the first draft of the Purchase Agreement. The Transaction evolved over time, especially near the December 21, 2011 closing date. For example, the Transportation Taxes were initially to be paid at closing by the Buyers but, instead they agreed to continue paying the IRS pursuant to payment terms already in place but Seller was to pay some of these taxes well after closing.[381]

Ehrlich testified that it is not unusual for the accounts payable of a purchased entity to not be paid at closing. The Buyers wanted to pay Swift's 121 Payables in due course. Moreover, Ehrlich wanted to know Buyers were adequately capitalized because, among other reasons, some of Moyes' Affiliates would need to be paid by New Swift. Ehrlich and Burdette wanted Buyers to succeed. However, Ehrlich did not discuss the possibility of Buyers personally assuming any of New Swift's debt. Ehrlich never recommended to Burdette "don't do this" Transaction. Ehrlich was satisfied with the representations and warranties contained in the Transaction Documents. He did not ever say the Transaction was an intentional fraud on Swift's creditors or a breach of Burdette's or Moyes' fiduciary duty. Ehrlich also thought the Buyers were proceeding in good faith in connection with the Transaction.

---

[380] Trial Ex. 011.
[381] See the Tax Note.

72

Ehrlich testified that, as a part of the Transaction, he did not represent SME or Redeye but was counsel for Transjet and the Transjet Subsidiaries, SAG and Swift, at least up to the point of the Settlement and Release Agreement and Transaction Documents.[382] He said Holland and Hart represented Swift on the Settlement and Release Agreement and the other Transaction Documents.

- • Cross-Examination. On cross-examination, Ehrlich was walked through Trial Ex.'s 028 and 055 and portions of Trial Ex. 001. The Court notes with interest that Buyers' signed LOI[383] references Buyers' willingness to personally guarantee the Transportation Taxes ($1.8 million) in a form acceptable to Seller, presumably if the Transportation Taxes were not paid by Buyers at closing.[384]

Ehrlich was shown his email to Buyers' lawyer[385] where he noted that, since there was now not going to be an $8 million equity contribution to New Swift, the deal would need to be re-worked because the 5% ownership share which Moyes was to retain would be worthless. Ehrlich noted that proposed 5% share was to be worth $300,000 to $400,000 (i.e. $8 million x 5% = $400,000).[386]

- • Re-Direct. On re-direct Ehrlich recognized that a 5% interest in New Swift would be a minority interest, would need to be discounted to show its fair market value and, in any event, 5% of book value is not the same thing as 5% of market value.

Ehrlich testified that he never received a demand on the SAG/SAM indemnity nor did Buyers ever tell him after the Transaction Date that Seller failed to disclose any debts to Buyers.

---

[382] Particularly Trial Ex.'s 004, 005, 006, 007, 009, and 010.
[383] Trial Ex. 055.
[384] Of course, Buyers did not pay the Transportation Taxes at closing nor did Moyes and Burdette obtain the personal guarantees which were apparently available for the taking. According to Ehrlich, they never even discussed with Buyers the prospect of a guaranty.
[385] Trial Ex. 101.
[386] This is interesting math because if there was to be an $8 million equity contribution to New Swift and 5% of New Swift might be worth $300,000 (but not over $400,000) then the $8 million equity contribution would be taking an entity from zero equity or negative equity to $8 million equity. If 5% = $300,000, then ending the equity position = $6,000,000. $8 million minus $6 million = starting equity of ($2 million).

1    Ehrlich was directed to SAG's 2011 tax return[387] where it noted a $4,510,000 plane

2    deposit and that, "due to financial hardship and insolvency [sic], the taxpayer could not

3    take delivery of the aircraft . . . the taxpayer took a deduction on 12/21/2011 on Form

4    4797." Ehrlich confirmed that the "insolvency" reference was to book value insolvency,

5    not market value. Moreover, the pass-through losses could not be promptly utilized by

6    Moyes because he already had significant passive losses.[388]

7        Before Defendants' final witness was called on the last day of trial, the parties had

8    a heated exchange over Plaintiff's surprise subpoena of a CPA (Aaron Evans). This battle

9    was all for naught as Plaintiff never called Evans as a part of their proposed rebuttal case.

10

11                        g.    Lyon[389]

12        Since Lyon's testimony is focused on the question of Swift's Transaction Date

13   solvency, it is recounted in § VII(A)(2)(f), below.

14        Following Lyon's testimony there were extended discussions about Plaintiff's

15   calling a rebuttal case. To summarize, no new evidence was admitted but Plaintiff's

16   counsel highlighted inconsistencies in testimony from Moyes and Burdette.

17        Finally, the parties pointed this Court to designations from depositions, all of which

18   designations appear in a three-ring binder received by the Court and admitted into

19   evidence with objections noted. (Green and orange reflects Defendants' designations,

20   blue and yellow reflect Plaintiff's designations.)[390]

21

22

23

---

[387] Trial Ex. 031.
24   [388] This exchange highlights for the Court that, while Moyes was not in a position to promptly shield income from the
     passive losses triggered by the Transaction, Moyes nevertheless was able to recognize a significant tax benefit at the
25   time of the Transaction. See § VII(C)(6)(i)
     [389] February 20, 2019 Trial Transcript, beginning at page 17. DE 498.
26   [390] February 20, 2019 Trial Transcript, page 231. DE 498. This three-ring binder is an unmarked exhibit listed in
     Attachment 2, at Trustee Trial Exhibits.

74

### 3. Trial Exhibits

**Attachment 2** is a list of the exhibits introduced by the parties, jointly and separately. **Attachment 2** also indicates which exhibits were and were not admitted into evidence. In addition to these exhibits, the parties provided the Court with a three-ring binder of designated excerpts of deposition transcripts.

### C. Post-Trial

The trial concluded on February 20, 2019. Defendants wished to submit closing briefs prior to making their closing arguments. The Court directed that simultaneous briefs be filed by March 25, 2019. The Trustee filed his Closing Brief on April 5, 2019,[391] and Defendants filed their Closing Brief the same day.[392] Closing arguments were set for March 29, 2019, but were later continued to April 17, 2019.

As noted below,[393] on January 29, 2019, this Court certified two questions to the Arizona Supreme Court pertaining to fiduciary duties owed to an LLC under Arizona law. On June 25, 2019, the Arizona Supreme Court issued its ruling after which this Court held a hearing on July 2, 2019, to hear argument on the impact the Arizona Supreme Court's ruling had on Plaintiff's breach of fiduciary duty claims.[394]

On September 23, 2019, in anticipation of this Court's imminent ruling on this matter and in light of certain personal issues experienced by Defendants' counsel, the parties requested that this Court issue only a tentative ruling. The parties would then evaluate and comment upon the tentative ruling before a final order or judgment would be entered by the Court.[395] The Court issued its Tentative Order on September 30, 2019.[396]

---

[391] DE 521.
[392] DE 522.
[393] See §§ VI(A)(4) and VII(c)(2).
[394] See § VII(C)(2).
[395] Perhaps naively, this Court thought this process might eliminate a round of motions for reconsideration, new trial, clarification, etc. The Court shall soon learn whether the Court's optimism was misguided.
[396] DE 541.

75

The parties filed their comments to the Court's Tentative Order.[397] A hearing was held on December 3, 2019, at 10:00 a.m. after which this matter was finally taken under advisement.

## VII. ANALYSIS OF TRUSTEE'S CAUSES OF ACTION

### A. Preferential Transfers

#### 1. Legal Analysis

Under § 547(b) a bankruptcy trustee may recover property for the benefit of the debtor's estate if the following six elements are satisfied:

> (1) there was a transfer of property of the debtor;
> (2) to or for the benefit of a creditor;
> (3) for or on account of an antecedent debt;
> (4) made while the debtor was insolvent;
> (5) made between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (6) that allows the creditor to receive more than it would receive had the transfer not been made and the debtor's estate liquidated according to the provisions of the Bankruptcy Code.

11 U.S.C. § 547(b).

A bankruptcy trustee must prove all six elements exist for a transfer to be avoidable as a preference.[398] Under § 547(g), the Trustee has the burden of proving all elements by a preponderance of the evidence.[399]

If and when a transfer is avoided under § 547, the Court looks to § 550 which provides:

> …to the extent that a transfer is avoided under section … 547…the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –

---

[397] DE's 542, 543, 545 and 546.
[398] *Danning v. Bozek* (*In re Bullion Reserve of N. Am.*), 836 F.2d 1214, 1217 (9th Cir. 1988), *cert.* denied, 486 U.S. 1056 (1988).
[399] 11 U.S.C. § 547(g).

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

The structure of § 550 provides for distinct treatment for initial transferees or beneficiaries, on the one hand, and immediate or mediate transferees, on the other.[400] The Bankruptcy Code does not provide for distinct treatment for immediate and mediate transferees.[401] In order to be a "transferee" for purposes of § 550, an entity must have dominion over the asset being transferred or the right to use the asset for one's own purposes.[402] In order for a trustee to recover from an entity "for whose benefit such transfer was made" "it is not enough that an entity benefit from the transfer; the transfer must have been *made for his benefit*."[403] The "entity need not actually benefit, so long as the transfer was *made* for his benefit."[404]

"Before a court can determine whether a transfer was made by or to or for the benefit of a covered entity, the court must first identify the relevant transfer to test that inquiry."[405] The Supreme Court goes on to discuss how, in the context of §546(e)'s safe harbor for securities, the relevant transfer is not the "component parts" of the transaction, but the transfer that the trustee is seeking to avoid.[406]

---

[400] *Danning v. Miller* (*In re Bullion Reserve of N. A.*), 922 F.2d 544, 548 (9th Cir. 1991).

[401] Neither the Bankruptcy Code nor Black's Law Dictionary define the terms "immediate" and "mediate." Merriam-Webster defines the former as "occurring, acting, or accomplished without loss or interval of time" and the later as "exhibiting indirect causation, connection, or relation." *In re Baker & Getty Financial Services, Inc.*, 974 F.2d 712 (6th Cir. 1992) provides the following insight: "A mediate or immediate transferee is simply one who takes in a later transfer down the chain of title or possession." This Court assumes that an "immediate" transferee is one who receives the transfer after the initial transferee and a "mediate" transferee is one who receives the transfer after the immediate transferee. In this case Moyes Trust would be the initial transferee of the Redeye Receivable, SAM would be the immediate transferee of that receivable and Redeye would be the mediate transferee.

[402] *In re Bullion*, 922 F.2d at 548. (citing with approval *Bonded Fin. Servs. V. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

[403] *Id.* (citing with approval *Merrill v. Dietz* (*In re Universal Clearing House Co.*) 62 B.R. 118, 128 n.12 (D. Utah 1986)).

[404] *Id.* (citing with approval *In re Richmond Produce Co.*, 118 B.R. 753, 759 (Bankr. N.D.Cal. 1990)).

[405] *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S.Ct. 883, 892 (2019).

[406] *Id.* at 892-93.

A bankruptcy trustee must show that the debtor was insolvent at the time of the challenged transaction in order to avoid a preferential transfer.[407]  Insolvency is defined as "a financial condition such that the sum of such entity's debt is greater than all such entity's property, at a fair valuation, exclusive of …" fraudulently transferred property and exempt property.[408]  "Mechanically, the balance-sheet solvency test asks if the market value of assets exceeds the fair value of debts."[409]  "Fair valuation" is not defined in the Bankruptcy Code but the Ninth Circuit has adopted a two-step process for determining whether a debtor was insolvent for purposes of avoiding preferential transfers.[410]  First, the Court must determine whether the debtor was "on its deathbed" or a "going concern" at the time of the transfer.[411]  Second, the Court must value the debtor's assets depending on its status as a "going concern" or "deathbed" debtor and apply the simple balance sheet test to determine solvency.[412]

Here, the parties agree that Swift was a "going concern" on the date of the Transaction Date.[413]  The parties also agree that SAG was merely a conduit of transfers made in connection with the Transaction.[414]  For purposes of § 550(a)(1), Moyes, Transjet and the Moyes Trust were the initial transferees of a portion of the 135 Related Party

---

[407] *In re DAK Industries, Inc.*, 170 F.3d 1197, 1199 (9th Cir. 1999).
[408] 11 U.S.C. § 101(32)(A).
[409] See *Simple Insolvency Detection for Publicly Traded Firms*, 74 Bus. Law. 723-24 (2019) (The permissibility of leveraged buyouts and spinoffs depends on whether the resulting entities are solvent, typically requiring solvency opinions before consummation.")  Of course, the Transaction at issue in this case was not a leveraged buyout nor did it involve a publicly traded entity.  The Court is not finding that a solvency opinion should have been obtained by Defendants in advance of the closing of the Transaction.  However, the Court does note that neither the Defendants nor the Buyers required a pre-Transaction solvency opinion concerning Swift.  Moreover, based on the American Institute of Certified Public Accountants *Standards Regarding Valuation*, business valuations are performed for a wide variety of reasons including planning oriented engagements, mergers and acquisitions, or potential transactions. N, B:  Defendants requested that this Court take judical notice of the AICPA guidelines at DE 462.
[410] *In re* DAK, 170 F.3d at 1199-1200.
[411] *Id.*
[412] *Id.*
[413] On the Transaction Date one could make a case for the proposition that Swift was on its "death bed" but neither of the parties have invited the Court to make this determination nor will the Court *sua sponte* make such a finding.
[414] See page 9, ¶ 9 and FN 41.

Case 2:14-ap-00534-DPC    Doc 555    Filed 03/31/20    Entered 03/31/20 15:42:31    Desc
Main Document    Page 86 of 174

Receivables. For § 550(a)(2) purposes, SAM, Moyes and Redeye were the immediate or mediate transferees of the SME, Briad and/or Redeye Receivables.

### 2. Interim MSJ Preference Order

Prior to trial, the Court determined that Swift transferred its interests in account receivables[415] totaling $12,136,669[416] to or for the benefit of certain of the Defendants for or on account of antecedent debts[417] owed by Swift which enabled such creditors to receive more than they would in a hypothetical liquidation had the transfers not been made.[418] On the transfer date,[419] the transferees were "insiders" of Swift within the meaning of § 101(31).[420] The transfers in question were made within one year of the Debtor's Petition Date. The Court further determined that the debts satisfied by these transfers i.e. $11,747,393[421] were "antecedent debts" of Swift, within the meaning of § 547(b)(2).[422] The Court, therefore, found that five of the six elements of a preferential transfer had been established by the Trustee. The Court left for trial the question of whether the Debtor was insolvent at the time of these insider transfers.

The Court now reviews evidence adduced at trial which pertains to the question of Swift's solvency or insolvency on the Transaction Date. First, the Court will address the reports and testimony of the Trustee's expert witness, Spindler, and then the Court will review the reports and testimony of the Defendants' expert, Lyon.

---

[415] The receivables in question are the 135 Related Party Receivables.

[416] Swift also transferred its 135 Business to SAM but the Court received no evidence indicating the value of such business on the Transaction Date. For this reason, the Court attributes no value to such transfer.

[417] After hearing testimony at trial, the Court hereby confirms its earlier finding that the 135 Related Party Receivables were transferred for or on account of the Antecedent Debts.

[418] At trial, the parties did not contest this point as it was resolved by summary judgment (DE 472). As the Trustee indicated at the motion for summary judgment hearing, unsecureds were only paid about seven cents on the dollar under Debtor's Chapter 11 Plan.

[419] The Transaction Date.

[420] DE 472, ¶ 7.

[421] This amount is defined as the Antecedent Debts (and as the 135 Related Party Payables).

[422] DE 472, ¶ 5.

79

3. <u>Insolvency</u>

a. <u>Spindler Report.</u>

The Trustee hired Spindler of GlassRatner to prepare an expert report on the question of Swift's solvency/insolvency on the Transaction Date. Spindler is based in Los Angeles. He is a certified public accountant, is certified by the American Institute of Certified Public Accountants in both financial forensics and business valuation. He has 36 years of experience in auditing and forensic accounting. While he has had experience in a vast array of industries, he had never previously valued an aviation company which held a 121 certificate.

Spindler's initial 28-page report (plus four exhibits and two appendices) is dated March 23, 2017.[423] In summary, that report opines that Swift was insolvent on a book value basis[424] from December 31, 2010 through the Transaction Date.[425] There is no debating this point as Swift's financial statements clearly reflect this fact. However, book value is not the test of insolvency for purposes of the Trustee's claims to avoid Swift's allegedly fraudulent or preferential transfers or for purposes of the breach of fiduciary duty claims. After certain adjustments to Swift's book value[426] balance sheet, Spindler concludes Swift was insolvent once the assets and liabilities of Swift are viewed based on fair market values. This is the so-called balance sheet test of solvency.[427]

Spindler determined Swift was to be valued as a going concern as of the Transaction Date.[428] He defines fair market value as:[429]

> 45. We define fair market value as follows: "The cash equivalent amount at which property would change hands between a willing seller and a willing

[423] Trial Ex. 048. See also DE 354, pp. 26-75.
[424] Id. at ¶¶ 29 and 46.
[425] Id. at ¶ 42.
[426] Spindler notes at ¶ 48 that the "term 'Book Value' derives from the accounting practice of recording asset values on its balance sheet at the original cost of acquiring the asset," less depreciation of those assets. ¶ 48.
[427] Id. at ¶ 44.
[428] Id. at ¶ 45.
[429] See Ex. 048 ¶ 45.

buyer when neither party is under any compulsion to sell or buy and when both parties have reasonable knowledge of the relevant facts."

To ascertain the fair market value of Swift's assets on the Transaction Date, Spindler made three adjustments:

1.     He increased the value of the 121 Certificate from a book value basis of $0 to a fair market value basis of $800,000;

2.     He applied a downward adjustment of $1,342,499 to Swift's accounts receivables due to the uncollectability of those receivables.  The balance sheet line item for Swift's receivables, therefore, decreased from $1,921,863 on December 21, 2011, to $579,364,[430] an amount Spindler deemed collectible; and

3.     He adjusted the value of Swift downward due to the Transaction requiring New Swift to include additional liability for the Transjet 121 Payable, an amount totaling $1,200,000 on the Transaction Date.

### (i)     Value of Swift's 121 Certificate

It is Spindler's first adjustment that is at the center of the parties' solvency debate. In 2011, the 121 Certificate was carried at a $0 book value on Swift's balance sheet. This book value reflects an acquisition cost of $1,484,268 less accumulated amortization totaling the same $1,484,268.[431]  Spindler acknowledges the 121 Certificate had value so his report launched into an analysis of that value.  After recognizing a 121 certificate is not itself transferrable,[432] it is worth noting how Spindler arrived at his $800,000 fair market value of the 121 Certificate.

---

[430] See ¶ 89 of the Spindler Report.  But see ¶ 32 of the Spindler Report which identifies fair market value of the receivables at $586,214.
[431] *Id.* at ¶ 55.
[432] Spindler noted that 121 certificates change hands via a change in the ownership of the entity that holds a 121 certificate.  This is exactly how the Transaction was structured.  Spindler contends this transferability issue itself diminishes the value of a 121 certificate. *Id.* at ¶ 54.

- <u>Income Approach</u>

Like most appraisers, Spindler looked at the three principal appraisal methods: the Cost Approach, the Income Approach and the Market Approach. Spindler rejected the Income Approach of valuation because the 121 Certificate, in and of itself, did not generate income. It only produced income when it was combined with other assets and the collective operations of those assets. Moreover, Spindler recognized the 121 Certificate operations generated "negative operating cash flows."[433]

- <u>Cost Approach</u>

As to the Cost Approach, Spindler states this form of valuation is based on the "economic principle of substitution." He identifies two methods of obtaining such substitution, (1) reproduction cost new less depreciation ("RP") and (2) replacement cost new less depreciation ("RC"). RP looks at the cost today of recreating an exact replica of an intangible asset. Spindler agrees this is the most relevant of the Cost Approach methods, but he found no data which identifies the direct cost to obtain a new 121 certificate from the FAA. Swift's actual cost to acquire its 121 Certificate was deemed irrelevant by Spindler because the $1,484,268 reflected on its books may or may not have accurately reflected acquisition costs. More importantly, he felt the overall condition of the U.S. airline industry in 2011 was poor, noting 15 airlines had filed bankruptcy between 2008 and the Petition Date.[434] He suggests that a 121 certificate could be acquired on the Transaction Date for considerably less than the amounts Moyes and Burdette claimed it cost to obtain a Swift's 121 Certificate from the FAA.

Spindler then turned to the valuation method he deemed most informative, the Market Approach.

---

[433] *Id.* at ¶ 58.
[434] *Id.* at ¶ 63.

- <u>Market Approach</u>

To start his analysis of the Market Approach, Spindler acknowledges intangible assets (the 121 Certificate) are rarely sold in a stand-alone transaction and when they are they are not often publicly reported. He did, however, identify a handful of airline bankruptcies filed between 2008 and 2013, and then found these scenarios analogous because Swift too ended up in bankruptcy six months after the Transaction Date.[435]

The Spindler Report mentions 21 airline bankruptcies filed between 2008 and 2013. He then proceeds to only review three of those cases. First, he reviewed the 2010 sale of Arrow Airlines' ("Arrow") stock for $800,000 plus coverage of up to $100,000 of operating expenses. There, the buyer received 100% of the new stock issued by the debtor in a chapter 11 plan. The entity acquired held a 121 certificate, miscellaneous intangible assets, some furniture, fixtures and equipment and an unidentified amount of receivables.[436] None of the property held by the entity was separately valued. Spindler concludes the value of the 121 certificate owned by Arrow could not have exceeded the $800,000 purchase price for the entire entity. Despite noting earlier in his report that Swift needed to be valued as a going concern for purposes of determining its fair market value, Spindler points to this Arrow transaction, a bankruptcy where Arrow ceased operations before it filed bankruptcy because it could not find a pre-bankruptcy buyer.

Spindler next looked at the Ryan International Airline ("Ryan") bankruptcy sale. Ryan apparently filed its March 2012 bankruptcy as an operating chapter 11. When no sale was forthcoming, it ceased operations in January 2013 but then later sold the stock of the business in February 2013 for $800,000. Like Arrow, Ryan's entity held a 121

---

[435] *Id*. at ¶¶ 66 and 67.

[436] Although Arrow operated pre-bankruptcy with seven leased airplanes, apparently none of those leased plans were part of the post-bankruptcy transaction recounted by Spindler.

certificate, miscellaneous intangible assets, equipment and a land lease.[437]  Again, unlike the Swift Transaction, the Ryan sale was of a non-operating entity.

The last "comparable" sale analyzed by Spindler involved a non-operating private air charter airline named Sky King Airlines ("Sky King").  In Sky King, a chapter 11 plan was confirmed where a buyer, for $500,000, acquired the newly issued stock of the debtor together with that debtor's 121 certificate plus miscellaneous intangible property.[438] Spindler posits that the 121 certificate alone must be valued at a number below $500,000. Once again, this sale involved a non-operating entity.

In addition to these three bankruptcy sales of non-operating 121 certificate holders, Spindler notes that there are "numerous examples of part 121 airlines, such as Pace Airlines ("Pace"), that ceased operating and had their respective 121 certificates vacated and returned to the FAA or that saw the FAA unilaterally terminate their Part 121 certificates."[439]  He suggests this indicates those 121 certificates were of negligible value.

In summary, Spindler finds that Swift's 121 Certificate would be generously valued at $800,000.  He then adjusts Swift's book value of the 121 Certificate from $0 to a fair market value of $800,000.

(ii)    Spindler's Accounts Receivable Adjustment

Spindler points to ¶ 3.23(j) and Schedule 3.23(g) of the Purchase Agreement[440] which reveals the Buyers were told by Seller that certain 121 Business receivables were uncollectible.  The Purchase Agreement then divides the $1,921,863 of receivables to be retained by New Swift into the four categories.  Spindler takes those four categories and

---

[437] Although Ryan operated pre-bankruptcy with four leased airplanes, apparently none of those leased planes were part of the post-bankruptcy sale transaction.
[438] The number of planes leased by Sky King was not revealed but apparently none of these leases were assumed as a part of the Sky King sale.
[439] Trial Ex. 048, ¶ 85.
[440] Trial Ex. 001, p. 24.

84

attaches a percentage representing the chance that the amount in each category will be collected. These mathematical equations produced estimated receivable collections in the amount of $579,364 thereby producing an accounts receivable write-off of $1,342,499.[441] Spindler then contends this is a conservative write-off amount because New Swift's December 31, 2011 financial statement reflects accounts receivable as totaling $274,383.[442]

Spindler concluded that Swift's Transaction Date 121 Receivables should be adjusted downward by $1,342,499 to reflect a true fair market value of such receivables at $579,364.

### (iii) Spindler's Payable Adjustment

Spindler highlights Schedule 1.1.3 of the Purchase Agreement which requires New Swift to assume liability for the 121 Business portion of Swift's liability on what is defined in the Purchase Agreement (and this Order) as the Transjet 121 Payable.[443] Under the Purchase Agreement, that debt assumption is not to exceed $1.2 million even though Schedule 1.1.2 identifies that payable as totaling $1,269,579. Spindler notes the New Swift December 22, 2011 balance sheet reflects payables at $3,233,625 (inclusive of long-term Transportation Taxes of $1,814,938) whereas New Swift's December 31, 2011 balance sheet reflects payables at $2,688,180 (exclusive of these long-term Transportation Taxes) thereby reflecting December 31, 2011 payables $1,269,493 greater than stated in December 22, 2011. Spindler, therefore, concludes the December 22, 2011 balance sheet failed to reflect New Swift's $1.2 million assumption of the Transjet 121 Payable. He then adjusts the Transaction Date Swift accounts payable amount upward by $1,200,000.

---

[441] $1,921,863 - $579,364 = $1,342,499.
[442] See Trial Ex. 048, Spindler Ex. 1 and Ex. 2 and Trial Ex. 030.
[443] Trial Ex. 001, p. 8, ¶ 1.1.3 and Schedule 1.1.3 attached to the Purchase Agreement.

(iv)    Spindler's Conclusions

Spindler adjusts Swift's Transaction Date book value balance sheet upward to reflect an $800,000 fair value of the 121 Certificate, downward by $1,342,499 to reflect the overstated value of receivables which were to remain with New Swift and downward to reflect $1.2 million in understated Transjet 121 Payable which were to be assumed by New Swift. These adjustments then, according to Spindler, reflected Transaction Date fair market values of Swift assets totaling $3,748,388 and liabilities totaling $6,507,003 for a fair market value reflecting negative equity (insolvency) of $2,758,615. Spindler also calculates that New Swift's insolvency on December 31, 2011, totaled approximately $3.9 million on a fair market basis.[444]

In the absence of the Spiral/Fowler $5 million loan or new equity, Spindler concludes New Swift was left after the Transaction with insufficient working capital to pay its ongoing debts as they became due.[445] He notes that just before the Transaction, Swift's current assets totaled $12,361,420 while their current liabilities totaled $6,953,190 for a surplus working capital of $5,408,230. The day after the Transaction Date, New Swift's working capital totaled ($1,102,357) but when New Swift cleaned up its books on December 31, 2011 to reflect the Transjet 121 Payable and write down in receivables, New Swift's working capital totaled ($2,991,628). This negative working capital, he states, demonstrated that New Swift could not pay its debts as they became due.[446]

---

[444] Trial Ex. 048, ¶ 96.

[445] *Id.*, ¶¶ 101 and 103. Spindler also analyzes the Legacy Transaction at ¶¶ 104 and 105 but since this Court denied Trustee's motion to add the Legacy Claim to his Complaint, the Court will not recount Spindler's comments in this regard.

[446] *Id.*, ¶¶ 102 and 103. The Spindler Report defines the Briad Receivable plus the Redeye Receivable as the "Non-Moyes Receivables." The 135 Related Party Receivables he refers to as the combination of SAVM Receivables plus the SME Receivables plus the Transjet Receivable which he defines as the "Inter-Company Receivables."

86

b.     <u>Lyon's Rebuttal Report</u>

In response to the Spindler Report, Defendants' expert Lyon prepared his April 23, 2018 Lyon Rebuttal Report.[447]  Lyon finds fault with the Spindler Report not analyzing the Transaction itself to determine whether that Transaction gave rise to an actual or constructive fraudulent transfer.  Lyon correctly notes the Spindler Report, at most, states Spindler's conclusion that Swift was insolvent on the Transaction Date or was rendered insolvent by the Transaction or, as a result of the Transaction, was left with insufficient capital to pay its debts as they became due.  Lyon not only has a contrary opinion regarding Swift's insolvency, he also goes on to opine that the Spindler Report fails to prove the Trustee's claims for actual or constructive fraudulent transfers or preferential transfers.  Moreover, Lyon's Rebuttal Report reiterates his findings in the Lyon Report[448] to the effect that the Transaction was not an intentional or constructive fraudulent transfer nor was it a preferential transfer.

Lyon unquestionably has greater experience than Spindler in the airline industry.  Lyon served on the board of Mesa Airlines, was a financial advisor for Hawaiian Airlines in its bankruptcy and was an advisor to the unsecured creditors committee of Mesaba Airlines.  All these airlines were considerably larger than Swift and all owned a FAA 121 certificate.

Lyon's critique of Spindler's analysis begins by agreeing with Spindler's definition of fair market value found at ¶ 45 of the Spindler Report:

> 45. We define fair market value as follows: "The cash equivalent amount at which property would change hands between a willing seller and a willing buyer when neither party is under any compulsion to sell or buy and when both parties have reasonable knowledge of the relevant facts."

See Trial Ex. 048, ¶ 45.

---

[447] Trial Ex. 051.
[448] Trial Ex. 049.

1    Lyon notes that he and Plaintiff both agree Buyers and Seller (SAG) were willing

2    buyers and sellers and under no compulsion to buy or sell and that they each had

3    reasonable knowledge of the facts relevant to the Transaction.

4    Lyon notes the value of a 121 certificate is considerably different if the holder of

5    the certificate is operating and has its 5 Wisemen in place. Lyon finds fault with Spindler

6    valuing Swift's 121 Certificate by looking at bankruptcy sales in which the 121 certificate

7    holder was defunct. He finds these to be in no way comparable transactions. He suggests

8    it would be akin to valuing an ongoing business by using a liquidation analysis.

9    Lyon also takes umbrage at Spindler failing to account for the value of customer

10   contracts assumed by New Swift. Those contracts include air transportation contracts with

11   various sports teams. Lyon finds it odd that the actual transaction at issue was not

12   analyzed by Spindler as reflecting the value of what Buyers acquired in the Transaction.

13   Lyon also points to Spindler's failure to mention that ,once New Swift filed bankruptcy

14   six months after the Transaction, the Debtor ultimately obtained new financing in the

15   aggregate amount of $6.3 million from Nimbos and that Nimbos acquired all of the

16   Debtor's assets in a chapter 11 plan confirmed by the Court 20 months after the

17   Transaction. This $6.3 million "purchase," Lyon contends, supports his $6.5 million

18   valuation of Swift's assets on the Transaction Date.

19   On a separate note, Lyon contends that splitting Swift's 135 Business away from

20   the 121 Business did not result in payment of Swift's antecedent debts to its Affiliates but,

21   rather, "was part of the implementation of the arm's-length negotiations of the

22   [Transaction]. To claim as a preference the asset side of the non-third party accounts

23   would result in a windfall to New Swift and that was not bargained for in the arm's-length

24   [Transaction]."[449]

25

26   _____

[449] Trial Ex. 051, pp. 16-17.

1    Next, Lyon criticizes Spindler's failure to analyze the matching of the 135 Related

2  Party Receivables transferred to SAG with the 135 Related Party Payables satisfied

3  through this transfer. In other words, were the receivables transferred used to satisfy

4  payables owed by that same transferee and were those receivables wholly or partially

5  uncollectible.

6    Finally, Lyon suggests the Transaction itself reflects contemporaneous exchange

7  of new value.

8    Lyon opines that Swift was not insolvent or rendered insolvent by the Transaction,

9  that there was no actual or constructively fraudulent transfer, that there was no preferential

10  transfer and that, even if there was a preferential transfer, the Defendants hold the defense

11  of contemporaneous exchange of new value.

12

13                   c.     Spindler Testimony[450]

14    •    Direct. On direct examination, Spindler highlighted his audit and forensic

15  experience in the airline industry but conceded that he had never valued an FAA 121

16  certificate. His testimony largely reiterated the basis for his insolvency opinion,

17  particularly emphasizing how he determined the value of Swift's 121 Certificate. He also

18  explained why he ascribed no value to Swift's customer contracts (they were producing

19  losses) or to the 5 Wisemen in place at Swift at the Transaction Date. He also reiterated

20  that his valuation of Swift was a going concern value.

21    •    Cross. On cross-examination, Spindler acknowledged he did not analyze the

22  Defendants' intent or whether they acted with an evil mind, whether their actions

23  constituted a breach of fiduciary duty or fraudulent transfer or what damages may have

24  been sustained by Swift. His testimony and reports focused on Swift's insolvency on the

25  Transaction Date. In researching the value of Swift, Spindler did not talk to anyone on the

26  _____
[450] February 11, 2019 Trial Transcript. DE 493.

Buyers' side of the Transaction and did not consider the Transaction itself as suggestive of Swift's market value on the Transaction Date. As to the 5 Wisemen and any value they might provide to Swift's going concern value, Spindler admitted he was not familiar with the requirements of the 5 Wisemen needed for an operating 121 certificate.

Defendants' counsel walked Spindler through pleadings in the Arrow, Ryan and Sky King bankruptcies. Defendants' cross-examination demonstrated the Arrow 121 certificate was subject to a transaction over a year prior to the Transaction Date, that Arrow was not operating at that time and that no charter customer contracts were assumed.[451] As to Ryan's bankruptcy, Defendants' cross-examination revealed that Spindler had not reviewed Ryan's list of executory contracts,[452] that the Ryan stock purchaser was not assuming any charter customer contracts[453] and that the purchaser could not start up 121 operations without prior approval of the FAA.[454] With respect to the Sky King comparable sale used by Spindler, Defendants' cross-examination demonstrated that this bankruptcy transaction was nine months after the Transaction Date, that Spindler did not look at Sky King's Schedule G list of executory contracts,[455] that Sky King had ceased operations and by doing so "the value of the business tied to its CFR 121 FAA Certificate, significantly decreased."[456] Lastly, as to the Hawaiian Air comparable transaction viewed by Spindler, Defendants' cross-examination showed that this transaction was nearly six years after the Transaction Date, that Spindler had not looked at Hawaiian Air's Schedule G list of executory contracts,[457] and that when the sale[458] of aviation assets failed to close, the Court authorized the abandonment of the 121 certificate.[459]

[451] Trial Ex. 222 (Schedule G-Executory Contracts in Arrow's bankruptcy schedules, Trial Ex. 223 (Arrow's Amended Disclosure Statement) and Trial Ex. 224 (Notice of Arrow's Assumed Contracts).
[452] Trial Ex. 226.
[453] Trial Ex. 227, Exhibit A Ryan "Assets to be Transferred."
[454] Trial Ex. 229, ¶ 8- Ryan Sale Order.
[455] Trial Ex. 215, Sky King – List of Executory Contracts.
[456] Trial Ex. 220, p. 12, ¶ 3 – Sky King Disclosure Statement.
[457] Trial Ex. 231 – Hawaiian Air List of Executory Contracts.
[458] Trial Ex. 234 – Hawaiian Sale Order.
[459] Trial Ex. 236 – Hawaiian Air Abandonment Order.

Defendants demonstrated through cross-examination that Debtor had numerous charter contracts[460] and that the Court approved the assumption of many of those executory contracts on August 28, 2012.[461] Next, Defendants showed Spindler that after the Transaction Date, New Swift arranged for working capital in the amount of $1.5 million.[462] Counsel also challenged Spindler's assumption that the SAVM Receivable owed to Swift was collectible on the Transaction Date and suggested Swift suffered no damage by the Transfer of the SAVM Receivable to SAG and Moyes.

- Re-Direct. On re-direct, Spindler confirmed that nothing in his search for comparable sales suggested a 121 certificate was worth over $800,000 nor did he find anything suggesting charter contracts would add to the value of the holder of a 121 certificate. He reiterated that the Swift charter contracts were of no value to Swift because Swift was losing money servicing those contracts.

### d. Lyon's Report

Lyon was Defendants' expert witness. He prepared an initial report on March 23, 2018.[463] Unlike the Spindler Report, the Lyon Report goes far beyond an analysis of Swift's solvency. The Lyon Report opines on all the Trustee's causes of action and concludes the Complaint must fail on its claims to avoid preferential and actual and constructive fraudulent transfers and on the Plaintiff's breach of fiduciary claims.

Lyon's resumé reveals that he has far more experience than Spindler in the aviation world. He is on the board of Mesa Airlines and has served as a financial advisor in the bankruptcies of Mesaba Airlines, Hawaiian Airlines and Pinnacle Airlines.[464] His contacts and knowledge of the industry clearly exceeds Spindler's.

---

[460] Trial Ex. 059 (Bucks), Trial Ex. 057 (Blackhawks), and Trial Ex. 058 (Celtics).
[461] Trial Ex. 211, Administrative DE 170.
[462] February 11, 2019 Trial Transcript, p. 109. DE 493.
[463] Trial Ex. 049.
[464] *Id*. at p. 19.

Case 2:14-ap-00534-DPC   Doc 555   Filed 03/31/20   Entered 03/31/20 15:42:31   Desc
Main Document    Page 99 of 174

1    The early portions of the Lyon Report establish his definitional playing field,

2    describes a bit of Swift's history and then recounts the Transaction at a 30,000-foot level.

3    He then determines there could be no preferential avoidance under § 547 because (1) the

4    transfer of Swift's 135 Business was from Swift to SAM and at the time of the

5    Transaction,[465] SAM owed no money to Swift, (2) Swift likely holds valid new value

6    and/or contemporaneous exchange of value defenses,[466] and (3) Swift was not insolvent

7    nor was it rendered insolvent by the Transaction.

8        Section 3.2.D of the Lyon Report[467] discusses Lyon's solvency analysis.  Lyon

9    identifies numerous methodologies available to determine insolvency under § 101(32)(A)

10   of the Bankruptcy Code but indicates all these methods seek to "get to fair market value

11   through construction of a hypothetical sale between willing buyer and seller in an

12   unrelated party transaction."  He finds that such "circumlocution is unnecessary here

13   because the [Transaction] at issue was an actual sale between a willing buyer and seller in

14   an arm's length transaction."[468]  Lyon also correctly points out that book value of a

15   company is "almost never equivalent to fair market value."[469]  Rather, he indicates Swift's

16   121 Certificate, name brand, contracts, customer lists, knowledge and expertise would be

17   worth more than as stated at book value.  Based on testimony and Lyon's discussions with

18   Swift personnel and unnamed industry contacts, Lyon deemed the 121 Certificate to be

19   worth at least $4 million but between $4 million and $6 million.  He then finds that Swift

20   was solvent at the time of the Transaction.[470]

21       In Section 3.2.B, Lyon determined there is no evidence suggesting Defendants had

22   any intent "to enter into a transaction that could result in a detriment to the parties

23

24   [465] Id. at p. 13.
     [466] The facts supporting such defenses were not supplied by the Lyon Report.
25   [467] Id. at pp. 17-19.
     [468] Id. at p. 18.
26   [469] Id.
     [470] Id. at p. 19.

92

involved." Without such intent, he opines there could be no claim against the Defendants for avoidance of an intentional fraudulent transfer. In Section 3.2.C, Lyon finds that "an arm's length transaction negotiated by two sophisticated parties with independent legal and financial advisors . . . by definition, invariably result in reasonably equivalent value being provided."[471] For this reason he opined there can be no claim to avoid a constructively fraudulent transfer.

Finally, Section 4 of the Lyon Report contends the facts clearly show Swift and the Buyers negotiated for a mutually beneficial sale and no seller officer could breach a fiduciary duty to the seller by virtue of the "buyer failing to execute on its business plan." Moreover, Lyon opines that the Buyers' failure to acquire working capital (through no fault of Swift's officers) is not a breach of a Swift's officer's fiduciary duty to Swift.

### e. Spindler's Rebuttal Report

Upon review of the Lyon Report, Spindler prepared his April 23, 2018 Rebuttal Report.[472] Spindler criticizes the Lyon Report as not specifying a date of solvency and failing to specify the balance sheets or financial statements supporting a book value insolvency of $2 - $3 million.[473] Spindler contends the Lyon Report provides no meaningful analysis to support his conclusion that Swift was solvent on the Transaction Date. Concerning the value of the 121 Certificate, Spindler notes Lyon did not attempt to value that Swift asset under any of the three customary valuation approaches but, rather, based his 121 Certificate value on discussions with Swift management, contracts in the industry and Lyon's familiarity with the airline industry.[474]

---

[471] *Id*. at p. 17.
[472] Ex. 050, defined as the Spindler Rebuttal Report.
[473] *Id*. at p. 2, ¶ 4.
[474] *Id*. at p. 3, P 7.

Spindler's Rebuttal Report provides new information concerning his review of the accounts receivable purchase of Reorganized Hawaiian Island Air's stock in order to acquire its 121 certificate and other assets for $450,000. This sale occurred in December 2017, in connection with a § 363 sale in Island Air's chapter 11 bankruptcy. Although this transaction occurred six years after the Transaction, Spindler contends it confirms his $800,000 valuation of the 121 Certificate and undercuts Lyon's $4 - $6 million valuation of the 121 Certificate.[475]

Spindler also looked at a July 2010 transaction involving Pinnacle Airline's acquisition of Mesaba Airlines for $75 million of which $12 million of that purchase price was attributable to Mesaba's intangible assets. $500,000 of the $12 million was attributed to a non-competition agreement and the remaining $11.5 million was based on Pinnacle's acquisition of customer contracts. Since no value was attributed to Mesaba's 121 certificate, Spindler takes this to mean that Mesaba's certificate had no describable value.[476] When Pinnacle later filed its own bankruptcy, Spindler's review of that bankruptcy shed no light on the value of Pinnacle's 121 certificate.[477]

In summary, Spindler finds nothing in the Lyon Report that would shake the opinions expressed by him in the Spindler Report.

f.      Lyon Testimony

G. Grant Lyon was the last witness called by the parties. Lyon graduated from Brigham Young University with degrees in accounting and a masters in business administration. He worked for Arthur Andersen, Ernst Young and a REIT named Evans Withycombe. At various times he also ran his own litigation support business named Odyssey Capital. His list of engagements is impressive, particularly his involvement in

---

[475] *Id*. at pp. 5-6, ¶¶ 17-19.
[476] *Id*. at pp. 6-7, ¶¶ 20-22.
[477] *Id*. at p. 7 ¶ 23.

94

the aviation sector, especially with airlines holding 121 certificates. He has testified 20 to 30 times on various topics in six to eight jurisdictions and has worn many different hats in a wide array of bankruptcy proceedings across the United States.

Lyon testified he is well aware of what a 121 certificate is and that the value of a 121 certificate is not so much in the certificate itself as the infrastructure built around that certificate, namely the 5 Wisemen and air travel contracts with the customers of a 121 certificate holder.

Lyons recognized the Buyers as independent parties represented by very capable advisors with full knowledge of all relevant facts and where Buyers were under no compulsion to close the Transaction. Lyon views the Buyers as arms-length purchasers. The Court agrees with Lyon's assessment of the Buyers.

In determining the Transaction Date value of Swift, Lyon principally viewed the Transaction itself. Lyon agreed with Spindler's definition of fair market value. He also viewed the Transaction itself as reflective of Swift's fair market value. The Buyers took on millions of dollars in debt and that price signaled Swift's solvency on the Transaction Date. The market acted freely and the Transaction itself is an expression of the market's recognition of Swift's value.

Lyon discussed the cost of obtaining a 121 certificate as a secondary basis for determining the fair market value of a 121 certificate. His discussions with airline industry people suggested that it takes $4 to $6 million to obtain a 121 certificate from the FAA. He also opined that 121 certificates are usually not worth much unless they are held in the context of an operating airline complete with its customer contracts and 5 Wisemen. This value will not show up in an airline's balance sheet but such value is real.

Lyon acknowledged the Buyer's payment of $100 for SAG's ownership of Swift was nominal consideration and not a measure of a very thin equity position. Lyon focused on retained liabilities as the market measure of the assets acquired by Buyers in the

Transaction. Lyon criticizes Spindler's failure to evaluate the Transaction as a measure of Swift's Transaction Date fair market value. He also criticizes comparable sales selected by Spindler, none of which Lyon views as comparable in that each sale was a bankruptcy sale where the holders of the 121 certificates had ceased their airline operations.

After opining that Swift was solvent on the Transaction Date, Lyon's testimony turned to his view that Burdette and Moyes acted reasonably in approving the Transaction. He notes that the Transaction must be viewed according to what was known to them at the time of the Transaction, not with the benefit of 20/20 hindsight. Moyes and Burdette, he felt, had reason to believe Spiral's $5 million would come into New Swift, that Buyers could perform on its debt service and that their business plan made sense. That New Swift would disastrously choose to enter into the Saipan Air deal could not be laid at Defendants' feet. Moreover, post-bankruptcy, Debtor was able to obtain significant financing from Nimbos which, in Lyon's view, supports the notion that Swift had significant value and a workable business plan. Lyon opined that Moyes and Burdette did not breach any fiduciary duties to Swift by their approval of the Transaction. Lyon also sees Burdette as situated different than Moyes. Moyes was an owner and had guaranteed some of Swift's debts. Moyes approved the Transaction. Burdette was not an owner, had guaranteed no debts and simply advised Moyes to do this deal.

• Cross-Examination. Lyon was directed to the Ryan Air and Arrow bankruptcy sales where he had to acknowledge that both airlines unsuccessfully tried to sell the airlines as going concerns before eventually shutting down and selling the entities holding 121 certificates. Lyons acknowledged his solvency opinion did not primarily look to the income approach, cost approach or market approach. He considered his valuation as recognition of a "reality" approach. In other words, willing arm's length Buyers entered into the Transaction and that millions of dollars of liabilities were "assumed" so the assets of Swift obviously had value at or above the debts assumed or retained. The fact that

Buyers did not guarantee the "assumed" debts was unimportant to Lyon's analysis of Swift's market value.

Lyon testified that he had no experience in acquiring 121 certificates. He acknowledged that the cost to obtain a 121 certificate from the FAA (and to build up the required infrastructure) would not be a fair measure of the value of the 121 certificate if one could buy for a lower amount the entire entity holding a 121 certificate. Lyon had no opinion as to the value of a 121 certificate and indicated anyone asserting a market value of 121 certificate does not know what they are talking about nor does the stated book value of a 121 certificate bear on the market value of the certificate. Lyon did not know if Buyers came out of pocket to do the Transaction (i.e., he did not know if Buyers paid their professionals who documented and negotiated this purchase).

Lyon testified it was not up to Seller to make sure Buyers performed on their business plan or obtained the financing needed to make their purchase successful. Moyes and Burdette did not breach their fiduciary duties to Swift because Buyers failed to do what they said they would do.

- Re-Direct. On re-direct Lyon indicated the Tax Note was additional value to Swift in the Transaction and would further push up its solvency valuation. While acknowledging that Swift's customer contracts may individually provide value to Swift (or not), the Transaction had to take all of these contracts and, as a collective whole, they provided value to Swift. Spindler erred in not finding value in these contracts. He also erred in his selected comparable sales which, to Lyon's mind, were not at all comparable to the Transaction.

g.     Findings Regarding Insolvency

At its core, Lyon's solvency opinion declares that the fair market value of Swift's assets on the Transaction Date can be simply determined by what the admittedly arm's

length Buyers paid for those assets. Lyon notes the Buyers paid $100 plus the amount of all liabilities "assumed" to acquire those assets. To Lyon, this indicates the fair market value of the assets acquired by Buyers is at, or above, those liabilities, i.e. Swift was solvent.

This analysis is flawed for several reasons. First, Buyers were not purchasing Swift's assets. Buyers purchased from SAG 100% of the membership interest of Swift. Buyers paid $100 for those membership interests. Buyers then had the privilege of controlling the assets retained in New Swift but with the responsibility of attending to the liabilities with which New Swift was saddled. Buyers did not "assume" or guaranty those liabilities. Buyers took control of the New Swift equity position subject to the liabilities owed by New Swift. Buyers certainly knew at the Transaction Date that Swift was deeply insolvent on a book value basis. Since Buyers did not require a solvency opinion from Ehrlich or anyone else, the Court surmises that the Buyers knew Swift was insolvent on a fair market value basis but understood this Transaction would not occur if the Buyers insisted on a finding of solvency or Seller's warranty and representation of Swift's solvency.

Lyon rightly acknowledges the $100 paid by the Buyers for this airline's ownership interests was a *de minimis* amount. Like Lyon, this Court disregards the $100 consideration paid by Buyers to acquire Swift's equity. Were it not otherwise, the payment of any amount for 100% of an entity's ownership interests would always stand as a recognition that the entity itself must have been solvent on the purchase date. Of course, this cannot be true. A hypothetical comes to mind:

ABC Company has only one asset, $1 million cash. ABC has only one debt, $10 million owed on an undisputed, non-contingent and liquidated debt owed to an arm's length, non-insider creditor. ABC is obviously insolvent on a fair market value basis.

Who would ever pay anything to acquire 100% of the ownership interests of ABC? Here are two possibilities:

(1) Buyer Prospect #1 is a good faith, arm's length buyer who thinks he could deploy the $1 million cash in a manner which will produce sufficient cash flow to service the $10 million debt and still provide income to him as an officer and/or produce a return to him as an equity investor. Would he be willing to risk $100 to play for these possible winnings? Of course.

(2) Buyer Prospect #2 is a scam artist. For $100 she can obtain the keys to ABC's vault which contains $1 million. She has no intention of paying down the $10 million owed by ABC. Is it possible that such a buyer is out there? The Court thinks so.

These scenarios are offered not to suggest Swift's Buyers had a nefarious plan in mind when they acquired Swift's equity interests for $100. There is no evidence in the record indicating this was the Buyers' intent. What the Court is recognizing, however, is that Lyon's valuation formula ("Liabilities Assumed + Cash Paid = FMV of Property = Solvency")[478] is fallacious. The property acquired from SAG by Buyers was SAG's equity ownership in Swift. Buyers paid $100 for that equity, an admittedly *de minimis* amount. Buyers did not assume or guaranty any of Swift's debt. Buyers acquired Swift's equity position thereby taking control of Swift's remaining assets subject to its remaining debts. This scenario does not prove Swift was solvent on the Transaction Date.

Lyon points to Swift's 121 Certificate as having a value of $4 - $6 million on the Transaction Date. However, his support for that value is very thin. He points to no comparable sales, or an analysis of the cost to obtain a 121 certificate or anything resembling the income approach of valuation. However, Lyon correctly notes that all the comparable sales identified by Spindler were sales of 121 certificates and related assets by non-operating entities in bankruptcy. Presumably none of those sales came with the

---

[478] Trial Ex. 051, p. 7.

required 5 Wisemen or with customer contracts. However, armed with its book of business and its 5 Wisemen, in 2011 Swift was losing copious amounts of money. It needed to sell that business or shut its doors.

Having rejected the methodology behind Lyon's solvency analysis and his conclusion that Swift was solvent immediately before and after the Transaction Date, the Court turns to Spindler's solvency analysis. While this Court finds Lyon is much more knowledgeable and experienced than Spindler in the aviation business, this does not necessarily make Lyon more qualified or knowledgeable than Spindler in the valuation of an aviation intangible asset. Lyon's stock in trade is his financial acumen, his business savvy, his capable service on corporate boards, and his value as a turnaround professional. Spindler, on the other hand, is a long tenured, very experienced traditional valuation expert. His report addresses the three valuation methods and concludes the Market Approach provides the most useful insights into valuation of Swift's 121 Certificate.

The comparable sales which the Spindler Report identifies are relatively close in time to the Transaction Date but all involve liquidation sale values not going concern values, even though Spindler acknowledges going concern value is the appropriate view to take concerning the Transaction. The Court is not persuaded that bankruptcy sales are "generally comparable" to the Transaction but it must be remembered that in the Fall of 2011, Moyes and Burdette were prepared to shut Swift down if they could not find a buyer. Were Swift to have shut down, there would presumably have been a liquidation of its assets either in or outside the bankruptcy arena.

Spindler adequately explains why the Arrow, Ryan and Sky King bankruptcy sales of entities holding 121 certificates are germane to a valuation of Swift's 121 Certificate. Of course, Spindler's analysis does not provide an unassailable valuation of the 121 Certificate. Intangible assets are always difficult to value and the values ascribed cannot be attained with absolute certainty. That said, the Court, finds Spindler's valuation of

Swift's 121 Certificate to be more disciplined, more supported by verified facts and circumstances, more likely to accurately identify the Transaction Date value of this important asset.

Moyes and Burdette testified that the Swift 121 Certificate cost about $5 million to acquire from the FAA and place into operation. This Court finds their testimony not credible nor is it borne out by Swift's own books. The fully amortized value of the 121 Certificate was historically booked by Swift at $1,484,268. Under the Internal Revenue Code § 263A, applicable regulations and GAAP, the cost of acquiring a long-term depreciable asset is to be capitalized, not entirely expensed in the year it is acquired. Swift only capitalized $1.4 million to obtain the 121 Certificate. The Court finds Swift did not spend over $1.4 million to acquire this capital asset, the 121 Certificate. Even if this finding is incorrect, whatever amount Swift paid to acquire the 121 Certificate occurred five to six years earlier and well before the "apocalypse" which Burdette indicated so dramatically impacted Swift's aviation business. Swift's 121 Certificate acquisition cost provided no meaningful support for Defendants' contention that the 121 Certificate was worth $5 to $7 million on the Transaction Date. Testimony from Moyes and Burdette did not persuade the Court that it cost Swift more than this to put its 121 Certificate in service. If Swift did spend more than $1,484,268 to put the 121 Certificate into service, the testimony of Moyes and Burdette did not persuade this Court as to what that amount was or to what degree those expenses (as opposed to capitalized costs) were actually expenses incurred by Swift which could be directly attributable to the acquisition of the 121 Certificate.

This Court finds Spindler's $800,000 fair market valuation of the 121 Certificate closely accounts for the market value of the 121 Certificate on the Transaction Date. The parties stipulated,[479] the experts agreed and this Court finds that the 121 Certificate

---

[479] DE 463, p. 13 in the JTPS at ¶ 70.

"cannot simply be transferred on purchase." One must either acquire ownership in a company that already owns a certificate or obtain a certificate from the FAA. This fact, of course, greatly impacted the marketability of Swift's 121 Certificate. The Court finds Spindler's valuation of the 121 Certificate closely approximates the fair market value of that Swift asset on the Transaction Date.

The Court also finds Spindler's receivables and payables adjustments are appropriate. The Court finds Spindler's failure to include adjustments for the value of Swift's contracts or for the use of Swift's name is also appropriate. The Court is persuaded that, while Swift's contracts with its sporting team customers had value well before the Transaction Date and that some of those contracts had value after the Petition Date, on the Transaction Date those contracts were causing Swift to incur massive losses, so massive that Moyes and Burdette were prepared to shut down Swift if it could not be quickly sold.[480] As to the "Swift Air" name or the "flyswiftair" domain name, under the Purchase Agreement, once SAM obtained its own 135 certificate, SAM would be entitled to use the name "Swift Air" and the domain name "flyswiftair."[481] This suggests to the Court that Buyers' right to use the name Swift was, at best, short lived and of little value to the Buyers.

Beyond the experts' reports, the Trustee points to several other items in the record which he claims supported a finding that Swift was insolvent on the Transaction Date. For example, Ehrlich's Red Flag Email at ¶ 53 flatly acknowledges SAG was insolvent in November 2011. The Trustee holds up Ehrlich's comment as proof of Swift's insolvency on the Transaction Date. The Court does not find Ehrlich's comment particularly helpful on the question of Swift's insolvency since Ehrlich references SAG's insolvency but Swift

---

[480] The fact that three of the six sporting team contracts were rejected by Debtor after its bankruptcy filing suggests that even months after the Transaction Date those rejected contracts were of no value to (or a drain upon) the Debtor's 121 Business.
[481] Trial Ex. 006, page 2, ¶ 3.

was only one of four entities owned by SAG, the other three affiliated entities being Services, Sales (then defunct) and SAVM (also then defunct). Moreover, Ehrlich is not clear as to whether he was measuring insolvency based on book value or fair market value.

Next, the Trustee also points to SAG's 2011 tax filings and Debtor's bankruptcy schedules as supporting a finding of Swift's insolvency. That tax return does refer to SAG's "insolvancy" and the Debtor's bankruptcy schedules do reflect a zero value of the 121 Certificate. Neither of these facts are binding on the parties or even persuasive to the Court. It is not clear whether these documents are referencing book value or fair market value.

The Trustee references testimony of Forry and Conry in support of his case that Swift was insolvent at the Transaction Date. Forry testified that Swift had negative equity of $3,259,968 on November 30, 2011. As noted in §VII(B)(1)(e), this Court does not put much stock in this testimony nor does it particularly bear on a fair market value of Swift's assets or liabilities at that time. As to Conry, the Trustee notes that, in August 2012, Conry signed a declaration[482] supporting Debtor's proposed sale of its assets to Fowler for $1.1 million,[483] free and clear of Debtor's obligations. The Trustee contends this shows Debtor was massively under water in August 2012 and likewise had to be insolvent on the Transaction Date. Defendants point out, (a) the $1.1 million proposed sale was just an opening offer and could have been out bid, (b) the proposed Fowler sale never came to bear fruit, (c) this proposed sale was eight months after the Transaction Date and (d) much water had flowed under the bridge since the Transaction. Nevertheless, the Court finds that Debtor's willingness to sell its assets as a going concern for only $1.1 million (including the 121 Certificate, etc.) suggests that Spindler's opinion that Swift was insolvent on the Transaction Date may have understated the magnitude of that insolvency.

---

[482] Trial Ex. 209. See also FN 346.
[483] See § VI(B)(2)(a).

Defendants suggest that the Tax Note from SAG and SAM to New Swift added value to New Swift. The Court disagrees. SAG had no ability to pay on the Tax Note and SAM was a newly formed entity with no apparent capitalization. Moreover, no payments were ever made on the Tax Note. That Tax Note was eventually torn up.

Finally, while Defendants note that the ongoing 121 Business operations of Swift had value on the Transaction Date and that Swift's 5 Wisemen were a part of that value, the Court finds such values are all subsumed within the 121 Certificate value found by Spindler. The fact that Spindler's market research only pointed to 121 certificates where the owner was in bankruptcy and not operating under their 121 certificates only suggests to the Court that, in and around December 2011, there was little or no market for fully operational 121 businesses similar to Swift's. The sales identified by Spindler were all preceded by pre- and post-bankruptcy efforts by those airlines to sell their businesses as fully operational 121 businesses. Each of those sellers could not obtain buyers despite concerted and professionally led efforts to do so. The Court, therefore, finds Spindler's market valuation of Swift's 121 Certificate at $800,000 necessarily accounts for and subsumes the market value of Swift's 5 Wisemen and its ongoing airline business "goodwill" on the Transaction Date.

Having read all the reports of these two experts and having heard their testimony at trial, the Court is satisfied that, at the time of the Transaction, Swift's 121 Certificate had a fair market value of less than $800,000. Swift's insolvency existed on the Transaction Date even if the 121 Certificate was worth double the $800,000 market value found by Spindler. With or without Spindler's $1,342,499 downward adjustment of the value of Swift's accounts receivable or his $1,200,000 upward adjustment of Swift's payables, Swift was insolvent immediately before and after the Transaction. That said, this Court finds Spindler's adjustments to Swift's payables and receivables were appropriate.

104

New Swift found itself needing to file bankruptcy within six months of the Transaction. After nearly two years in bankruptcy the Debtor finally righted the ship after acquiring in excess of $6 million in financing from Nimbos, shedding numerous unfavorable customer contracts, shedding all of its debt by creating a $500,000 creditors' pool from which creditors were to be paid and vastly reducing the monthly lease payments on the 801 and 802 airplane leases. These are further indications of how far insolvent Swift was on the Transaction Date and how much further insolvent it became over the next two years.

The Court finds Swift was insolvent on the Transaction Date.

4.  Defenses

a.  Contemporaneous New Value

Section 547(c) provides defenses to otherwise avoidable preferential transfers. One such defense is the contemporaneous exchange for new value. Section 547(c) states:

> (c) The trustee may not avoid under this section a transfer –
> (1) to the extent that such transfer was –
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> (B) in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1).

The principle behind the contemporaneous exchange for new value defense is that a transfer of new value does not result in the depletion of the estate's assets to the detriment of other creditors.[484] To accomplish this purpose, "[a] court must measure the value given to the creditor and the new value given to the debtor in determining the extent to which

---

[484] *In re JWJ Contracting Co., Inc.*, 287 B.R. 501, 506 (9th Cir. BAP 2002) (citing *In re Gem Constr. Corp. of Virginia*, 262 B.R. 638, 645 (Bankr. E.D. Va. 2000)).

the trustee may void a contemporaneous exchange."[485]  Value should be measured at the time of the transfer.[486]  New value is defined in § 547(a)(2):

> "[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

11 U.S.C. § 547(a)(2).

Section 547(a)(2)'s definition of "new value" is exclusive because of the use of the word "means."[487]  Section 102(3) states that "'includes' and 'including' are not limiting …" and Congress did not use either word in the definition of "New Value."  If Congress had intended to create an open-ended definition for "new value," they would have used the word "includes" instead of "means."[488]  Instead, Congress created an exclusive definition for new value.[489]

The new value provided to a debtor does not need to go directly to the debtor but may instead go to third party creditors if the benefit is to the debtor.[490]  For the purposes of § 547, new value must confer some tangible economic value on the debtor.  This view is consistent with the purpose the new value defense serves – replenishing the debtor's estate.[491]  Although release of or credit on a debtor's preexisting obligation does not

---

[485] *In re Nucorp Energy, Inc.*, 902 F.2d 729, 733 (9th Cir. 1990) (citing *In re Jet Florida Systems, Inc.*, 861 F.2d 1555, 1558-59 (11th Cir. 1988)).

[486] *In re Grand Chevrolet, Inc.*, 25 F.3d 728, 733 (9th Cir. 1994).

[487] See *In re Energy Co-op. Inc.*, 832 F.2d 997, 1003 (7th Cir. 1987).

[488] *Id.*

[489] *Id.* (citing 1 L. King, *Collier on Bankruptcy* ¶ 101.00[2], at 101-15 (15h ed. 1987)).

[490] *In re Laguna Beach Motors, Inc.*, 148 B.R. 322, 324 (9th Cir. BAP 1992) (citing *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1280 (8th Cir. 1988).

[491] *In re Phoenix Restaurant Group, Inc.*, 316 B.R. 671, 680 (Bankr. M.D. Tenn. 2004) (citing *In re Aero-Fastener, Inc.*, 177 B.R. 120, 137 (Bankr. D. Mass. 1994); *In re Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224, 229-31 (5th Cir. 1988); *In re Hatfield Elec. Co.*, 91 B.R. 782, 786 (Bankr. N.D. Ohio 1988); *In re Nucorp Energy, Inc.*, 80 B.R. 517, 519 (Bankr. S.D. Cal. 1987), *aff'd*, 902 F.2d 729 (9th Cir. 1990); *In re Jet Florida Sys., Inc.*, 841 F.2d 1082, 1084 (11th Cir. 1988)).

typically fall within the definition of "new value,"[492] if the debtor is released of an obligation owed to a unrelated third party, such a release constitutes "new value."[493]

The party asserting a contemporaneous exchange for new value defense "has the burden of proving that the parties intended the transfer to be a contemporaneous exchange for new value, that the exchange was in fact contemporaneous, and that new value was given."[494]

In the case at bar, any new value supplied by Defendants to New Swift or the Debtor occurred post-Transaction Date. The promise to pay new value was not itself new value.[495]

Penrod testified that Trial Ex. 238 was a spreadsheet created to aid in the process of paying the 135 Non-Related Party Payables.[496] The spreadsheet explicitly shows that SAM's payment of 135 Non-Related Party Payables did not actually begin until early 2012 and continued through August 2012.[497] This spreadsheet demonstrates that any new value provided to Debtor or New Swift was not contemporaneous with the Transaction and, therefore, cannot fall within the § 547(c)(1) defense.[498] Defendant's failed to sustain their burden of proving their contemporaneous new value defense.

---

[492] *In re Chase & Sanborn Corp.*, 904 F.2d 588, 596 (11th Cir. 1990) (stating that if "new value" included credit towards antecedent debts, § 547 would be "rendered a tautological nullity.")

[493] *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1280 (8th Cir. 1988).

[494] *In re JWJ*, 287 B.R. at 510 (citing *In re Marino*, 193 B.R. 907, 913 (9th Cir. BAP 1996)). See also 11 U.S.C. §547(g).

[495] *See In re Teligent, Inc.*, 315 B.R. 308, 317 (Bankr. S.D.N.Y. 2004) (explaining that "[a] promise of future services…does not constitute 'new value.'"); *See also Northwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) (discussing "new value" exception to absolute priority rule and stating that "[u]nlike 'money or money's worth,' a promise of future services cannot be exchanged in any market for something of value to the creditors today.").

[496] Penrod testimony, on February 14, 2019 Trial Transcript, at page 35. DE 499.

[497] Trial Ex. 238, column "Date."

[498] The parties submitted additional briefing on the issue of contemporaneous exchange of new value at DE 476 (Bench Memorandum Re: Defendants' Contemporaneous Exchange for New Value and Subsequent New Value Defense) and DE 517 (Response to Trustee's Bench Memorandum Re Preference Issues).

b. <u>Subsequent New Value</u>

Another defense claimed by Defendants to Plaintiff's preferential transfer claims is the subsequent new value defense. Section 547(c)(4) provides:

> (c) The trustee may not avoid under this section a transfer –
>> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
>>> (A) not secured by an otherwise unavoidable security interest; and
>>> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4).

There are two essential elements to a subsequent new value defense: (1) the creditor must give unsecured new value; (2) the new value must be given after the preferential transfer.[499] The new value does not need to be provided directly to the debtor to make this defense applicable.[500] Payments made to third-party creditors of the debtor can also be considered new value.[501] Similar to the rationale behind the defense of contemporaneous exchange for new value, the purpose behind the subsequent new value defense is to ensure that the estate is not unjustly depleted to the detriment of other creditors.[502] "Thus, the relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate."[503] The party asserting the "new value" defense must demonstrate that it provided unsecured new value after the preferential transfer.[504] Finally, "the text of § 547(c)(4) requires that the transfer of new value be from *such* creditor to whom the alleged

---

[499] *In re IRFM, Inc.*, 52 F.3d 228 (9th Cir. 1995).
[500] *In re Bellanca*, 850 F.2d 1275, 1280 (8th Cir. 1988) (holding that the statute allows setoffs for new value given "to or for the benefit of the debtor.").
[501] *Id.*
[502] *Matter of Kroh Bros. Development Co.*, 930 F.2d 648, 652 (8th Cir. 1991).
[503] *Id.*
[504] *In re IRFM, Inc.*, 52 F.3d at 231.

preferential transfer was made."[505] "The creditor-transferee, not a third party, must be the one to extend new value to the debtor."[506]

Trustee contends Defendants failed to preserve the defense of subsequent new value. Defendants note that the same evidence supporting their contemporaneous new value defense supports their subsequent new value defense and, in any event, the Trustee was not surprised or prejudiced by permitting this defense. "New value" has long been asserted by Defendants as a defense to Plaintiff's preference claims. Prior to trial, the Court denied Plaintiff's efforts to preclude Defendants' contemporaneous new value defense.[507] The Court agrees with Defendants that the evidence submitted by Defendants in support of their contemporaneous new value defense is the same evidence supporting their subsequent new value defense. The Court found that timing issues preclude applicability of the former but now finds that same evidence supports the latter. Moreover, the Court finds the Plaintiff was not prejudiced or surprised by allowing the introduction of this evidence or permitting the Defendants to raise their subsequent new value defense at trial.

Here, it is important to distinguish between the 135 Non-Related Party Payables and the 135 Related Party Payables. Defendants' payment of the former constitutes "new value," while Defendants agreeing to handle the latter is the exact type of release of or credit on a debtor's preexisting obligation that would render § 547 preferences a "tautological nullity."[508]

New value was provided to New Swift or the Debtor <u>subsequent</u> to the Transaction Date when paid $350,000 of the Balkans Claim was paid and when $746,509 of the 135 Non-Related Party Payables was paid.[509] Trial Ex. 238 is the spreadsheet which Penrod

---

[505] *In re Telsave Corp.*, 116 Fed.Appx. 91 (9th Cir. 2004).
[506] *Id.*
[507] DE 472, the Preference MSJ Interim Order, ¶ 13.
[508] *In re Chase & Sanborn Corp.* at 596. See also *supra* FN 492.
[509] Trial Ex. 238.

Case 2:14-ap-00534-DPC    Doc 555    Filed 03/31/20    Entered 03/31/20 15:42:31    Desc
Main Document    Page 117 of 174

testified shows that 135 trade payables were paid after the Transaction. However, this spreadsheet does not distinguish between related and unrelated payables. The spreadsheet includes the following:

> (1) Payments to "Swift Aviation" of $7,090.95
>
> (2) Payments to "Swift Services" of $112,733.99
>
> (3) Payments to "Swift" of $34,062.87 and
>
> (4) Payments to "Transjet" of $4,662.30

These 135 Related Party Payables paid total $158,550. Because they are payments to insiders of Swift, these payments must be subtracted from the $905,059 asserted as new value. This leaves a total of $746,509 in subsequent "new value" in the form of 135 Non-Related Party Payables paid after the Transaction Date. New Swift and/or Debtor also received subsequent new value after the Transaction Date when $350,000 of the Balkans Claim was paid.[510]

At oral argument on December 3, 2019, Plaintiff's counsel posited the following hypothetical concerning the value of a subsequent contribution of New Value:

Unsecured creditors are to receive $0.33 on their dollar claim in a chapter 7. Pre-petition a preference defendant satisfied $1 million of Debtor's third party unsecured debts after having itself received an avoidable preferential transfer. Is the subsequent new value (1) $1 million or (2) is it $333,333 because that is what unsecureds are to receive in the chapter 7 or (3) is it yet a different number? Does it make a difference that the subsequent new value transferred by the preference defendant results in an increase in a debtor's assets as opposed to a reduction in a debtor's liabilities? The change to the debtor's net worth is mathematically the same. The cash outlay by the preference defendant is also the same whether that defendant hands $1 million in cash to the debtor as opposed to directly paying $1 million of that debtor's liabilities. However, the difference to the creditors of the

---

[510] Trial Ex. 47 at 4.

ultimate chapter 7 estate is one-third of the $1 million. This Court finds that new value is measured by the money paid to or for the benefit of the debtor which is important, not the net benefit that new value conferred upon debtor's creditors.

All this being said, the plain language of § 547(c)(4) "requires that the transfer of new value must be from *such* creditor to whom the alleged preferential transfer was made. The creditor-transferee, not a third party, must be the one to extend new value to the debtor."[511] Here, <u>SAM</u> provided the new value.[512] No evidence was admitted suggesting that Moyes provided any new value. Furthermore, the subsequent new value defense only applies to preference defendants for whom liability is based on § 547. Here, SAM's liability is not based on § 547, but instead, is based on subsequent transferee liability under § 550(a)(2).

Defendants did not provide new value to New Swift or the Debtor when they agreed to handle the 135 Related Party Payables because ($11,747,390) those were debts owed to the Defendants and their Affiliates which were satisfied in consideration of Swift's transfer of the 135 Related Party Receivables to the Defendants. In other words, this was simply satisfaction of an antecedent debt owed by Debtor to the Defendants.

As a part of the Transaction, SAG and SAM agreed to indemnify New Swift on the 135 Related Party Payables which they were agreeing to handle.[513] SAG was just a holding company, had no assets other than ownership of certain Affiliates and never had money to pay anything or any bank accounts from which it could pay anyone.[514] SAM was a newly formed entity which, on the Transaction Date, had nothing to satisfy its

---

[511] *In re Telsave Corp.*, 116 Fed.Appx. 91 (9th Cir. 2004).
[512] Although Penrod's spreadsheet (Trial Ex. 238) identifies "SAG" as the payor, her testimony made it clear that payments were made by SAM. SAG had no accounts from which it could pay anyone.
[513] Trial Ex. 003.
[514] The Court notes that Trial Ex. 238 shows SAG as the "payor" for a substantial number of the 135 Non-Related Party Payables but maintains that this could not be the case because SAG was just a holding company with no ability to pay debts.

111

indemnity liability. SAM's indemnity Erhlich recognized as "not worth much."[515] This Court finds the SAG and SAM indemnities provided no additional new value (contemporaneous or subsequent) to New Swift.

The fact that Balkan and the 135 Non-Related Party Payables may themselves received preferential transfers is not at issue in this case. SAM paid value of $1,096,509 to reduce New Swift's or Debtor's obligations to those Non-Parties. This reduced liabilities by $1,096,509 and increased owner's equity by the same amount.[516]

To summarize, SAM provided subsequent new value when it satisfied Debtor's 135 Non-Related Party Payables. Further, SAM provided subsequent new value when it satisfied $350,000 of the Balkans Claim. Both the satisfied 135 Non-Related Party Payables and payments toward the Balkans Claim "replenished" the estate by virtue of decreasing Debtor's liabilities. Had Moyes paid these amounts at the time the Transaction closed, Moyes would have a contemporaneous new value defense but since it was only promised to later pay these amounts, the new value benefited the Debtor only at the time these Swift Payables were actually satisfied. Had Moyes or Transjet (not SAM) paid this subsequent new value, they could have availed themselves of this defense because they were all initial transferees. Since SAM was neither a creditor of Swift's nor a preference defendant but, rather, a subsequent transferee defendant under § 550(a)(2), the subsequent new value defense is not available to SAM, even though it paid $1,096,509 of New Swift's or the Debtor's debts. Moyes Trust is denied this defense because it was neither a Swift creditor nor did it pay any new value to or for the benefit of Swift.

---

[515] Trial Ex. 066, ¶ 49.

[516] This is not to say these new value payments made New Swift solvent. Rather, this new value reduced the amount of New Swift's negative equity.

c. Transjet Setoff or Recoupment

On February 13, 2019, the Court issued the Preference MSJ Interim Order.[517] In ¶ 12, at pages 6 and 7, the Court stated:

> The Defendants timely raised the defenses of setoff and recoupment with respect to the receivables owed to the Debtor by the Transjet Subsidiaries, and with respect to the Transjet Payables the Debtor owed to the Transjet Subsidiaries. For the reasons set forth in the Bench Ruling, the Motions, and in related documents, however, the Defendants have not met their burden of proof to establish the affirmative defenses of setoff and recoupment. The defenses of setoff and recoupment are hereby denied as to the Transjet Receivable and Transjet Payables.[518]

In denying the defense of setoff, the Court primarily relied on the operating and management agreement between Swift and Transjet 1 and 2.[519] Specifically, under Section 4 of the management agreement (titled "Compensation") and subsection b. (titled "Payment"), Swift and Transjet agreed to the following:

> All payments now or hereunder due or payment to [Swift] from [Tranjset] shall be paid without offset, abatement, counterclaim, withholding, setoff or reduction for any reason whatsoever.[520]

Defendants assert that such amounts were customarily setoff against each other at the end of each month.[521] Defendants argue that, although the contractual terms do not allow for a setoff, the parties customary practice was to do just that. However, the Court expressly addressed this argument by referencing "the reasons set forth in the Bench Ruling." Again, the Court relied on the operating and management agreement between Swift and Transjet 1 and 2. Section 14, subsection a. (titled "Entire Agreement") states:

---

[517] DE 472.
[518] *Id.* at pages 6 – 7.
[519] The operating agreements between Swift and Transjet 1 and Swift and Transjet 2 were attached to Plaintiff's statement of facts in support of motion for summary judgment re: Transjet account receivable, filed at DE 340, Ex. 4.
[520] *Id.* at page 9.
[521] Defendants rely on the testimony of Huska for this argument (Question: "So this – and that's the activity we were talking about before where Swift Air and Transjet would clear their accrued receivables and payables against each other at the end of each month?" Answer: "Correct.") See February 13, 2019 Trial Transcript at page 223 lines 19 – 23. DE 495.

113

1
2
3
4
5

> This agreement constitutes the entire agreement and understanding between the parties concerning the subject matter hereof, and supersedes all prior negotiations, proposal, discussions, agreements, letters of agreement and understanding with respect to such subject matter. NO TERM OR PROVISION OF THIS AGREEMENT MAY BE CHANGED, WAIVED, DISCHARGED OR TERMINATED EXCEPT BY AN INSTRUMENT IN WRITING EXPRESSED TO BE A SUPPLEMENT TO OR AMENDMENT OF THIS AGREEMENT SIGNED BY THE PARTIES…

6   The Court went on to determine that there was no modification to the operating and

7   management agreement and that contractually Defendants were barred from asserting a

8   setoff defense. Defendants did not present any evidence at trial indicating there was a

9   written modification to the operating and management agreement and, therefore, this

10  Court's previous ruling on the setoff defense will not be altered.

11  As for the defense of recoupment, the Court agreed with Plaintiff's argument that

12  recoupment was not an appropriate defense under these circumstances. The Court barred

13  the recoupment defense and sees no reason to now alter that earlier ruling.

14

15  ### 5.   Transferee Liability

16  As noted in the legal analysis set forth in § VII(A)(1), when a transfer is avoided

17  under § 547, the Court looks to § 550 to establish liability. Section 550 requires distinct

18  treatment for initial transferees and immediate or mediate transferees. *In re Bullion*

19  requires transferees of a preferential transfer to have "dominion" over the asset transferred.

20  The Transaction involved a transfer of the 135 Related Party Receivables from

21  Swift to SAG, then from SAG to Moyes, the Moyes Trust and Transjet.  For purposes of

22  transferee liability under § 550, SAG was a "mere conduit."[522] Moyes, the Moyes Trust

23  and Transjet were the initial transferees: (a) Moyes for the SAVM Receivable; (b) the

24  Moyes Trust for the Redeye Receivable, Briad Receivable and SME Receivable; and (c)

25  Transjet for the Transjet Receivables. In other words, using the language from the

26

[522] See *supra* FN 41.

114

Supreme Court's decision in *Merit Management Group LP*, the "relevant transfers" are from Swift to (a) Moyes, (b) the Moyes Trust and (c) Transjet. SAM was the immediate transferee of the Redeye Receivable, Briad Receivable and SME Receivable. Moyes was the mediate transferee of the Redeye Receivable and Briad Receivable. Finally, Redeye was the mediate transferee of the Redeye Receivable and Briad Receivable.

The SAVM Receivable was transferred to Moyes and for Moyes' benefit. Moyes "put the money to his own purposes" when Moyes increased the amount owed to him under the SAVM Note by the exact amount of the SAVM Receivable which was transferred to him.[523] This satisfies the "dominion" test articulated by the Ninth Circuit in *In re Bullion*.[524] Once Moyes directed the SAVM Receivable to be applied to the SAVM Note, Moyes controlled the SAVM Receivable being transferred and used the asset for his own benefit.[525]

The Moyes Trust was the initial transferee of the Redeye Receivable, the Briad Receivable and the SME Receivable. The Moyes Trust put these assets to its purposes when it caused all these receivables to be transferred to SAM, an entity 100% owned by the Moyes Trust. In doing so, the Moyes Trust exercised the sort of "dominion" required by the *In re Bullion* test.

Transjet was the initial transferee of the Transjet Receivables. The Transjet Receivables were transferred to Transjet and applied against the Transjet 135 Payable. That left $103,125 still owed on the Transjet 135 Payable. This Transjet Surplus was then used to pay down an amount owed by Transjet to Moyes.[526] Transjet put the Transjet Receivables to its own use by using them to pay down the Transjet 135 Payable. In doing so, Transjet exercised over the Transjet Receivables the sort of "dominion" required by

---

[523] See *supra* FN 29.
[524] See *supra* FN 402.
[525] See *supra* FN 29. *See also* Trial Ex. 243. *See also* JPTS at DE 463, page 11, ¶40.
[526] See Declaration of Forry attached as Exhibit C to DE 381.

the *In re Bullion* test. The Transjet Surplus which was transferred to Moyes certainly worked to his benefit but must not be included in the measurement of preference damages for which Moyes is to be held liable because that transfer was of Transjet assets and not as a mediate transfer of Swift assets.

SAM was the mediate transferee of the Redeye Receivable, the Briad Receivable and the SME Receivable. SAM exercised the necessary "dominion" over these account receivables. First, SAM collected the SME Receivable in its entirety and presumably put those funds to its own use.[527] Second, SAM exercised its dominion by transferring the Redeye Receivable and Briad Receivable to Moyes.

Moyes was the mediate transferee of the Redeye Receivable and the Briad Receivable because these transfers were made for the benefit of Moyes and were eventually used to increase Moyes Redeye capital account in the amount of $5,823,090.[528] Again, Moyes put the Redeye Receivable and the Briad Receivable "to his own purposes" and exercised the requisite "dominion" over the assets being transferred, all in satisfaction of the *In re Bullion* test. Redeye also exercised the requisite "dominion" over the Redeye Receivable when it was applied by Redeye to amounts it owed Swift.

### 6. Conclusions Regarding Preference Causes of Action

The Transaction resulted in the transfer of Swift's 135 Business to SAM and its 135 Related Party Receivables to SAG. Since SAG was merely a conduit, those 135 Related Party Receivables were passed on to the Moyes Trust, Transjet or Moyes.[529] Moyes Trust was the initial transferee of the SME Receivable, Briad Receivable and Redeye Receivable within the meaning of § 550(a)(1). Transjet and Moyes were the initial

---

[527] See *infra* FN 537.
[528] JPTS p. 11 ¶ 46.
[529] In the case of the SAVM Receivable, SAG passed that receivable directly to Moyes. The Transjet Receivables were passed by SAG to Transjet. The remainder of the 135 Related Party Receivables went from SAG to Moyes Trust.

transferees of the Transjet Receivables and the SAVM Receivables, respectively. SAM was the immediate transferee from Moyes Trust of the Briad, Redeye and SME Receivables, within the meaning of § 550(a)(2). Moyes was the mediate transferee from SAM of the Redeye and Briad Receivables. Redeye was the mediate transferee from Moyes of the Redeye and Briad Receivables. These transfers were made to or for the benefit of Moyes and/or some of his Affiliates who held claims against Swift. These transfers resulted in the payoff or write off of antecedent debts.[530] The Affiliates who owed these antecedent debts were Moyes, Sales, Services and the Transjet Subsidiaries, all of whom were "insiders" of Swift, within the meaning of § 101(31) of the Bankruptcy Code.

Swift was insolvent (within the meaning of § 101(32)) at the time of the Transaction. New Swift was insolvent immediately after the Transaction. These transfers to Swift's insiders occurred within one year of Debtor's Petition Date. These transfers (1) resulted in Moyes Trust receiving the Redeye Receivable, Briad Receivable and the SME Receivable, which receivables collectively totaled $5,817,857 on the Transaction Date; (2) passed to SAM the Redeye Receivable, Briad Receivable and SME Receivable which receivables collectively totaled $5,817,857 on the Transaction Date; (3) enabled Moyes to gain possession of the Transjet Surplus, the SAVM Receivable, Briad Receivable and Redeye Receivable which receivables were used to pay off Swift's obligations to him on the Moyes Note,[531] reduce Transjet's obligations to him[532] and enabled Moyes to increase his capital account at Redeye by $5,228,237;[533] (4) resulted in Transjet paying off the amount Swift owed on the Transjet 135 Payable,[534] and (5) resulted in Redeye receiving the Briad Receivable and the Redeye Receivable, which in turn

---

[530] Also described as the 135 Related Party Payables.
[531] Swift's obligation on the Moyes Note Payable totaled $4,762,395 on the Transaction Date.
[532] The Transjet obligation to Moyes was reduced by $103,125, i.e. by the Transjet Surplus.
[533] The amount of the Briad Receivable ($1,053,936) plus the Redeye Receivable ($4,174,301).
[534] On the Transaction Date, the Transjet 135 Payable totaled $1,905,792.

(a) eliminated Redeye's payable to Swift and (b) increased Redeye's assets by the amount of the Briad Receivable. These transfers to or for the benefit of these Affiliates enabled them to obtain more than they would have received had they not received these transfers and Swift was instead liquidated under Chapter 7 of the Bankruptcy Code. The Trustee has carried his burden of proof on his §§ 547 and 550 causes of action.

As a part of the Transaction, SAG and SAM agreed to stand good for the 135 Non-Related Party Payables. They demonstrated to this Court's satisfaction that $350,000 of the Balkans Claim and $746,509 of the 135 Non-Related Party Payables were paid down after the Transaction Date. These payments were not contemporaneous with the Transaction so the Defendants' § 547(c)(1) defense has not been satisfied. Rather, this new value of $1,096,509 was supplied to New Swift and/or Debtor subsequent to the Transaction. SAM made these new value payments. But SAM is liable under § 550(a)(2) not § 547. The subsequent new value defense is only available to a person liable under § 547. No § 547 defendant paid any new value. None of the Defendants are entitled to assert the § 547(c)(4) subsequent new value defense.

Whether the SAVM Receivable was collectible on the Transaction Date is irrelevant for the purposes of this Court's preference analysis. The SAVM Receivable was transferred to SAG and then to Moyes. This transfer resulted in a pay down of the Moyes Note.[535] Moyes' books also reflect that the SAVM Note to Moyes was increased by the exact amount of the SAVM Receivable.[536] The value of the SAVM Receivable was recognized by Moyes to be the full amount of SAVM Receivable. If the SAVM Note was ultimately uncollectible, the Court presumes (but does not affirmatively find) that Moyes wrote off this bad debt for his tax purposes. What the Court does find is that Moyes

---

[535] On the Transaction Date, the balance on the Moyes Note totaled $4,762,360. See FN 58. The Moyes Note was paid off as a part of the Transaction.
[536] See Trial Ex. 243and the JPTS (DE 463) at p. 11, ¶ 40. See also *supra* FN 29.

enjoyed the full amount of the SAVM Receivable when that Swift asset was transferred to him.

As to the collectability of the remainder of the 135 Related Party Receivables, the parties do not contend these receivables were fully or partially uncollectible[537] nor would it matter as, among other things, the transfer of those receivables enabled Moyes and his Affiliates to (1) pay off all the 135 Related Party Payables,[538] (2) to increase Moyes' capital account with Redeye,[539] (3) to payoff the Transjet 135 Payable,[540] and (4) for SAM to obtain Swift's 135 Business.[541]

Moreover, other than the SAVM Receivable, the Court previously determined that there were no issues regarding the collectability of the 135 Related Party Receivables.[542] The Court finds that the value of the 135 Related Party Receivables on the Transaction Date was $12,136,669 and that it is the value of such property that must be paid to the Trustee. Section 547(b) does not impose a limitation on the amount a trustee can avoid based on the antecedent debt for which the transfer was made for or on account of. Also, no such limitation is found in § 547(c). Here, although the 135 Related Party Receivables transferred exceed the antecedent debts for which the transfers were made for or on account of, the preference liability is based on the 135 Related Party Receivables, not the 135 Related Party Payables.[543]

Under § 550(a) of the Bankruptcy Code, the Court orders that the Trustee may recover the following value from the following Defendants:

---

[537] As to the SME Receivable, the record reflects that receivable was fully paid. See Forry's Declaration, DE 381, Ex C., ¶ 8.
[538] i.e., $11,747,393.
[539] i.e., $5,228,237.
[540] i.e., $1,905,794.
[541] No evidence was introduced at trial to reflect the value of that 135 Business.
[542] DE 472, the Preference MSJ Interim Order.
[543] Again, the 135 Related Party Receivables which are the subject of this Order totaled $12,136,669. The 135 Related Party Payables totaled $11,747,393. The difference is $403,848.

| | | |
|---|---|---|
| From the Moyes Trust: | the sum of $5,817,857, plus interest |
| From Transjet: | the sum of $1,802,668, plus interest |
| From SAM: | the sum of $5,817,857, plus interest, |
| From Moyes: | the sum of $9,744,381, plus interest; and |
| From Redeye: | the sum of $5,228,237, plus interest. |

The Moyes Trust is jointly liable with SAM for all of SAM's liability and all of Redeye's liability. Moyes and Redeye are also jointly liable for $5,242,806 of the Moyes Trust liability and the SAM liability.[544]

## B.   Fraudulent Transfers

### 1.   Legal Analysis

Counts One and Two of the Complaint seek avoidance of allegedly fraudulent transfers and recovery of these transfers under 11 U.S.C. §§ 544, 548 and 550. Specifically, Count One seeks to avoid intentional and constructive fraudulent transfers from Swift to the Defendants (except Briad and Redeye) under both bankruptcy and state fraudulent transfer laws. Count Two seeks to avoid the transfer of the Briad Receivable and the Redeye Receivable to Moyes, Redeye, Briad and SAM because the Trustee contends such transfers were actual and constructively fraudulent transfers.

The general purpose of § 548 is to protect creditors from the unfair depletion of the bankruptcy estate's pool of assets.[545] Section 548 serves the goal of increased creditor dividends by avoiding fraudulent transfers and bringing property back into the estate for distribution.[546]

Section 548 grants a bankruptcy trustee the authority to recover fraudulent transfers made by the debtor within two years of filing the bankruptcy petition:

---

[544] Section 550(d) notes that the "trustee is entitled to only a single satisfaction . . . ."

[545] *Frontier Bank v. Brown* (*In re Northern Merchandise, Inc.*), 371 F.3d 1056, 1059 (9th Cir. 2004).

[546] *Henry v. Lehman Commercial Paper, Inc.* (*In re First Alliance Mortg. Co.*), 471 F.3d 977, 1008 (9th Cir. 2006).

(a)(1) The trustee may avoid any transfer…of an interest of the debtor in property…that was made…on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

(A) made such transfer…with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made…

or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. §548.

The Bankruptcy Code also permits a bankruptcy trustee to avoid pre-bankruptcy fraudulent transfers using state fraudulent transfer laws. Section 544 states:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

"The transfer of any interest in the property of the debtor … is voidable by the trustee in bankruptcy if the purpose of the transfer was to prevent creditors from obtaining satisfaction of their claims against the debtor by removing property from their reach."[547]

Initially, a bankruptcy trustee seeking to avoid a fraudulent transfer has the burden of proving, by a preponderance of the evidence, that all elements of a fraudulent transfer are present.[548]   Once a trustee establishes indicia of fraud, the burden shifts to the transferee to show some "legitimate supervening purpose."[549]

---

[547] *In re Acequia, Inc.*, 34 F.3d 800, 804 (9th Cir. 1994) (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991)).
[548] *Id.*
[549] *Id.*  Defendants suggest this burden shifting is "permissive" and not required by *Acequia*.  See DE 546, p. 9.  The Court disagrees.

122

a.    Intentional Fraudulent Transfers

Proving actual intent to hinder, delay or defraud creditors is often unfeasible so courts use badges of fraud to infer actual intent when applying § 548(a)(1)[550] and state fraudulent transfer laws.[551]  These badges of fraud serve as indicia of the actual intent required under § 548(a)(1) and include:

(1) actual or threatened litigation against the debtor;

(2) a purported transfer of all or substantially all of the debtor's property;

(3) insolvency or other unmanageable indebtedness on the part of the debtor;

(4) a special relationship between the debtor and the transferee; and, after the transfer,

(5) retention by the debtor of the property involved in the putative transfer.[552] "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose."[553]

Reviewing the badges of fraud in the context of the Transaction reveals that a number of the badges were present on the Transaction Date.

Litigation:  The Balkans Claim was reduced to a judgment in New York on April 12, 2012 via a confession of judgment which was supported by a January 24, 2012 affidavit signed by Burdette acknowledging Swift's obligation to Balkans.[554]  While it is not clear when that lawsuit was filed against Swift, what is clear is that this debt was owed, was past due and was known to Moyes and Burdette on the Transaction Date.  Also known to them at the Transaction Date was the past due Transportation Taxes, in an amount then

---

[550] *Id.* at 805-06.
[551] A.R.S. §§ 44-1001 – 1010. *Torosian v. Paulos*, 82 Ariz. 304, 312 – 313 (1957).
[552] *Id.* at 806.
[553] *Id.*
[554] It is puzzling that Burdette would sign this affidavit on behalf of New Swift over one month after he resigned from Swift.  See Trial Ex. 012.

totaling approximately $1.8 million.  Although the Transportation Taxes were apparently not reduced to judgment or even the subject of a lawsuit by the Transaction Date, it was an important obligation owed by Swift which was past due and fully known to Moyes and Burdette before the Transaction Date.

Property Transfer:  As to the next badge of fraud, while the Transaction did not result in a transfer of all or substantially all of Swift's assets, it did result in the loss of a significant portion of Swift's business (the 135 Business) and the lion's share of its receivables.

Insolvency:  As noted above, Swift was insolvent on the Transaction Date. Moreover, this Court finds that Swift could not have survived without a sale to the Buyers. Burdette and Moyes determined by at least 3Q2011, that a sale of Swift must occur or it would need to close its doors.

Special Relationship:  Of course, Moyes and Burdette had a special relationship with the transferees of Swift's 135 Business and Swift's 135 Related Party Receivables. Moyes directly owned or controlled all these transferees both before and after the Transaction.  Moyes and Burdette were officers of the transferees both before and after the Transaction.

Property Retention:  As to the final badge of fraud referenced above, Moyes' entity SAM retained the 135 Business and he and his Affiliates received the full value of the 135 Related Party Receivables.  Because New Swift leased the 801 and 802 from two of the Transjet Subsidiaries, for a time Moyes was able to avoid making payments on the Transjet Plane loans which he had guaranteed.  Since New Swift agreed to lease Services' FBO, Moyes was able to keep cash flowing into his Services entity.  Since New Swift agreed to lease employees from Transpay, Moyes' Transpay entity was able to retain many of its employees who were assigned to New Swift.

Most important to Moyes and Burdette, the Transaction enabled Moyes and Burdette to absolve various Affiliates of liability which these entities owed to Swift without actually coming out of pocket to reduce those obligations. The price for this debt absolution was agreeing to drop claims Moyes and various Affiliates held against Swift. From the perspective of Moyes' self-interest, this was an easy decision to make in connection with the Transaction because the 135 Related Party Payables owed by Swift were not likely to ever be paid by Swift if the Transaction did not move forward. Instead, if a sale did not occur, Swift would have shut down and the 135 Related Party Payables would receive little or no payment from Swift in a subsequent dissolution.

Virtually all the § 548 badges of fraud identified by Ninth Circuit case law were present at the time of the Transaction. However, these badges of fraud are only aids designed to assist a trier of fact in determining whether a defendant intended to hinder, delay or defraud a plaintiff. The law does not determine a finding of intent based on a mathematical tally of these badges. However, this Court does recognize the existence of badges does shift the burden to Defendants to demonstrate a "legitimate supervening purpose."[555]

Moyes and Burdette failed to insist on the Buyers obtaining and injecting $5 million into New Swift and failed to insist New Swift merge with Direct Air because they were more focused on offloading Swift or closing its doors so Moyes could stem the flow of losses which Moyes historically stood good for. Moreover, the Transaction enabled Moyes and Burdette to receive what best served Moyes' and Burdette's interests by making sure the claims of Moyes and Affiliates were satisfied. However, Moyes and Burdette's actions did not rise to the level of invoking § 548 liability. There "must be

---

[555] *Acequia* at 806.

something more than intent to prefer one creditor over another."[556]  The Court found in § VII(a) that Moyes and Burdette preferred Moyes and Affiliates but now finds they did not do so intending to hinder, delay or defraud Swift or Swift's creditors.  Moyes and Burdette were focused on taking care of Moyes, including his claims against Swift but not intending to harm non-insider claimants or Swift itself.  The alternative was, of course, simply shutting Swift down.  Acting in one's self interest does not necessarily mean one has acted fraudulently.[557]  The Court finds the Defendants have satisfied their burden of demonstrating a legitimate supervening purpose for the transfers at issue.

The Court dismisses with prejudice all of Plaintiff's intentional fraudulent transfer claims against Defendants.

### b.    Constructive Fraudulent Transfers

Fraudulent transfers sought to be avoided under § 548(a)(1)(B) are not fraudulent at all.  Fraud, of course, requires a finding of intent.  Constructively fraudulent transfers do not.  Rather, such transfers are avoidable if made (1) for less than reasonably equivalent value and (2) by a debtor which, at the time of the transfer, was insolvent, was rendered insolvent by the transfer, was too thinly capitalized or was not able to pay their debts as they became due.[558]  While the Trustee's Complaint sought avoidance of both actual and constructive fraudulent transfers, the JTPS does not reference claims for constructive fraudulent transfer avoidance either under state or bankruptcy law.  This is puzzling as this Court has been unable to locate a pleading in which Plaintiff dismissed his constructive fraudulent transfer claims.  However, even if Plaintiff did not intend to

---

[556] Colliers, pp. 548-60, 548.04[1][a].  *See also Rubin Bros. Footwear, Inc. v. Chemical Bank* (*In re Rubin Bros. Footwear, Inc.*), 119 B.R. 416, 423 (S.D.N.Y. 1990) ("Mere intent to prefer one creditor over another, although incidentally hindering or delaying creditors, will not establish a fraudulent transfer under section 548(a)(1).").

[557] Although the Court is denying the Trustee's intentional fraudulent transfer claims, the actions described above as badges of fraud together with degree to which Moyes and Burdette acted in Moyes' self-interest do support the Court's findings concerning the Trustee's breach of fiduciary duty claims.  See § VII(C), below.

[558] § 548(a)(1)(B).

126

dismiss or abandon his constructive fraudulent transfer claims, the Court nevertheless denies such claims because Plaintiff failed to carry his burden of proving Swift received less than reasonably equivalent value in return for the transfers of the 135 Business to SAM or the 135 Related Party Receivables to SAG (as a mere conduit) and then to the Moyes Trust or Moyes or Transjet (as initial transferee) or SAM and Moyes as immediate and mediate transferees, respectively.

The 135 Related Party Receivables totaled $12,136,669 but Swift received from SAG and SAM their agreement to handle the 135 Related Party Payables totaling $11,737,393 plus the 135 Non-Related Party Payables totaling $1,260,510. Swift transferred receivables totaling $12,136,669 but received from the transferees debt relief in the aggregate of $12,997,903. In other words, Swift received more value than it transferred away.[559]

The Trustee did not carry his burden of proving Swift received less than reasonably equivalent value in return for the transfer of the 135 Business and the 135 Related Party Receivables. Section 548(d)(2)(A) tells us that "value" includes satisfaction "of a present or antecedent debt of the debtor." The 9th Circuit reminds us that a debtor who pays down pre-existing debt has received reasonably equivalent value.[560] That value received by the transferees is counted dollar-for-dollar against the value transferred to Swift.[561] The nominal dollar amount of the receivables transferred away by Swift is exceeded by the

---

[559] While it is true that SAG had no business of its own and SAM was a newly formed entity, the Swift liabilities which they promised to resolve were apparently largely properly handled by SAM since none of the 135 Related Party Payables filed allowed claims in the Debtor's bankruptcy (see Claims Register). SAM did file claim #70-1 in an unknown amount and SAG filed claim #72-1, also in an unknown amount. The Debtor objected to both claims (Administrative DE 694) and these objections were sustained. The Transjet Subsidiaries filed claims numbered 73-1, 74-1 and 75-1 but the Debtor also objected to claims 73-1 and 74-1 (Administrative DE's 696 and 697) and those objections were sustained. Transjet 3's claim #75-1 was apparently allowed. Services filed claim #71-1 in the amount of $368,154.32 for amounts owed to it on the New Swift's sublease of the FBO property at Sky Harbor Airport. This was a post Transaction obligation and not one of the 135 Related Party Payables which SAG and SAM agreed to handle.
[560] *In re Fitness Holdings Intern. Inc.*, 714 F.3d 1141, 1147 and 1149, n. 9 (9th Cir. 2013).
[561] See Judge Tracey Wise's decision in *Licking River Mining, LLC*, Case No. 15-01004-TNW, DE 300, 7-19-2019 at page 32 (E.D. Kentucky) citing *Lisle v. John Wiley & Sons, Inc.* (*In re Wilkinson*) 196 F.App'x 337, 344 (6th Cir. 2006).

127

nominal dollar amount of the debts from which Swift was relieved. Plaintiff's

constructive fraudulent transfer claims are denied in their entirety.[562]


### 2. Conclusions Regarding Fraudulent Transfer Causes of Action

Moyes and Burdette caused Swift to transfer to SAM the 135 Business and to SAG

the 135 Related Party Receivables. Those transfers were not actual or intentional

fraudulent transfers avoidable by the Trustee under §§ 544(b)(1) or 548(a)(1)(A). Those

transfers were also not constructively fraudulent transfers. To the extent the Trustee had

not abandoned or waived his § 548(a)(1)(B) causes of action, they are hereby denied. All

of Plaintiff's fraudulent transfer causes of action (Counts One and Two) must be dismissed

with prejudice.


### C. Breach of Fiduciary Duty

#### 1. Legal Analysis

Count Six of the Complaint alleges breaches of fiduciary duties owed to Swift by

Moyes and Burdette and that such breaches caused harm to Swift. Under Arizona law, a

party asserting a claim for breach of fiduciary duty against a corporation must prove:

(1) the existence of a duty owed;

(2) breach of that duty; and

(3) damages causally related to such breach.[563]

In the absence of prior decisions to the contrary and in the absence of applicable

statutes, Arizona courts generally follow the Restatement whenever applicable.[564] Section

---

[562] This review of Plaintiff's constructive fraudulent transfer claim is, in the final analysis, moot because at the conclusion of the trial, Plaintiff's counsel notes the Plaintiff was only pursuing claims for intentional fraudulent transfers. See February 20, 2019 Trial Transcript, page 259. DE 498.

[563] *Surowiec v. Capital Title Agency, Inc.,* 790 F.Supp.2d 997, 1004 (D. Ariz. 2011). *See also Smethers v. Campion,* 108 P. 3d 946, 949 (Az. App. 2005).

[564] *Barnes v. Outlaw*, 192 Ariz. 283, 285 (1998).

874 of the Restatement (Second) of Torts states: "[o]ne standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."[565] Comment b to § 874 notes that "the beneficiary is entitled to tort damages for harm caused by the breach of the duty arising from the relation."[566] Damages sustained are provided for in sections 901 through 932.[567] Section 901 provides the general rules applicable to measuring damages in any tort.[568] These rules are guided by the purposes for which tort damages are awarded, namely compensation, indemnity or restitution.[569]

"Generally, compensatory damages are designed to put the injured party in as good a position as he would have been in had the tortious conduct not occurred."[570] Comment b of § 874 goes on to state the following:

> …the beneficiary is entitled to tort damages for harm caused by the breach of duty arising from the relation, in accordance with the rules stated in §§ 901- 932. In addition to or in substitution for these damages the beneficiary may be entitled to restitutionary recovery, since not only is he entitled to recover for any harm done to his legally protected interests by the wrongful conduct of the fiduciary, but ordinarily he is entitled to profits that result to the fiduciary from his breach of duty and to be the beneficiary of a constructive trust in the profits.

---

[565] *The Restatement (Second) of Torts* § 874 (1979).
[566] *Id.* at comment b.
[567] *Id.*
[568] *Id.* at § 901.
[569] *Id.*
[570] *Id.* at § 903.

The Revised Arizona Jury Instructions (Civil) 5th ("RAJI") also lean on the Restatement of Torts when it comes to addressing breach of fiduciary duty damages. This RAJI states:

COMMERCIAL TORTS 3
Fiduciary Duty
(Measure of Damages)

If you find that [name of defendant] is liable to [name of plaintiff] [on the breach of fiduciary duty claim], you must then decide the full amount of money that will reasonably and fairly compensate [name of plaintiff] for any of the following elements of damage proved by the evidence to have resulted from [name of defendant]'s breach of this duty:

1. Loss of money or other property;
2. The profit or proceeds that [name of plaintiff] would have received had [name of defendant] performed his duties;
3. Money or property that is unjust for [name of defendant] to keep;
4. Bodily harm; and
5. Emotional distress.[571]

As a general rule, "once the right to damages has been established, uncertainty as to amount of damages will not preclude recovery."[572] "This is particularly true where, from the nature of the case, the extent of the injury and the amount of damage is not capable of exact and accurate proof."[573] Still, "there must be a reasonable basis in the evidence for the trier of fact to fix compensation when a dollar loss is claimed."[574]

No Arizona cases explain with particularity how the trier of fact is to measure damages for "loss of … property" or "property that is unjust for [the defendant] to keep."

---

[571] The comments to this RAJI are as follows:
**SOURCE**: RESTATEMENT (SECOND) OF TORTS § 874 comment b and § 924; RESTATEMENT (SECOND) OF AGENCY §§ 403, 404, 404A; RAJI (CIVIL) 5th Bad Faith 7, 12, and Contract 17.
[572] *Nelson v. Cail*, 120 Ariz. 64, 67 (App. 1978).
[573] *Maricopa County Mun. Water Conservation Dist. No. 1 v. Roosevelt Irrigation Dist.*, 39 Ariz. 357, 366 (1932).
[574] *Nelson*, 120 Ariz. at 67.

Arizona's Limited Liability Company Act, enacted in 1992, does not expressly impose any fiduciary duties on members or managers.[575] The question as to whether a fiduciary duty is owed by members to their LLC and, if so, whether the LLC's operating agreement could limit or eliminate that duty, was certified to the Arizona Supreme Court.[576]

### 2. Moyes and Burdette Owed Common Law Fiduciary Duties To Swift

On June 25, 2019, the Arizona Supreme Court held that, indeed, members of an Arizona LLC do owe common law fiduciary duties to their LLC but that the LLC "operating agreement may lawfully limit or eliminate common law fiduciary duties owed to the LLC by its members or managers, although it may not erase the covenant of good faith and fair dealing implied in every contract."[577]

Given that the Arizona Supreme Court determined members and managers of Swift owed common law fiduciaries duty to Swift, the question is whether Moyes and Burdette owed fiduciary duties to Swift up to and including the time of the Transaction. At this Court's July 2, 2019 hearing, their counsel conceded they did.

### 3. The Swift Operating Agreement Did Not Eliminate Fiduciary Duties Owed to Swift By Moyes or Burdette

Because the Arizona Supreme Court has now held that fiduciary duties owed to an Arizona LLC may be limited or eliminated by the LLC's operating agreement, the next

---

[575] A.R.S. §§ 29-601 – 29-858. See also Scott DeWald, James Reynolds & Matthew Engle, *Fiduciary Duties and Indemnification*, Ariz. Att'y, Mar. 2019, at 18-19 (contrasting the LLC Act with ALLCA, which recognizes fiduciary duties).

[576] At the same time, Bankruptcy Judge Paul Sala, in the case of *In re Sky Harbor Hotel Properties, LLC*, Bankruptcy Case No. 2:17-bk-08082-PS, also certified certain limited liability company related questions to the Arizona Supreme Court. The Arizona Supreme Court consolidated these certified questions into one proceeding before that Court.

[577] *In Re Sky Harbor Hotel Partners, Inc.,* 246 Ariz. 531 (2019). A covenant of good faith and fair dealing is implied in every Arizona contract. *Wagenseller v Scottsdale Memorial Hospital*, 710 P.2d 1025, 1088 (1985).

131

question is whether the fiduciary duties owed to Swift by Moyes and Burdette were limited or eliminated under the terms of Swift's Operating Agreement.[578]  The Operating Agreement states, in relevant part:

> ¶ 6.1 <u>Management; Number, Tenure, and Qualifications of the Manager.</u>
>
> …
>
> (e) Nothing contained in this Agreement shall prevent the Manager or any Member from engaging in other activities (some of which may compete with the Business). The engagement by the Manager or any Member in such competitive activities shall not be considered a conflict of interest or breach of their fiduciary duty hereunder.

The Defendants cite this provision but the court finds it is not pertinent to this case as the Defendants' competition with Swift, if any, is not at issue.[579]  It is interesting to note, however, that this subparagraph implicitly acknowledges that Swift's Member and Manager do owe fiduciary duties to Swift.

The next Operating Agreement provision cited by Defendants reads as follows:

> ¶6.5 <u>Limitation of Liability and Indemnity of the Manager.</u> The Manager shall not be liable to the Company or its Member, or to any third party, for any act performed or omission made in good faith under any authority granted in this Agreement. The Manager shall be indemnified by the Company to the fullest extent permitted by Arizona law as currently enacted or as enacted in the future.

Defendants do not expound on the import of this paragraph nor will the Court because neither Moyes nor Burdette were a Manager of Swift, as that term was defined in the Operating Agreement.[580]  Paragraph 6.5 was and is, therefore, inapplicable to them.

---

[578] Trial Ex 065.

[579] Defendants even suggest ¶6.1(e) may well be superfluous in view of ¶7.10 discussed below.

[580] SAVM was defined as Swift's manager under ¶ 2.8 of the Operating Agreement. Defendants acknowledge this in their Closing Brief. (DE 522, page 43)

1
2

### 4.  The Settlement and Release Agreement Did Not Release Moyes or Burdette From Their Breaches of Fiduciary Duties Owed to Swift.

3       In the Amended Under Advisement Order,[581] this Court determined that the

4   Settlement and Release Agreement[582] did not release Moyes or Burdette from fiduciary

5   duties they owed to Swift.  This Court determined that the Agreement itself compels such

6   a finding.  Alternatively, in that Order, this Court determined that the Settlement and

7   Release Agreement is ambiguous as to whether Moyes and Burdette were released from

8   their fiduciary duties and, therefore, evidence was needed to ascertain the intent of the

9   parties from the language contained in the relevant sections of that Agreement.  The

10  Amended Under Advisement Order and the findings related to the Settlement and Release

11  Agreement are incorporated herein by this reference.

12      No evidence was presented at trial pertaining to the intent of the parties when they

13  crafted the language contained in Sections 2 and 4 of the Settlement and Release

14  Agreement.  Since the evidence at trial sheds no further light on how this Court is to

15  interpret the Settlement and Release Agreement, the Court now finds that, if that

16  Agreement is ambiguous (again, this Court finds it is not), the Defendants failed to

17  demonstrate the Agreement waived claims against them or released them from liability

18  they might otherwise have to Swift based on any breaches of their fiduciary duties to Swift.

19      Even if the Settlement and Release Agreement did call for the release Debtor's

20  breach of fiduciary duty claims against Moyes and Burdette, this Court finds the Settlement

21  and Release Agreement was later breached by their failure to fully satisfy all the 135 Non-

22  Related Party Payables which they agreed to handle.[583]  Moyes and Burdette cannot now

23  enforce against Plaintiff the release terms of that Settlement Agreement.

24

25  [581] DE 429.
    [582] Trial Ex. 003.

26  [583] For example, Balkans was only paid $350,000 of its $700,000 claim.  Balkans filed a claim in Debtor's bankruptcy for the unpaid portion of the Balkans Claim.

133

### 5. Moyes and Burdette Were Not "Officers" of Swift

The Operating Agreement also contains this provision protecting its Manager, Member and "any Officer":

> ¶7.10 <u>Company Indemnity of Manager, Officers and Member.</u> The doing of any act or the failure to do any act by the Manager, any Officer or a Member which shall not constitute fraud or intentional, wrongful misconduct in pursuance of the authority granted, the effect of which may cause or result in loss or damage to the Company, if done in good faith, shall not subject the Manager, or any officer or any member to any lability; and in such event, the Company will indemnify and hold harmless the Manager, any Officer or any Member from any claim, loss, expense, liability, action or damage resulting from or relating to any such act or omission, including without limitation reasonable fees and expenses of attorneys engaged by them in defense of such act or omission and other reasonable costs and expenses of litigation and appeal.

We have already seen that neither Moyes nor Burdette were the Manager of Swift. They were also not Swift's Member.[584] Swift's various officer positions are defined and described in ¶ 6.11 of the Operating Agreement. Moyes was, at all relevant times, Swift's President.[585] Burdette was, at all relevant times, Swift's Vice-President.[586] While the Operating Agreement refers to Swift's "officers" and "Officers" in several places within ¶ 6.11 and refers to "Officer" in ¶ 7.10, the Court has not found, nor have the parties shown the Court, where the term "Officer" or "Officers" is defined in the Operating Agreement.[587] If ¶ 7.10 referenced "officer" rather than the defined term "Officer" then, of course, it would not matter because Moyes and Burdette were at all relevant times officers of Swift and would be entitled to the protections of ¶ 7.10. But ¶ 7.10 pertains to "Officer," a capitalized word signifying it must have a particular meaning within the context of the

---

[584] Swift's sole Member was, at all relevant times, SAG. See the Operating Agreement at ¶ 2.7 and the Purchase Agreement, page 1.

[585] See ¶ 6.11.5 of the Operating Agreement.

[586] See ¶ 6.11.6 of the Operating Agreement.

[587] Article 1 is the definitional article of the Operating Agreement but other defined terms are scattered throughout the Operating Agreement. One would expect that if "Officer" was a defined term it would be defined in Article 1 or ¶ 6.11 of Article 6. It is not.

134

Operating Agreement. However obvious the draftsman of the Operating Agreement or the Defendants or their counsel may think the word "Officer" was intended to mean in ¶ 7.10, this Court will not presume the word "Officer" provides Moyes or Burdette the protections of ¶ 7.10. The Court finds the Operating Agreement does not limit or eliminate the common law fiduciary duties Moyes or Burdette owed to Swift up through the time of the Transaction.

### 6. Even If Fiduciary Duties Owed By Moyes and Burdette Were Eliminated By ¶ 7.10 of the Operating Agreement, They Were Still Required to Act In Good Faith

If this Court is incorrect in its definitional analysis of "Officer," then the question is what impact does ¶ 7.10 have in the context of this Adversary Proceeding? In Defendants' view, ¶ 7.10 establishes for Swift's Manager, Member and Officer, a <u>singular</u> duty to refrain from fraud and intentional, wrongful misconduct.[588] Defendants suggest the clause "done in good faith" contained in ¶ 7.10 simply acknowledges that the covenant of good faith and fair dealing is implied in all contracts.[589] In essence, if Moyes and Burdette did not defraud or intentionally harm Swift, Defendants contend their common law fiduciary duties to Swift are eliminated by ¶ 7.10. Defendants point out that the parties to the Operating Agreement were SAG and SAVM and that neither Moyes nor Burdette personally signed the Operating Agreement so they are not bound by the covenant of good faith and fair dealing implied in the Swift Operating Agreement.[590] Moreover, Defendants note the Trustee's Complaint does not allege a breach by any Defendants of the implied covenant of good faith and fair dealing so they cannot have liability in this Adversary Proceeding on such grounds.

[588] DE 522, page 46, lines 8-9
[589] *Id*. at lines 10-12.
[590] *Id*. at page 43, lines 23-28.

The Trustee urges this Court to find the common law fiduciary duties owed by Moyes and Burdette were not limited to the Swift Operating Agreement. The Trustee points to ¶ 6.1(e) which permits a manager or member to compete with Swift. The Trustee argues that Defendants did not provide evidence "at trial that the ambiguous language of the Operating Agreement (which arguably only applies to the scope of the indemnity and does not expressly address fiduciary duties) was intended to limit the fiduciary duties of officers and controlling members to" Swift.[591] This Court agrees that the language of ¶ 7.10 is confusing and ambiguous.

Despite the ambiguity of the language of ¶ 7.1, in light of the LLC statutes, Arizona case law and apparent intent of the Operating Agreement, this Court finds ¶ 7.10 requires two things of its Member, Manager and Officers if they wish to be free of claims against them by Swift:

1.    do not defraud Swift or cause it harm through your intentional, wrongful misconduct; and

2.    your acts and omissions on behalf of Swift must be "done in good faith."

Accordingly, contrary to Defendants' contention, ¶ 7.10 does not provide a <u>singular</u> duty to not defraud Swift or cause it harm through intentional, willful misconduct. Nor is the "done in good faith" language in ¶ 7.10 simply a recitation of the requirement that the Operating Agreement implicitly contain a covenant of good faith and fair dealing. Rather, if a Member, Manager or Officer of Swift is to be afforded the protection of ¶ 7.10, the actions or inactions of that Member, Manager or Officer must both be "done in good faith" and "not constitute fraud or intentional, willful misconduct." Since Moyes and Burdette seek the protections of ¶ 7.10, they have the burden of demonstrating they have satisfied ¶ 7.10's two prongs. While this Court finds neither Moyes nor Burdette perpetrated actual fraud against Swift or engaged in intentional, willful misconduct while acting as officers

---

[591] DE 521, page 38, lines 15-20.

of Swift, the Court finds they did not sustain their burden of demonstrating they acted in good faith in discharging their duties as Swift's President and Vice-President,[592] respectively. For this reason, the Court rejects Defendants' contention that they are insulated from the Trustee's claims by virtue of ¶ 7.10.

Even if, as Defendants' contend, the "done in good faith" language of ¶ 7.10 is nothing more than a nod to the implied covenant of good faith and fair dealing, the parties to the Operating Agreement were SAG and SAVM, neither of which had employees and both of which acted only through Moyes and Burdette. They are both personally bound by the implied covenant of good faith and fair dealing. Neither may stand behind these entities and shirk the duties implied in the Operating Agreement.

### 7.    Moyes and Burdette Breached Their Common Law Fiduciary Duties to Swift

Since this Court finds that fiduciary duties were owed to Swift by Moyes and Burdette and that ¶ 7.10 provides no refuge for them, the next question to be answered is whether they breached their common law fiduciary duties to Swift. It is worth exploring what exactly a fiduciary duty entails. Arizona courts have been instructive in this regard. In *Gemstar*[593] the Arizona Supreme Court held "a fiduciary owes a duty of the utmost good faith, loyalty and full disclosure.[594] A fiduciary duty is not breached "so long as he acts honestly and in good faith and breaches no duty owing to the [Entity]."[595] Once the fiduciary duty exists, it is upon that fiduciary to demonstrate he has fully complied with this duty.

---

[592] See the signature page on the Operating Agreement, Trial Ex. 065.
[593] *Gemstar Ltd. v. Ernst & Young*, 917 P.2d 222 (Ariz. 1996).
[594] *Id*. at 233; *see also Ghiz v. Millett*, 71 Ariz. 4, 8 (1950) (Fiduciary duty imposes obligation of loyalty.).
[595] *Master Records, Inc. v. Backman*, 652 P.2d 1017, 1020 (Ariz. 2007) citing *Atkinson v. Marquardt*, 541 P.2d 556, 558 (Ariz. 1975); *see also DeSantis v. Dixon*, 236 P.2d 38, 41 (Ariz. 1951) (fiduciary duty imposes "the obligation of the utmost good faith in their dealings" and "requires a high degree of care.").

The Trustee contends Moyes and Burdette breached their fiduciary duties in three general ways:

1. Through misappropriation of Swift's goods and services by causing Swift to provide such goods and services for Moyes' benefit without consideration and without using efforts to collect the Moyes Receivable;[596]

2. Through Moyes' use of Swift's "goods and services to make his capital contribution to Redeye, and allowed Redeye and Briad to set-off the debts that they owed to [Swift] against Moyes' personal debt obligations to Redeye;"[597] and

3. By stripping Swift "of substantially all of its assets, and then caused ownership of [Swift] to be transferred to 3rd parties that had no means to finance [Swift's] ongoing operations."[598]

Moyes and Burdette bear the burden of proving they, as fiduciaries of Swift, discharged that duty exercising the utmost good faith and that at all times they acted with loyalty to Swift. Moyes and Burdette must demonstrate their actions and inactions were fair and reasonable and for the benefit of Swift to whom they owed such fiduciary duties. For the reasons set forth below, the Court finds Defendants have failed to sustain this burden of proof. However, even if the burden of proving a breach of fiduciary duty was on the Trustee, this Court finds the Trustee sustained his burden of proof.

This Court finds that in the 3Q2010 Moyes and Burdette were highly motivated to unload Swift or at least Swift's 121 Business. Burdette put it succinctly when he signed a declaration noting "[i]n the time leading up to the Transaction, I had occasional conversations with Jerry Moyes about the Transaction. Our conversations primarily focused on the viability of the Buyers' proposed business model for Swift. Our decision

---

[596] The Trustee defines this as "Misappropriation." DE 462, page 3, lines 15-18.
[597] The Trustee defines this as "Personal Debts." *Id* at lines 18-20.
[598] The Trustee defines this as "Stripping." *Id* at lines 20-23.

Case 2:14-ap-00534-DPC    Doc 555    Filed 03/31/20    Entered 03/31/20 15:42:31    Desc
Main Document    Page 146 of 174

at the time was whether to enter into the Transaction or have Swift cease operations altogether. In our business judgment, the Transaction presented the better course of action for Swift and was in the best interests of Swift."[599] At trial, Burdette testified that Buyers were in a hurry to close the Transaction but the Seller was not. The Court finds this testimony not credible. Swift was crippled and needed to be sold or quickly closed.

Although Burdette testified he was not actively shopping Swift for sale, they did entertain sale discussions with several potential buyers. Two such potential buyers were promptly disregarded. Miraculously, however, they were approached by Conry in October 2011 with the prospect of selling Swift's 121 Business to the Buyers. After receiving Buyers initial letter of intent, Burdette contacted Ehrlich to begin working on a possible sale transaction. As noted in § III(D), above, Ehrlich wrote his Red Flag Email to Burdette identifying the many transactional issues Burdette needed to consider in a possible sale to the Buyers. While Burdette scoffed at the Red Flag Email as just another expression of Ehrlich's typical "sky is falling," alarmist mentality, this Court finds it quite illuminating. The Court is, of course, aware that a transaction seldom strictly adheres to terms contained in an initial letter of intent. However, that initial offer is an important start point and the counterproposal from a seller is where the meat begins to be applied to the transaction's bones.

Swift's 121 Business was seasonal and highly dependent upon flying professional hockey and basketball teams. When the NBA lockout began on July 1, 2011, Swift's 121 Business sustained sharp losses. By the beginning of 4Q2011 Swift was in horrible shape. Moyes would need to continue propping Swift up or shut it down. He was done spending more money to support Swift's losing operations.

[599] Burdette Declaration, DE 258-3, page 5, ¶ 25. See also Burdette's trial testimony on February 11, 2019 at page 186 lines 5 – 8. DE 493. Although Burdette testified Swift was not listed for sale and he was not trying to sell Swift, this Court finds Burdette and Moyes were quite anxious to be rid of Swift's 121 Business by the time of the Transaction Date.

139

Burdette also testified that Buyers did not need Fowler's $5 million when the Transaction closed but would need it to expand. The Court finds this testimony ignores the cash crunch that was soon obviously ahead of New Swift because a huge portion of Swift's receivables (collectible and otherwise) were transferred at closing to Moyes and his Affiliates.

Moyes testified that he knew the 121 Business would be a long-term challenge but says he would have toughed it out if it was not sold to the Buyers. The Court finds this testimony was not credible since he followed Burdette's advice concerning Swift and that Burdette told him in 3Q2011 to sell or close Swift.

By the time of the Transaction Date, Swift was insolvent, it was not paying its debts to Affiliates, it was sustaining huge losses, Moyes was in no mood to keep funding those losses and Burdette was looking for a way to get Moyes out of this jam.

### a. Moyes and Burdette Disregarded Prudent Advice of Counsel

Ehrlich's Red Flag Email highlighted several crucial deal points for Burdette's and Moyes' consideration. Foremost among those deal points was Buyers' need to inject $5 million into New Swift. Ehrlich essentially thought it would be foolhardy to close a sale to the Buyers without the Buyers actually infusing the $5 million, whether in the form of equity capital or an owner's loan to New Swift. Burdette did not verify Spiral's ability to find this proposed $5 million cash injection.[600] He did not even consider Buyers' financing to be any of his business.[601] Moreover, neither Moyes nor Burdette read Buyers' business plan or any of Buyers' financials.[602]

---

[600] February 14, 2019 Trial Transcript at page 203 lines 3-22. DE 499.
[601] February 15, 2019 Trial Transcript at page 54 lines 1-23. DE 494.
[602] February 14, 2019 Trial Transcript at page 187 lines 11-15. DE 499. February 15, 2019 Trial Transcript at page 47 lines 6-24. DE 494.

Burdette indicated he did not care whether the $5 million arrived in the form of equity or a loan.[603] In fact, he thought it would be prudent for a buyer to loan New Swift $5 million rather than tie their investment up in the form of an equity contribution.[604] The Court does not quibble with Burdette's opinion in this regard. However, this Court does not believe that a truly objective seller properly guided by loyal officers properly exercising the fiduciary duties owed to an Arizona limited liability company would agree to turn over the keys to a significant portion of their business without any proven investment or guaranty or assurances enforceable against the buyer. Yet Burdette testified that he did not care if the Buyers had any "skin in the game."[605] This was not just reckless, it was a sign of desperation. It reflected Moyes' and Burdette's mindset that Swift should be closed or, better yet, sold under most any terms. Their failure to insist upon the Buyers' infusion of any new money was a breach of their fiduciary duty to Swift.

This Court finds that failure of Moyes and Burdette to insist on a $5 million cash infusion prior to the Transaction closing, with or without New Swift's deals with Saipan Air or KMW, New Swift would have been unable to avoid a bankruptcy filing because it had insufficient cash flow to continue its 121 Business.

Ehrlich and Burdette regularly communicated about the proposed Transaction right up to the Transaction Date. Ehrlich did not discuss this proposed Transaction with Moyes. Burdette spoke to Moyes about the Transaction but only in the most general of terms. Burdette was tasked with running Swift and its air transportation Affiliates. Moyes was too busy to be bothered with the Transaction details and, in any event, was not a detail-oriented owner. Moyes was running Swift Transportation, a company with thousands of employees and truck drivers and annual revenues of over $3 billion. His NHL hockey

---

[603] February 14, 2019 Trial Transcript at 195:15 – 196:5. DE 499.
[604] After all, this is exactly what Moyes did with Swift. He transferred millions of dollars to Swift and booked those transfers as loans, not capital contributions. See the Moyes Note discussion above at § II(E)(1).
[605] Trial Tr. February 11, 2019 at page 69 lines 4-8. DE 493.

team was in the throes of its own chapter 11 bankruptcy in Arizona. He also was quite active in the community with charitable endeavors. Moreover, Moyes was a devoted family man with a wife, ten children and many grandchildren, several of whom lived with him.[606] Moyes was exceedingly busy and paid very little attention to the sale of Swift to the Buyers.

The fact remains, however, that Burdette advised Moyes that Swift needed to be sold or shut down.[607] Swift's 121 Business was bleeding money. Burdette and Moyes agreed the bleeding needed to stop. Although Moyes testified that he was in the air business "for the long haul"[608] and that "he paid his debts,"[609] this Court finds Moyes trusted Burdette, listened to Burdette and knew Burdette was right. By late 2011, Swift needed to be sold or shut down.

Moyes and Burdette were driven to push the 135 Related Party Receivables out of Swift and into the hands of Moyes and the Affiliates while at the same time obtaining leases from New Swift in the exact amounts needed to service Moyes' ongoing obligations on the Transjet Planes. In this regard, Burdette was acting out of loyalty to Moyes (not Swift) and Moyes was looking out for his own interests. After all, up to that point, Swift had no obligation on the loans owed by the Transjet Subsidiaries and Moyes. This Court also finds their fiduciary duties were breached where Moyes and Burdette did not require the Buyers to merge their recent acquisition of Direct Air into New Swift. Moyes and Burdette testified that it was exactly that business combination which Burdette saw as the business model which might enable New Swift to succeed where old Swift was failing. Why would they not insist on the merger? Presumably the Buyers balked at the merger and neither Moyes nor Burdette saw fit to look out for Swift's best interests.

---

[606] February 19, 2019 Trial Transcript, page 59. DE 500.
[607] Again, see DE 258-3, page 5 of 21, ¶ 25.
[608] Moyes testimony.
[609] Moyes testimony.

Swift was owed $12,136,669[610] by various Affiliates. Naturally, Moyes did not want the Affiliates to have to pay New Swift these amounts, especially since he and some of the Affiliates were collectively owed $11,747,393[611] by Swift. By having Swift transfer to SAG all of the 135 Related Party Receivables while agreeing that SAG and SAM would handle all the 135 Related Party Payables, Moyes was able to recover all amounts he and his Affiliates were owed by Swift without writing a check for any amount owed by Affiliates to Swift. An elegant solution? Perhaps. A proper exercise of the fiduciary duty of "utmost good faith" or of "loyalty" owed by Moyes and Burdette to Swift? No. This Court finds this was one of the primary motivations to Moyes and Burdette to consummate the Transaction and that it was to benefit Moyes' business interests but not to advance the best interests of Swift. If Swift's best interests were properly cared for, Moyes should have required payment of the 135 Related Party Receivables long before the Transaction Date. Moreover, Swift's best interests were not served by Burdette and Moyes making sure the 135 Related Party Receivables ended up in the hands of Moyes controlled entities.

Ehrlich's Red Flag Letter contained many important warnings and numerous pieces of sound advice to Burdette and Moyes, much of which was ignored by Moyes and Burdette.

### b. Moyes Captured the Value of the 135 Related Party Receivables

The 135 Related Party Receivables should have been paid by the Affiliates at or shortly after the time these obligations to Swift were incurred. Given they were outstanding just before the Transaction, to the extent possible, they should have been paid just prior to the Transaction. But, of course, many of the 135 Related Party Receivables

---

[610] This amount is defined as the 135 Related Party Receivables. See Attachment 1.
[611] This amount is defined as the 135 Related Party Payables. See Attachment 1.

could not be paid in November 2011.  SAVM (which owed $4,516,144[612] to Swift) on the Transaction Date was by then out of business, had no assets and could not possibly pay Swift.[613]  The $1,802,668 owed to Swift by the Transjet Subsidiaries[614] could also not be paid in cash just before the Transaction Date because any money obtained by the Transjet Subsidiaries came from Swift's operations or in the form of loans from Moyes.[615]  However, the Redeye Receivable, the SME Receivable and the Briad Receivable could and should have been paid to Swift at or before the Transaction Date.  Had they done so, Swift could have fully paid the Transportation Taxes[616] and a significant portion of the 121 Payables.  Alternatively, all 135 Payables and 121 Payables could have been partially paid on an equitable or pro rata basis.  Instead, the Transaction was structured so that the 135 Business went to SAM and all 135 Receivables and 135 Payables went to SAG and then on to Moyes and his Affiliates while all the 121 Payables remained with New Swift.  This may appear facially fair or reasonable or even proper in an accounting sense, but, of course, that was never how Swift operated or how it booked its pre-Transaction accounting records.  Swift's 121 Payables and 121 Receivables and 135 accounts payables and receivables were rightly lumped together on Swift's balance sheets.  Buyers did not want Swift's 135 Business so the parties to the Transaction pushed Swift's 135 Business to a newly formed entity[617] created by the Moyes team.

The Transaction did not need to result in the 135 Receivables going to Moyes or his Affiliates nor did the 135 Payables necessarily need to leave Swift.  Rather, for Moyes it was an excellent opportunity to have Swift's 135 Business remain under his control, to

---

[612] This amount is defined as the SAVM Receivable.

[613] In effect, Moyes' business interests were served by the SAVM Receivable because SAVM ran up debts with Swift but never had to pay them.  Were the SAVM Receivable not incurred, either SAVM would have failed earlier or Moyes would likely have needed to inject even more funding into SAVM.

[614] This amount is defined as the Transjet Receivables.

[615] The Transaction result in satisfaction of the Transjet Receivables because the $1,905,792 owed by Swift to the Transjet Subsidiaries was handled through the Transaction.  In essence, the Transaction effectuated a setoff of Transjet Receivables ($1,802,668) against the Transjet 135 Payable owed by Swift on the Transaction Date ($1,905,792).

[616] Up to $1.9 million.  See Purchase Agreement, p. 3 and Schedule 1.1.1.

[617] SAM, formed in December 2011.

fully satisfy the Moyes Note,[618] for the Transjet Subsidiaries to have their obligations to Swift fully satisfied and for Redeye, Briad and SAM to capture significant value from Swift at a time when the alternative was to simply shut down Swift. Yes, Swift was relieved of millions of dollars of debt owed to Moyes and his Affiliates but in doing so they captured millions of dollars of value that would have either been lost had Swift shut down or value which rightly should have been shared with other Swift creditors who were not in a position to make sure they were satisfied ahead of or on par with Moyes and the Affiliates.

c.     <u>SAM Retained the 135 Business</u>

While the record is clear that Buyers only wished to obtain Swift's 121 Business, it is also obvious to the Court that Moyes was served by spinning Swift's 135 Business off to SAM. Moyes needed a 135 certificate for use in his executive travel, especially through Redeye. The Transaction recognized this reality when the parties entered into the Part 135 Transaction Services Agreement.[619] Since SAM was newly formed it needed to apply to the FAA for its own 135 certificate. In the meantime SAM needed access to New Swift's 135 Certificate. Moreover, when the Part 135 Transaction Services Agreement was no longer necessary, Moyes wanted back the "Swift Air" name and the "flyswiftair" domain name.[620] In effect, Buyers could not even effectively use the Swift Air name productively because it would go back to Moyes once SAM obtained its own 135 Certificate.

---

[618] The Moyes Note owed by Swift to Moyes totaled $4,762,359 on the Transaction Date.
[619] Trial Ex. 005.
[620] Trial Ex. 006, page 2, ¶ 3.

Case 2:14-ap-00534-DPC    Doc 555    Filed 03/31/20    Entered 03/31/20 15:42:31    Desc
Main Document    Page 153 of 174

### d. Moyes Was Motivated to Have New Swift Pay the Debt He Guaranteed on the Transjet Planes

The Transjet Subsidiaries had leased two Boeing 737's which Swift used to fly its sporting team customers. Significantly, Moyes guaranteed both of those leases. The Transaction called for New Swift to lease both of those planes, not based on known market price[621] but, rather, simply based on the amount of Transjet's monthly debt service. Swift was the only source of revenue for the Transjet Subsidiaries. If Swift could not produce revenues to pay the Transjet Subsidiaries, the Transjet Subsidiaries could not pay the airplane loan obligations. To protect his exposure on his guarantees, Moyes would need to suffer a cash flow crunch in excess of $200,000/month.[622] For Moyes, Swift's possible closure was a very personal matter.

### e. Moyes Benefited by New Swift Assuming $1.2 Million Payable to Transjet.

As a part of the Transaction, New Swift agreed to pay Transjet $1.2 million.[623] This obligation did not exist on Swift's books prior to the Transaction. Moyes continued to own and control Transjet post-Transaction. This fresh debt of New Swift would help assure Transjet's future.

### f. Moyes Was Motivated to Keep Business Flowing to Services and Transpay

Swift had no employees. Transpay hired personnel who were then leased to Swift and other Affiliates. The Transaction called for New Swift to likewise lease Transpay's

---

[621] February 15, 2019 Trial Transcript at page 131 lines 14-16. DE 494. February 19, 2019 Trial Transcript at 159:21 – 160:5. DE 500.

[622] The monthly lease payment on the 801 plan was $118,936/month as of January 1, 2012. The monthly lease payment on the 802 plan was $116,154/month as of January 1, 2012.

[623] See the Purchase Agreement, p. 8, for the definition of Transjet Accounts Payable and § 2.4 where the Buyers covenant to pay this obligation.

146

people for use in New Swift's operations. In effect, Moyes could keep his people employed but have many of those people paid through New Swift. Moyes' entity Transpay was benefited by this arrangement and, at least emotionally, Moyes benefited from knowing his people would still have jobs after the Transaction closed. The alternative to this sale was closing Swift and laying off many long-time employees employed by Affiliates.

Under the terms of the Transaction, New Swift would also lease its office and aviation operations space from Services, the fixed based aviation operation used to house Swift's 121 Business and its 135 Business. This new lease arrangement held out the prospect that Services could survive and that Moyes' corporate jet travel needs could be handled through the continued survival of Services. Absent the Transaction Swift would shut down and Services' operations supporting Moyes' private jet transportation would have been in grave jeopardy.

g.     <u>Moyes Benefited from the Legacy Transaction</u>

Since December 31, 2007,[624] Legacy owed Swift at least $3,985,635. This changed on September 24, 2011, when Swift transferred to Moyes the Legacy Receivable which Moyes then applied to reduce Swift's obligation on the Moyes Note. While this Court rejected the addition of the Trustee's Legacy Claim to his Complaint, this Court finds the Legacy Transaction constitutes further evidence of Moyes exercising power over Swift for his own personal benefit. Whether or not the Legacy Receivable was collectible on September 24, 2011, Moyes causing Swift to transfer the Legacy Receivable to him on that date breached his fiduciary duty to Swift. Moreover, the fact that Moyes and Burdette allowed Legacy to build up such a large receivable over many years evidences their

---

[624] Trial Ex. 022, page 2 reflects the Legacy Receivable owed to Swift as totaling $3,986,981 as of December 31, 2007. As of December 31, 2010, the Legacy Receivable totaled $3,985,634. See Trial Ex. 025, p.2.

domination of Swift as a manner designed to suit Moyes' personal interests, not the best interests of Swift.

### h. <u>Moyes and Burdette Gained Indemnities From the Transaction</u>

Under the terms of the Transaction, Swift was split into two (not necessarily equal) parts. The 121 Business and all its related assets and liabilities (plus the newly absorbed Transjet Account Payable) went to New Swift while the 135 Business and its related assets and liabilities remained under the control of Moyes and Burdette. The parties agreed to indemnify one another for the obligations they each agreed to satisfy. Specifically, the Buyers, New Swift and SAG agreed at ¶ 9.2[625] to, in relevant part:

§9.2 <u>Indemnification</u>. (a) After the Closing, Seller agrees, whether or not contained in Article V or in any certificate or other document delivered pursuant to this Agreement, to indemnify and hold Purchasers and their Affiliates (including Company) and their respective stockholders, officers, directors, members, managers, employees, agents, successors, assif,111S and Affiliates (each a "**<u>Purchaser Indemnitee</u>**"), harmless from and against any damages, losses, liabilities, obligations, claims of any kind, interest and penalties, or expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, **"<u>Losses</u>"**), suffered, incurred or paid, directly or indirectly (except for punitive, special, incidental and consequential damages) as a result of, in connection with or arising out of (i) the failure of any representation or warranty made by Company or Seller in this Agreement (whether or not contained in Article III , Article V or in any Schedule, Exhibit or certificate or delivered pursuant to this Agreement) to be true and correct in all respects as of the date of this Agreement and as of the Closing Date, (ii) Company Disputes and Orders, (iii) any tax share sharing agreement between Company and Seller and/or any other Affiliate, (iv) Assumed Obligations, (v) Taxes, (vi) any Accrued Passenger Facility Charges, (vii) any liabilities of the Part 135 Business and any pre-Closing Part 121 Accounts Payable in excess of One Million Four Hundred Fifty Hundred Thousand Dollars ($1,450,000), and (ix) any Transjet Accounts Payable in excess of One

---

[625] Purchase Agreement, pp. 39-41. Trial Ex 001.

Million Two Hundred Thousand Dollars ($1,200,000), *provided, however,* that there shall be no liability of Seller to Company or indemnity of Seller to Company or Purchasers with respect to the pre-Closing Part 121 Accounts Payable or the Transjet Accounts Payable) as long as the sum of these two amounts does not exceed Two Million Six Hundred Fifty Thousand Dollars ($2,650,000), in the aggregate, and *further provided,* that the aggregate liability of Seller with respect to any payments under Sections 9.2(a)(i) shall be limited to the aggregate amounts invested in or loaned to Company by Purchasers or their Affiliates; and *provided* further, that as a condition to any payment of liability under Section 9.2(a)(ii) neither Company nor any Purchaser Indemnitee shall enter into any settlement with respect to any Order or the Subsequent Lawsuit without the prior written consent of Seller (which consent shall not be unreasonably withheld or delayed). In addition Seller agrees to indemnify and hold each Purchaser Indemnity harmless from and against any Losses arising out of or in relation to the Assumed Obligations, whether or not such Assumed Obligations are listed in <u>Schedule 2.4(b).</u> Seller's obligation to indemnify for Losses arising out of or in relation to the Assumed obligations is not subject to any limitation with respect to the amount of such indemnity and no time limitations, except for relevant statutes of limitations.

(b)     After the Closing, Company and Purchaser agree to indemnify and hold Seller and its Affiliates and their respective agents, successors and assigns (other than Company) (each a "**Seller Indemnity**") harmless from and against Losses suffered, incurred or paid, directly or indirectly, as a result of, in connection with or arising out of (i) the failure of any representation or warranty made by Purcha5ers in this Agreement (whether or not contained in Article IV) or in any Schedule, Exhibit or certificate delivered pursuant to this Agreement to be true and correct in all respects as of the date of this Agreement and as of the Closing Date, (ii) any breach by Purchasers of any of the covenants or agreements contained herein or in any other agreement entered into in connection with the consummation of the transactions contemplated hereby, including, but not limited to, Company's failure to pay any FT Taxes, the Part 121 Accounts Payable or the Transjet Accounts Payable and (iii) Company's assets, operations or business after the Closing.

(c)     The obligations to indemnify and hold harmless pursuant to Sections 9.2(a) and 9.2(b) shall survive the consummation of the transactions contemplated by this Agreement for the time periods set forth in Section 9.1, except for claims for indemnification asserted

prior to the end of such periods in accordance with the procedures set forth herein, which claims shall survive until final resolution thereof.

(d) No claim shall be made pursuant to this Section 9.2 unless and until the aggregate Losses shall exceed Two Hundred Thousand Dollars ($200,000) and only to the extent of such excess.

In the Court's experience, these types of mutual indemnification agreements are commonplace in business sales. However, for the purposes of this Adversary Proceeding it is worth noting that, if the Transaction did not happen and Swift were to shut down, Moyes and Burdette would potentially be exposed to all manner of claims arising out of Swift's 121 and 135 business operations as well as obligations from the Affiliates for which they might be liable. Selling Swift and its 121 Business to Buyers with the possibility that New Swift might survive and make good on its indemnification of Moyes and Burdette was an important feature of the Transaction and a factor motivating Moyes and Burdette to approve the Transaction.

i.     <u>Moyes and Burdette Sought to Reduce Their Exposure on the Transportation Taxes</u>

Ehrlich testified that in initial discussions, the Buyers were to pay the Transportation Taxes at closing.[626] It is particularly curious that, in the final analysis, Moyes and Burdette would allow the Buyers to take over the 121 Business without paying the Transportation Tax liability[627] for which Burdette, and possibly Moyes, had personal liability as "control parties" of Swift. Moyes or Burdette did not even see fit to compel the Buyers to guarantee any portion of the Transportation Taxes or accounts payable left stranded in the 121 Business transferred to the Buyers. These missteps too constitute breaches of Moyes' and Burdette's fiduciary duty to Swift.

---

[626] See Ehrlich's testimony, § VI(B)(2)(f).
[627] February 19, 2019 Trial Transcript at page 123 lines 11 – 18. DE 500.

### j. Moyes and Burdette Cut Swift's 121 Payables Creditors Adrift.

Rather than insist that Buyers fully pay all Swift's outstanding 121 Payables,[628] Moyes and Burdette agreed to let Buyers try to seek discounted payments from these Swift creditors.[629] This was obviously not beneficial to Swift's creditors but, for purposes of this lawsuit, this arrangement also did not benefit Swift. Had Buyers or Moyes been required to pay all these payables at closing, Swift would have had fewer demands on its diminished cash flow. As it turns out, New Swift carried many of these unpaid debts into its Chapter 11 Proceeding. Moyes and Burdette did not care enough about Swift after the Transaction to require the Buyers to operate New Swift without the baggage of these unpaid payables. This breached their fiduciary duty to Swift.

### k. Moyes Enjoyed Tax Benefits From the Transaction

As noted in § VI(B), above, during Ehrlich's testimony counsel explored implications of SAG reporting on its 2011 tax return a $4,510,000 loss due to a forfeited airplane deposit made in 2007. That 2007 deposit was lost because the taxpayer could not complete the purchase due to its "insolvency"[630] [sic] and financial hardship. As a result of this very sizable tax loss, Moyes obtained a passive loss carry forward which could not be immediately used but after 2011 would be there to shield his future taxable income. As Moyes noted in his testimony, he is a long-term planner. This was truly a long-term view of how the Transaction could personally benefit him.[631]

---

[628] Ehrlich even suggested the ownership interest in New Swift be held in escrow until all these payables had been satisfied. See Trial Ex. 066 at ¶ 2. Moyes and Burdette ignored this advice.

[629] See Ex. 102, ¶ 2.

[630] While this Court raised its eyebrows when it realized SAG was claiming to the IRS that it was insolvent in 2011, the Court does not find this tax filing aids in the determination of Swift's solvency status in December 2011.

[631] As noted in FN 129 and FN 388, Moyes also enjoyed further tax benefits when he wrote off the Moyes Note and if he wrote off bad debt expenses associated with his acquisition from Swift of the SAVM Receivable.

SAVM's Cash Was Drained By Moyes

2    In the year prior to the Transaction, millions of dollars were paid from SAVM to

3  Moyes in reduction of SAVM's liabilities to Moyes or to creditors whose claims Moyes

4  guaranteed.[632]  These transfers rendered SAVM incapable of paying Swift on the SAVM

5  Receivable.  As of the Transaction Date, the SAVM Receivable was uncollectible and

6  SAVM was defunct.  By gutting SAVM of its cash, Moyes and Burdette ensured that

7  SAVM could not pay its bills to Swift.  By serving his own interests in the matter of SAVM,

8  Moyes and Burdette breached their fiduciary duties to Swift.

9

10    m.    Moyes' Personal Interests Were Served by Ehrlich

11    Ehrlich was Moyes' long-time attorney.  He formed many of the Affiliates

12  (including Swift) and handled many of their transactions and legal issues.  When the Buyers

13  approached Swift to acquire the 121 Business, Ehrlich was the obvious lawyer to call.

14  Ehrlich knew full well that, first and foremost, the Transaction needed to make sense for

15  Moyes.  Even though Moyes' interests were in conflict with Swift's interests, Ehrlich

16  explicitly or implicitly represented Swift, Moyes, SAG and other Affiliates in the

17  Transaction.  Ehrlich knew the questions of Swift's solvency was a cloud hanging over the

18  Transaction but did not obtain or even suggest Swift obtain an expert's opinion of Swift's

19  solvency before or after the Transaction.[633]  He thought SAG was insolvent and likely

20  suspected Swift was as well.  If an expert report was commissioned and showed Swift was

21  insolvent before and after the Transaction, Moyes would have lost the opportunity to lay

22  the 121 Business and 121 Payables off to the Buyers.  Of course, the Buyers also did not

23

24  [632] See Trial Ex. 020, page 19.
[633] See *Simple Insolvency Detection for Publicly Traded Firms*, Heaton, J.B., The Business Lawyer, Volume 74, Issue
25  3, pages 723-4 (Summer 2019) (The permissibility of leveraged buyouts and spinoffs depends on whether the resulting
entities are solvent, typically requiring solvency opinions before consummation.")  The Court does not find the
Defendant's failure to obtain a solvency opinion as dispositive as to the question of solvency, but mentions the
26  common practice of obtaining such opinions to further highlight another failure of Defendants to protect the interests
of Swift in the lead up to the Transaction.

152

insist on a solvency opinion. They essentially had nothing to lose by entering into the Transaction.[634]

Ehrlich wore many hats in connection with the Transaction but, at bottom, served Moyes' interests above all.

### n. The Existence of Badges of Fraud Further Support a Finding of Breach of Fiduciary Duty.

As noted in § VII(B), above, the "badges of fraud" pertinent to the Court's findings concerning the Trustee's intentional fraudulent transfer claims are also pertinent to the Trustee's breach of fiduciary duty claims. Those findings are incorporated in this section where the Court finds that Moyes and Burdette breached their fiduciary duties to Swift.

### 8. The Court Rejects Moyes' and Burdette's Defenses of *In Pari Delicto* and Release

During the course of this Adversary Proceeding, Burdette and Moyes filed a motion[635] for partial summary judgment claiming they were released from any of Trustee's potential claims for breach of fiduciary duty by virtue of the Settlement and Release Agreement.[636] Moyes and Burdette also argued that the doctrine of *in pari delicto* barred the Trustee's breach of fiduciary claims against them. These issues were explored by the Court in its Amended Under Advisement Order.[637] Points 5 and 6 on pages 14-16 of that Order recognized a genuine issue of material fact remained concerning the

---

[634] Defendants suggest that Buyers incurred about $.5 million in expenses to document the Transaction but there is no evidence in the record confirming this contention nor was proof provided that such fees and expenses, if incurred, were paid by the Buyers.
[635] DE 270.
[636] Trial Ex. 003.
[637] DE 429, dated January 10, 2019.

enforceability of the Settlement Agreement based on the allegation that SAG and SAM had not satisfied certain claims they agreed to resolve.[638]

The Court now directly addresses Defendants' *in pari delicto* defenses.

The Latin phrase *in pari delicto* translates "in equal fault."[639] "The doctrine of *in pari delicto* dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed *in pari delicto*, and the law will aid neither, but rather, will leave them where it finds them."[640] "The defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality"[641] Application of *in pari delicto* is governed by state law.[642] Under Arizona law, "the party more at fault cannot employ the doctrine of *pari delicto* to shield his deliberate invasion of the rights of the [Plaintiff]."[643]

In their *in pari delicto* argument, Defendants contend that the Buyers "compelled" the speed and terms of the Transaction. This argument fails to address *Defendants'* involvement in the Transaction. For this defense to apply, the two parties required to be *in pari delicto* are Debtor and Defendants not Buyers and Debtor. Whether Buyers did, in fact, dictate many of the terms of the Transaction and wanted it to close quickly is irrelevant to determining whether Defendants' were at equal fault for the ultimate consequences of the Transaction.

---

[638] In view of this Court's other findings to the effect that the Settlement and Release Agreement did not release breach of fiduciary duty claims against Moyes and Burdette (See § VII(c)(4) above), this Court need not now determine whether the Settlement and Release Agreement was enforceable due to SAG and SAM allegedly failing to fully resolve the Balkans Claim or any other claims against Swift which SAG and SAM agreed to handle.

[639] *Black's Law Dictionary* 862 (9th ed. 2009). The full Latin phrase is "*in par delicto potior est conditio defendantis*: in a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 303 (1985).

[640] *In re Bill Johnson's Restaurants, Inc.*, 255 F.Supp.3d 927, 934 (D. Ariz. 2017) (quoting *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen, L.L.P.*, 175 F.Supp.2d 1180, 1198 (D. Ariz. 2001)).

[641] *Bateman* at 306.

[642] *In re Tarcynski*, 2015 WL 728410 * 11 (9th Cir. BAP 2015).

[643] *Brand v. Elledge*, 89 Ariz. 200, 205 (1961).

154

1    Moreover, this Court does not accept the contention that the Buyers were driving

2    Swift into the Transaction structure and terms.  Burdette testified that he was acting on

3    behalf of both Swift and SAG throughout the negotiations and that Ehrlich provided legal

4    representation for both Swift and SAG.  This lack of independent representation for parties

5    with disparate interests demonstrates that Burdette and Moyes steered Swift into the

6    Transaction. Swift could not have caused the Transaction to occur without Burdette and

7    Moyes making it happen.  As the court noted in *In re Granite Partners*, "*in pari delicto*

8    does not apply if the third party dominated or controlled the actions of the insider."[644]

9    Moyes and Burdette dominated and controlled Swift.  The Plaintiff (and Swift) cannot be

10   equally responsible for the consequences of a deal it did not itself direct.

11       Finally, as already detailed in great length, the Transaction resulted in Swift losing

12   its 135 Business and over $12 million in receivables. These assets were applied to

13   outstanding liabilities owed to Moyes and Affiliates. Any benefit Swift may have derived

14   from the Transaction paled in comparison to benefits extracted by Moyes and his

15   Affiliates. Swift was not *in pari delicto* with Moyes and Burdette.  The Court wholly

16   rejects Defendant's *in pari delicto* defenses.[645]

17

18            9.    Conclusions Regarding Fiduciary Duty Causes of Action

19       The Trustee has asserted three types of breach of fiduciary duty claims:

20       a.    Misappropriation which is claimed to have caused Swift's damage in the

21   amount of $12,151,238.

22

23

24   [644] *In re Granite Partners, L.P.*, 194 B.R. 318, 331 (Bankr. S.D.N.Y. 1996).

     [645] Bankruptcy Judge Haines suggests yet another basis for not employing the defense of *in pari delicto* to hamstring
25   a bankruptcy trustee.  He cites to cases where the defense was denied once the party who caused the inequitable or
     "unclean" conduct to be replaced by a third party receiver (or bankruptcy trustee).  See *In re Southwest Supermarkets,*
     *LLC*, 325 B.R. 417, 426 n. 31 (Bankr. D.Ariz. 2005).  Because the *in pari delicto* issue is resolved by this Court on
26   other bases, this Court need not decide whether the trustee should not be hampered by the *in pari delicto* defense
     simply because he replaced the party who was *in pari delicto* with Moyes and Burdette.

155

b.      Payment of Personal Debts by Moyes in connection with the Transaction allegedly causing damage to Swift in the amount of $5,242,806.

c.      Stripping assets from Swift by Moyes and Burdette to be then transferred to various Affiliates thereby allegedly causing Swift damages in the amount of $12,151,238.

Arizona Courts addressing breach of fiduciary duty damages would employ the standards set forth in the Restatement of Torts.  Those standards are, in turn, reflected in the RAJI quoted in § VII(C)(1) above.  The types of damages identified in numbers 4 and 5 of this RAJI do not apply in this case.  Plaintiff failed to prove damages reflected by #2 of this RAJI.  This is not surprising in that Swift was losing money before the Transaction.  This was the main reason Moyes and Burdette wanted to sell Swift.  As to #1 of this RAJI, the money lost by Swift by virtue of the Transaction caused by Moyes and Burdette was the amount of the 135 Related Party Receivables transferred to Defendants Moyes, Transjet and the Moyes Trust, i.e. $12,136,669.  Burdette may not have enjoyed the benefit of the Swift property transferred to Moyes, Transjet and the Moyes Trust but he and Moyes caused these transfers to occur and Swift was damaged thereby.  Moyes and Burdette are liable for the amount of $12,136,669.  As to #3 of this RAJI, Moyes and his Affiliates acquired Swift's most valuable assets, the 135 Related Party Receivables.  This left New Swift with virtually no cash flow.  This Court finds it would be unjust for Moyes to retain those receivables.  Again, Moyes is liable for the sum of $12,136,669.

Moyes benefited by having the Briad Receivable and Redeye Receivable applied to Moyes' Redeye Capital Account. As to the SAVM Receivable, Moyes benefited by having the amount due to him under the SAVM Note increased by the amount of the SAVM Receivable. As for the Transjet Receivables, Moyes benefited by his entity

156

Transjet receiving the full value of the Transjet Receivables and then having the Transjet Surplus[646] applied to pay down his claims against Transjet.

In addition to Swift transferring the 135 Related Party Receivables, Swift transferred Swift's 135 Business to SAM. That was a breach of Moyes' and Burdette's fiduciary duty to Swift. The value of the 135 Business, however, was never proven at trial by Plaintiff. Damages will not be awarded on account of Swift's loss of its 135 Business. Moreover, SAM received the 135 Business, not Moyes. Neither Moyes nor Burdette are liable for damages related to breaching their fiduciary duty in Swift transferring the 135 Business to SAM.

The Court hereby rejects Plaintiff's request for damages in an amount measured by liabilities incurred by New Swift and/or the Debtor after the Transaction Date. While it is clear to this Court that the Transaction left New Swift with one hand tied behind its back, New Swift's ultimate slide into bankruptcy was a function of numerous factors attributable to events before the Transaction as well as the Transaction itself and the post-Transaction business decisions of New Swift. The obligations incurred after the Transaction were not created by Moyes or Burdette but, rather, the management team for New Swift and the Debtor. The extent to which New Swift's bankruptcy was proximately caused by the Transaction or by post-Transaction missteps was not proven by Plaintiff nor can the proximate cause or damage amounts be discerned by this Court. Accordingly, no damages will be assessed against Defendants due to events that occurred or debts which were incurred after the Transaction Date.

These damages are awarded on an "alternative" basis meaning that any payment towards the preference damages would result in a corresponding decrease in damages awarded on account of Defendants' breaches of fiduciary duties.

---

[646] $103,126 (i.e. the Transjet Payable of $1,905,794 less the Transjet Receivables of $1,802,668). This is defined as the Transjet Surplus.

The loss of Swift assets helped hasten New Swift's ruin but Plaintiff failed to demonstrate that New Swift's ultimate bankruptcy filing and losses sustained after the Transaction Date were proximately caused by Defendants.

### D. Damages

The Trustee's Complaint enumerates the relief sought in the closing "Prayer For Relief"[647] which "requests the following relief:

     A.    For avoidance of the Subject Transfers pursuant to Code §§ 544, 547, and 548;

     B.    For recovery of the Subject Transfers or their value pursuant to Code § 550;

     C.    For compensatory damages against Moyes, Burdette, SAG and SAVM for breach of fiduciary duty and/or for aiding and abetting a breach of fiduciary duty;

     D.    For punitive damages against Moyes and Burdette based upon their extreme conduct in breaching their fiduciary duties to the Debtor;

     E.    For declaratory relief determining that the Moyes Note and the Related Party Payables do not evidence rights to payment and would have been disallowed, recharacterized and/or subordinated in the Debtor's bankruptcy case;

     F.    For declaratory relief determining that the Transferee Defendants are alter egos of each other, operated as single business enterprise, and are equally liable for any judgment entered against any of them;

     G.    For declaratory relief determining that Moyes and Burdette are liable for any judgment entered against any one of the Transferee Defendants as if the judgement had been entered against Moyes and Burdette directly and personally;

---

[647] DE 94, pp. 25-26, ¶¶ A-H.

1          H.      With respect to all the foregoing, for interest, attorneys' fees, and

2   costs; and

3          I.      Such other relief as the Court deems just and appropriate under the

4   circumstances."

5          As to Prayer for Relief D, the Court on summary judgment[648] denied the Trustee's

6   request for punitive damages finding Trustee had failed to show there were genuine issues

7   of material facts that could support a claim for punitive damages.  Even if the Court

8   mistakenly granted summary judgment on this issue, the facts at trial and the findings made

9   in this Order make clear that the Trustee failed to sustain his burden of entitlement to

10  punitive damages.  The Court finds that neither Moyes nor Burdette acted with an "evil

11  hand guided by an evil mind," as required by Arizona law.[649]  Neither Moyes nor Burdette

12  intended to injure Swift nor did they consciously pursue a course of conduct knowing that

13  it created a substantial risk of significant harm to Swift.[650]  Their conduct was selfish but

14  not outrageous or aggravated.

15         As to Prayer for Relief F, as noted in § VI(a)(6), this Court already determined that

16  he Trustee was precluded from seeking any relief based on theories of alter ego or piercing

17  the corporate veil.[651]

18

19         1.     Preference Damages

20         Plaintiff seeks and this Court hereby awards Plaintiff preferential transfer avoidance

21  damages against the Moyes Trust (the initial transferee) in the aggregate amount of

22  $5,832,426, plus interest The Court also hereby awards preferential transfer avoidance

23  damages against the following transferees:

24  _____

[648] DE 401.

25  [649] *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986).

[650] *Id*.  See also *Linthicum*, 723 P.2d 675, 680 (1986) (for punitive damages to be awarded, an "evil mind" must be
26  accompanied by "aggravated and outrageous conduct.")

[651] DE's 466 and 530.

159

| | |
|---|---|
| Moyes: | $9,744,381,[652] plus interest; |
| Transjet: | $1,802,668,[653] plus interest; |
| SAM: | $5,817,857,[654] plus interest; and |
| Redeye: | $5,228,237,[655] plus interest. |

The Trustee also sought preference damages in connection with the Legacy Claim but the Legacy Claim was dismissed by the Court in its summary judgment reflected in the Legacy Order.[656]

### 2. Fraudulent Transfer Damages

Despite the existence of facts supporting many badges of fraud, this Court finds Defendants did not intentionally hinder, delay or defraud Swift via the Transaction. As to Plaintiff's constructive fraudulent transfer claims, Plaintiff abandoned such claims and/or failed to sustain its burden of proof on such claims. Counts One and Two of Plaintiff's Complaint shall be dismissed with prejudice.

### 3. Breach of Fiduciary Duty Damages

Moyes breached his fiduciary duties to Swift and was enriched in the amount of the 135 Related Party Receivables ($12,136,669) transferred to SAG and then on to Moyes, Transjet and the Moyes Trust. New Swift and Debtor sustained damages in a like amount. Burdette also breached his fiduciary duties to Swift and, while he did not financially benefit from those breaches, he nevertheless caused New Swift and the Debtor to sustain damages in the amount of $12,136,669.

---

[652] The amount of the SAVM Receivable (as the initial transferee) plus the Briad Receivable plus the Redeye Receivable (where Moyes was the immediate or mediate transferee).
[653] Transjet was the initial transferee of the Transjet Receivables.
[654] The amount of the Briad Receivable plus the Redeye Receivable plus the SME Receivable.
[655] The amount of the Briad Receivable plus the Redeye Receivable.
[656] DE 311. See also DE 461.

160

The Court hereby rejects Plaintiff's request for additional damages in an amount measured by liabilities incurred by New Swift and/or the Debtor after the Transaction Date.

4.    Interest on Damage Awards

a.    Interest on Preference Damages

"The award of prejudgment interest in a case under federal law is a matter left to the sound discretion of the trial court. Awards of prejudgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole."[657] Prejudgment interest is an element of compensation, not a penalty.[658] In the case of a preferential transfer recovered by a trustee, interest is computed from the date of demand for its return, or in the absence of such a demand, from the date of the filing of the complaint.[659] The rate of prejudgment interest is determined by the nature of the claims.[660] Generally, the federal interest rate applies in federal question cases, however, courts have the discretion to choose a different rate if "the equities of a particular case demand a different rate."[661]

This Court has seen no pre-litigation demand from the Plaintiff so the Court awards interest from the date the Adversary Proceeding was commenced (June 27, 2014). This Court declines to award prejudgment interest from the date of the Transaction.

The Court finds the equities of this case do not "demand a different rate" from the federal rate. The Court also rejects Plaintiff's invitation to increase the prejudgment interest

---

[657] *In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1994) (citing *Purcell v. United States*, 1 F.3d 932, 942-43 (9th Cir. 1993)).

[658] *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013) (citing *Schneider v. Cnty. of San Diego*, 285 F.3d 784, 789 (9th Cir. 2002)).

[659] *In re Neponset River Paper Co.*, 219 B.R. 918, 921 (Bankr. D. Mass. 1998), *aff'd, In re Neponset River Paper Co.*, 231 B.R. 829 (B.A.P. 1st Cir. 1999).

[660] *Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 961 (9th Cir. 2008).

[661] *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1099 (9th Cir. 2010) (citing *In re Nucorp Energy, Inc.*, 902 F.2d 729, 734 (9th Cir. 1990)).

161

rate. The Court will award prejudgment interest at the federal rate from June 27, 2014 on the principal amount of the preference damages.

The federal rate is found at 28 U.S.C. § 1961(a) which provides:

> …[I]nterest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment…

The weekly average of the 1 year T-bill for the week of March 23, 2020, was 0.17%. This federal rate will be applied to the preference damage and shall run from June 27, 2014, to the date of Judgment and then thereafter at this very same federal interest rate.

### b. Interest on Breach of Fiduciary Duty Damages

The general rule is that state law governs awards of prejudgment interest on damages associated with state law actions.[662] In Arizona, the award of prejudgment interest depends, in part, on whether the claim is liquidated or unliquidated.[663] A claim is liquidated if the plaintiff provides a basis for precisely calculating the amounts owed.[664] On the other hand, an unliquidated claim is one where the amount owed cannot be "definitively fixed from the facts proved…but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or smaller amount should be allowed."[665]

Here, Plaintiff's breach of fiduciary duty claims arise under Arizona law so Arizona law controls the award of prejudgment interest. Plaintiff's breach of fiduciary duty claims were unliquidated claims, therefore, prejudgment interest is prohibited by Arizona statute.

---

[662] *Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 961 (9th Cir. 2008).
[663] A.R.S. § 44-1201(D)(1) ("D. A court shall not award…1. Prejudgment interest for any unliquidated, future, punitive or exemplary damages that are found by the trier of fact.").
[664] *Alta Vista Plaza, Ltd. v. Insulation Specialists Co., Inc.*, 186 Ariz. 81, 82 (App. 1995).
[665] *John C. Lincoln Hosp. and Health Cor. v. Maricopa County*, 208 Ariz. 532, 544 (App. 2004).

162

As to post-judgment interest, it is well settled law that an award of post-judgment interest is procedural in nature and thereby dictated by federal law even if the federal court is making a damage award on a state law cause of action.[666] As stated above, 28 U.S.C. § 1961 is the applicable federal statute. The federal interest rate of 0.17% will be applied to the breach of fiduciary duty damages but shall run from the date of entry of judgment in this Adversary Proceeding.

## VIII. CONCLUSION

In the 3Q2011, at Burdette's recommendation, Moyes agreed Swift needed to be sold or closed. When Buyers contacted Burdette in October 2011 about a possible purchase of Swift's 121 Business, Moyes and Burdette had found the solution Moyes needed. Through the ensuing Transaction, Buyers bought Swift's airline for $100 and Moyes was able to pay off all the debts owed by Swift to Moyes and his Affiliates by transferring to them of all Swift's 135 Related Party Receivables. Moreover, Moyes was able to push Swift's 135 Business to Moyes' newly created entity, SAM.

Swift was insolvent on the Transaction Date. This Transaction left New Swift incapable of servicing its liabilities, absent the injection of millions of dollars of new capital. Moyes and Burdette knew this and yet failed to insist that the Buyers obtain the crucial financing prior to closing. Furthermore, Moyes and Burdette failed to gain from Buyers any form of guaranty or other assurances that the obligations New Swift was taking on as a part of the Transaction, notwithstanding Buyers' apparent willingness to guaranty the Transportation Taxes and perhaps other 121 Business liabilities. Moyes and Burdette also never insisted that New Swift be combined with Direct Air so as to ensure New

---

[666] *In re Cardelucci*, 285 F.3d 1231, 1235 (9th Cir. 2002) (citing *Northrp Corp. v. Triad Int'l Mktg.*, S.A., 842 F.2d 1154, 1155 (9th Cir. 1988).

Swift's business would realize the synergies which Burdette thought would aid New Swift's survival where old Swift was failing.

Through the Transaction, Burdette accomplished what best served Moyes while disregarding what best served Swift. In doing so, he served the wrong master. For his part, Moyes was too busy to pay attention. Rather, Moyes simply approved the Transaction negotiated by Burdette and documented by his long-time lawyer, Ehrlich. Again, all this occurred at a time when Swift was insolvent. In looking out for Moyes' interests alone, Burdette and Moyes enabled Buyers to make a risk-free and cost-free gamble in their acquisition of Swift's 121 Business. To suggest that the Buyers were arms-length, well lawyered and with no compulsion to enter into the Transaction does not excuse Burdette or Moyes from their breaches of their fiduciary duties to Swift.

Moyes is liable for the damage he caused New Swift and Debtor as well as the benefit he extracted from his breach of his fiduciary duties to Swift. That amount totals $12,136,669. This amount would be unjust for Moyes to retain. This unjust asset transfer for Moyes' benefit will not be reduced by the amount of 135 Related Party Payables which Moyes Affiliates agreed to cover because those obligations to Moyes and his Affiliates were part and parcel of the 135 Business which SAM received. SAM agreed to assume the 135 Related Party Payables[667] but otherwise paid no consideration for transference of Swift's 135 Business to SAM. Moyes and Burdette, on the other hand, did not agree to assume, guaranty or otherwise handle the 135 Related Party Payables and, therefore, may not reduce their breach of fiduciary duty damages by the amount of these debts assumed by SAM.

Burdette also breached his fiduciary duties to Swift but extracted no benefit to himself. Rather, Burdette damaged Swift by orchestrating the transfer of the 135 Related Party Receivables to Moyes, the Moyes Trust and Transjet and transferring the 135

---

[667] See Ex. 001, Purchase Agreement at § 2.4(b).

Business to SAM. He did so out of loyalty to Moyes but caused terrible harm to the entity to which he owed fiduciary duties. This Court finds the measure of damages caused by Burdette total $12,136,669. Judgment will be awarded on Plaintiff's breach of fiduciary duty claims against Moyes and Burdette as follows:

> Moyes - $12,136,669, plus interest from the entry of Judgment at the federal rate, until paid; and

> Burdette - $12,136,669, plus interest from the entry of Judgment at the federal rate, until paid.

In addition to breaching their fiduciary duties to Swift, the Transaction orchestrated by Moyes and Burdette resulted in preferential transfers avoidable under § 547 as well as transfers avoidable under § 550. Judgment will be awarded against the following Defendants in the following amounts:

> Moyes Trust - $5,817,857, plus interest at the federal rate from June 27, 2014, until paid;

> Transjet - $1,802,668, plus interest at the federal rate from June 27, 2014, until paid;

> Moyes - $9,744,381, plus interest at the federal rate from June 27, 2014, until paid;

> SAM - $5,817,857, plus interest at the federal rate from June 27, 2014, until paid; and

> Redeye - $5,228,237, plus interest at the federal rate from June 27, 2014, until paid.

Because this Court finds Plaintiff failed to prove its claims for fraudulent transfers, Counts One and Two are hereby dismissed with prejudice. Further, since the Complaint seeks no relief against Briad, Briad is hereby dismissed as a party defendant, with prejudice. Vickie Moyes is a named defendant "because of her marital relationship with

Moyes."[668]   The Court finds Vickie Moyes is not liable solely or separately for any amounts in this Order.   Rather, it is Moyes and the Moyeses' marital community which are liable.

Wherefore, based on the foregoing

**IT IS ORDERED** directing counsel for the Trustee to prepare and lodge with this Court a form of judgment consistent with this Order.

**DATED AND SIGNED ABOVE.**

COPY of the foregoing mailed by the BNC and/or
sent by auto-generated mail to interested parties.

---

[668] Complaint, ¶ 8.